UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE GREENSKY SECURITIES LITIGATION

No. 1:18-cv-11071(PAE)

---

**GREENSKY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

## Table of Contents

Table of Authorities ............................................................................................................. ii

Preliminary Statement .......................................................................................................... 1

Statement of Relevant Facts................................................................................................. 3

    A.    GreenSky............................................................................................................ 3

    B.    The May 2018 IPO and GreenSky's Revenue Model ............................................ 4

    C.    Disclosures Following the IPO ............................................................................ 7

    D.    Plaintiffs File Suit in Response to the Earnings Miss ............................................ 9

Argument ........................................................................................................................... 10

I.    The Section 11 Claims Should Be Dismissed.................................................................... 10

    A.    Defendants Had No Duty To Disclose the Allegedly Omitted Information.......... 12

    B.    The Alleged Omissions Were Fully Disclosed..................................................... 16

    C.    The Alleged Omissions Were Not Material......................................................... 18

    D.    Plaintiffs Fail To Plead Any Actionable Misstatements....................................... 19

    E.    Plaintiffs' Red Herring Allegations Are Irrelevant to the Section 11 Claims. ...... 23

II.    The Section 12(a)(2) Claims Should Be Dismissed. ......................................................... 23

    A.    The Section 12 Claims Should Be Dismissed for All the Same Reasons as the Section 11 Claims. ................................................................................................ 24

    B.    Plaintiffs Fail To Plead that They Purchased GreenSky Shares in the IPO.......... 24

III.    The Section 15 Claims Should Be Dismissed................................................................... 25

Conclusion ......................................................................................................................... 25

## Table of Authorities

**Page(s)**

**Cases**

*In re Am. Realty Cap. Props., Inc., Litig.*,
  No. 15-mc-40(AKH), 2015 WL 6869337 (S.D.N.Y. Nov. 6, 2015) ......................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................................10

*Axar Master Fund, Ltd. v. Bedford*,
  308 F. Supp. 3d 743 (S.D.N.Y. 2018) ...............................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................................10

*Billhofer v. Flamel Techs., S.A.*,
  No. 07 Civ. 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ...........................................20

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
  No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...........................................13

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ..........................................................................................20

*In re China Valves Tech. Sec. Litig.*,
  979 F. Supp. 2d 395 (S.D.N.Y. 2013) ...............................................................................20

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ...............................................................................20

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  928 F. Supp. 2d 705 (S.D.N.Y. 2013) ...............................................................................24

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005) ...........................................................................24, 25

*In re Duane Reade Inc. Sec. Litig.*,
  No. 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) .............................22

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...........................................................................................20, 25

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) ...............................................................................................13

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010) ...............................................................................19

*Lopez v. CTPartners Exec Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016)........................................................22

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)...........................................................11, 12, 23, 24

*N.J. Carpenters Health Fund v. DLJ Mortgage Cap. Inc.*,
    No. 08 Civ. 5653(PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ................................25

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
    No. 08 Civ. 9203(RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ...................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)........................................................16, 21

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)...........................................................11, 17, 18

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
    135 F. Supp. 3d 145 (S.D.N.Y. 2015)........................................................15

*In re ProShares Trust Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)........................................................12

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)........................................................12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...........................................................12, 20, 21

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015).........................................................3, 10, 12, 21

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014)........................................................11

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)...........................................................17, 18

*Stadnick v. Vivint Solar, Inc.*,
    Nos. 14 Civ. 9283, 14 Civ. 9709, 2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015) ...........................................................13

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)........................................................21

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)........................................................12

*Vaccaro v. New Source Energy Partners L.P.*,
  No. 15 Civ. 8954(KMW), 2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016).............................23

*White v. Melton*,
  757 F. Supp. 267 (S.D.N.Y. 1991) ...........................................................................................11

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005).....................................................................................................24

**Statutes & Rules**

17 C.F.R. § 229.303 ......................................................................................................................13

17 C.F.R. § 229.503 ................................................................................................................14, 15

15 U.S.C. § 77k ............................................................................................................................11

15 U.S.C. § 77*l*.......................................................................................................................11, 23

15 U.S.C. § 77o ...........................................................................................................................25

15 U.S.C. § 78u-4(b)(1) ....................................................................................................11, 19, 20

**Preliminary Statement**

Defendant GreenSky, Inc. ("GreenSky" or the "Company") is a financial technology company that "powers commerce at the point of sale" by enabling merchants across a range of industries to connect customers with banks to obtain consumer loans. Through GreenSky's proprietary technology, merchants, consumers and banks are better able to achieve their goals—for merchants, the ability to close more transactions; for consumers, the ability to obtain instantaneous, low-interest credit; and for banks, the ability to generate a nationwide portfolio of high-quality consumer loans. For GreenSky, this ecosystem creates a strong, recurring revenue model in the form of up-front transaction fees from merchants plus ongoing servicing fees and incentive payments from banks.

In May 2018, GreenSky offered Class A shares of common stock to investors through an initial public offering ("IPO"). Six months later, in November 2018, GreenSky's stock price fell when the Company publicly revised its fiscal year 2018 earnings guidance. Relying on hindsight and a fundamental misunderstanding of GreenSky's business, Plaintiffs—a putative class of shareholders who purchased Class A shares—have asserted claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933 ("Securities Act") hoping to pin that decline on supposed misstatements and omissions in GreenSky's Offering Documents. Those claims are deficient and should be dismissed.

Plaintiffs' core allegation is that GreenSky did not tell IPO investors that: (1) solar panel merchants generally paid GreenSky higher transaction fee rates (*i.e.*, the average transaction fee that merchants pay to the Company, as a proportion of the total loan amount) than merchants in other sectors; and thus (2) when GreenSky allegedly shifted its business away from solar panel merchants to elective healthcare providers, GreenSky's "overall transaction fee rates" could decrease. (Compl. ¶¶ 5, 52, 53, 70, 74.) That information was not required to be disclosed

and, in any event, *was* disclosed.  In the Offering Documents, GreenSky *disclosed* that it had actively reduced its presence in the residential solar panel industry, *disclosed* that the elective healthcare industry came with risks, and *disclosed* that its transaction fee rate had decreased steadily and substantially by the time of the IPO.  Recognizing this, Plaintiffs rest their complaint on the revelation—many months *after* the IPO—that GreenSky's solar transactions had declined more than Defendants reasonably anticipated at the time of the IPO.  Pleading by hindsight, however, is not a legitimate theory of liability under Section 11 of the Securities Act.  And in any event, the post-IPO report on which Plaintiffs rely reveals that GreenSky's transaction fee rate actually *increased* from the rate disclosed before the IPO.  *See infra* Sections I.A-I.C.

In addition to this manufactured omission, Plaintiffs allege that Defendants made affirmative misrepresentations about the current and future strength and prospects of the Company.  Those too must fail because statements of puffery, opinion and accurate statements of historical performance are inactionable as a matter of law.  *See infra* Section I.D.

Plaintiffs' remaining claims also fail.  In addition to the reasons above, the Section 12(a)(2) claims must be dismissed because the Consolidated Amended Class Action Complaint (Dkt. 85) ("Complaint") does not allege that Plaintiffs purchased shares in the GreenSky IPO—instead, Plaintiffs say they bought "shares pursuant *and/or traceable to*" the IPO.  Courts routinely reject Section 12(a)(2) claims pleaded on that basis.  *See infra* Section II.  And the Section 15 claims must be dismissed because Plaintiffs do not adequately plead a primary violation of Sections 11 or 12(a)(2).  *See infra* Section III.

**Statement of Relevant Facts[1]**

**A.      GreenSky**

GreenSky is a financial technology company that operates a consumer lending platform.  Merchants who sign up with GreenSky can introduce their customers to the platform, which streamlines consumer loan applications with banks.  (Compl. ¶ 43.)  GreenSky's technology supports the full lifecycle of a loan and delivers stability, speed, scalability and security:



Source:  Ex. D at 4 (Prospectus ("P") excerpts).[2]

Merchants use GreenSky's platform to increase sales volume by facilitating low or deferred-interest financing; consumers use the platform to apply for and secure immediate financing at the point of sale; and banks use the platform to build a diversified, nationwide portfolio of high-quality consumer loans.  (P 1.)  GreenSky markets its platform to merchants in

---

[1] Upon a motion to dismiss, well-pleaded allegations are presumed true, but the Court need not credit conclusory allegations.  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 517 n.1 (S.D.N.Y. 2015) (Engelmayer, J.).  In addition to the complaint itself, a court may consider all documents referenced therein.  *Id.*

[2] Exhibits cited herein are attached to the accompanying Declaration of Karin A. DeMasi.

a range of industries, in particular for home improvement projects and elective healthcare.
(P 1-2.)

GreenSky earns revenue from transaction fees paid by merchants and servicing fees and incentive fees paid by bank partners.[3]  (P 2, 85.)  Each of GreenSky's revenue streams depends on a complex combination of factors.  As the Offering Documents disclosed, GreenSky's transaction fee revenue is a product of many variables, including transaction volume, the number of active merchants, the number of consumer accounts, the size of the loan portfolio and the fee earned per dollar originated.  (P 2, 7-8, 86-90.)

**B.      The May 2018 IPO and GreenSky's Revenue Model**

In May 2018, GreenSky effected its initial public offering pursuant to a Registration Statement, after two amendments, and a final Prospectus (together, the "Offering Documents").[4]  (Compl. ¶ 51.)  In the Offering Documents, GreenSky identified its "existing markets" as "home improvement and elective healthcare," observing that those markets "are sizeable and growing," and that the Company "[is] well-positioned to increase volume in the growing elective healthcare industry vertical."[5]  (P 3, 114-15.)  At the same time, GreenSky "ma[d]e no assurance that we will achieve similar levels of success, if any, in this industry vertical."  (P 38-39.)  The Offering Documents also expressly stated that the Company had "actively reduced our transaction volume with [solar panel] merchants in 2017."  (P 7, 118.)

---

[3] Incentive payments are sometimes referred to as performance fees.

[4] In this memorandum, "Registration Statement" refers to the registration statement, as amended, filed May 14, 2018 (Ex. B), and "Prospectus" refers to the prospectus filed May 25, 2018 (Ex. C).  The Complaint cites statements that appear in both the Registration Statement and Prospectus.  For ease of reference, page citations in this memorandum refer to the Prospectus, excerpted in Ex. D.

[5] A "vertical" refers to a particular industry.  For example, "the elective healthcare industry vertical" refers to GreenSky's involvement with healthcare providers who perform elective procedures for patients.  (P 86.)

This shift was intentional and was done because GreenSky management was "concerned about the level of consumer satisfaction [with solar] and . . . the value proposition in that vertical." (Compl. ¶ 95.)

The Offering Documents also informed investors how GreenSky earns revenue and the impact of "transaction volume" (*i.e.*, the overall dollar value of loans in a given period) and transaction fee rate (*i.e.*, the average transaction fee that merchants pay to the Company, as a proportion of total loan amounts) on that revenue. As GreenSky explained: "We derive most of our revenue and profitability from upfront transaction fees that merchants pay us every time they facilitate a transaction using our platform." (P 2.) GreenSky further disclosed that transaction fees paid by merchants—which made up 86% of GreenSky revenue in 2017—are a product of "merchant transaction volume" and the "transaction fee rate," and that "profitability is strongly correlated with merchant transaction volume." (P 2, 83.) The other components of GreenSky's fees—servicing fees and incentive payments—are paid by the Company's banking partners over the life of the loan. (P 6, 85.)

Although the Complaint conflates the terms "transaction fee rate," "transaction volume" and "transaction fees," these concepts, though related, are distinct metrics in GreenSky's revenue model.[6] **Transaction fee rate** is the average up-front fee paid, as a percentage, on each loan made by the banks (P 2, 7-8), while **transaction volume** refers to the overall dollar amount of such loans (P 2, 84). **Transaction fees**—the component of GreenSky's revenue—are the product of the transaction fee rate and transaction volume (P 90-94):

---

[6] For example, Plaintiffs allege that, because a "substantial majority of [GreenSky's] total revenue is generated from the transaction fees," then "decisions, trends, and risks affecting GreenSky's average transaction fee rate are of great importance to investors." (Compl. ¶ 104.) In fact, as GreenSky disclosed, revenue and profitability are driven by *transaction volume*—not transaction fee rate. (*See, e.g.*, P 2, 8, 83.)

**Transaction Fees = Transaction Fee Rate x Transaction Volume**

Because of its recurring revenue model, GreenSky's total transaction fees can grow on a high transaction volume even where the average transaction fee rate decreases. Indeed, that is precisely what happened in 2017, the year before the IPO.  As disclosed in the Offering Documents, in 2017—the year when GreenSky allegedly began to expand healthcare and actively reduce solar—GreenSky's total transaction fee revenue *increased*, even though its transaction fee rate *decreased* substantially.  (¶ 94.)  In fact, GreenSky's transaction fee rate had declined steadily from 2016 until the May 2018 IPO, and then, as set forth in post-IPO filings, increased in the several quarters following the IPO:

| Date | Transaction Fee Rate | Source |
|------|:--------------------:|:------:|
| FY 2016 | 7.93% | ¶ 94 |
| FY 2017 | 7.40% | ¶ 94 |
| 1Q 2018 | 6.87% | ¶ 90 |
| IPO—May 2018 | | |
| 2Q 2018 | 6.84% | Aug. 2018 10-Q |
| 3Q 2018 | 6.91% | Nov. 2018 10-Q |
| 4Q 2018 | 7.11% | Mar. 2019 10-K |



Thus, investors knew from the Offering Documents themselves that the transaction fee rate had steadily declined in the two years immediately preceding the IPO.

GreenSky also disclosed that it faced a range of significant business risks that could affect its future revenue and profitability.  Those risks included changes in market conditions (P 59), errors in underlying assumptions (P 37) and changes in demand or growth in elective healthcare and other new lines of business for which GreenSky "ma[d]e no assurance that we will be able to accurately forecast demand (or the lack thereof)."  (P 39.)

### C.   Disclosures Following the IPO

On August 7, 2018, GreenSky reported its earnings for the second quarter of fiscal year 2018.  (Compl. ¶¶ 77-78.)  Among other things, GreenSky disclosed a 6.84% transaction fee rate, in line with the declining rate of 6.87% disclosed in the Offering Documents for the first quarter of fiscal year 2018.  (Compl. ¶¶ 56, 80.)  GreenSky noted in its August 7, 2018 earnings call that the slight, 0.03% reduction in its transaction fee rate from the first quarter was "nothing unusual" and that it believed the "mix shift . . . doesn't impact profitability *as our economics are derived by a combination of transaction fee and the performance fee that banks pay us over time.*"  (Ex. E at 8-9 (8/7/2018 Earnings Call) (cited at Compl. ¶ 79) (emphasis added).)

On November 6, 2018, GreenSky reported for the third quarter of 2018 an *increase* in its transaction fee rate, to 6.91%—*above* what GreenSky had disclosed in the Offering Documents for the three-month period immediately preceding the IPO (*i.e.*, the first fiscal quarter of 2018).  (Compl. ¶ 90.)  Despite the higher transaction fee rate, GreenSky also announced that it expected its earnings for fiscal year 2018 to fall short of its previously issued guidance.  (*Id.* ¶ 93.)  On this news, its stock price declined.  (*Id.* ¶ 118.)  In addressing "what changed," GreenSky's Chairman and CEO David Zalik explained that two unanticipated market

forces in the third quarter of 2018 contributed to the decline:  (1) solar loans as a percentage of GreenSky's overall business had decreased more than the Company anticipated (declining to below 4%, when the Company had expected it to stabilize at 8%); and (2) merchants passed on rate increases to the consumer, which resulted in lower-than-expected upfront fees (but which did not adversely affect the lifetime profitability of the loan—*i.e.*, the revenue was recognized in future periods).[7]  (Ex. H at 5 (11/12/2018 Conf.) (cited at Compl. ¶ 91); Ex. F at 8, 11-12 (11/6/2018 Earnings Call) (cited at Compl. ¶¶ 85-86, 113-16).)  GreenSky stated on its third-quarter earnings call that it was "encouraged . . . our transaction fee percentage this quarter [6.91%] was up 7 basis points over the second quarter," noting it "expect[s] that we have passed the point of inflection as the decline in the transaction fee rate attributable to solar merchants has run its course."  (Ex. F at 4-5.)

On March 15, 2019, in its Form 10-K for fiscal year 2018, GreenSky disclosed that its transaction fee rate had *increased again* from the previous quarter, up to 7.11% for the fourth quarter of 2018.  (Compl. ¶ 100.)  GreenSky also explained that its total transaction volume and revenue increased year-over-year from 2017 to 2018.  (*Id.*)  GreenSky noted that its transaction fee rate had decreased from fiscal year 2017 to fiscal year 2018—but the fiscal year 2018 level (6.94% ) was *higher* than the rate for the first quarter of 2018 (6.87%) that GreenSky disclosed in the Offering Documents.  (*Id.*; P 90.)

---

[7] GreenSky and analysts cited by Plaintiffs attributed the guidance miss to a variety of factors, including lower volume growth, bank partner incentives and higher expenses.  (Ex. F at 6-8, 10.)  As CFO Robert Partlow explained on GreenSky's third-quarter earnings call, the "key variable impacting our updated guidance" had nothing to do with solar:  it was "our expectation that merchants will continue to select higher [consumer] rate loan products" that have lower transaction fee rates "as we change pricing to reflect the rising rate environment."  (*Id.* at 8.)  Notably, "the lifetime profitability on every dollar is stable, but those dollars are pushed into the future."  (*Id.* at 12.)

**D.      Plaintiffs File Suit in Response to the Earnings Miss**

On November 27, 2018, and January 4, 2019, separate putative class action complaints were filed in this Court, alleging that the Defendants made misstatements and omissions in the Offering Documents in violation of the Securities Act.  After the cases were consolidated (ECF No. 76), Plaintiffs filed the operative Complaint on May 20, 2019.[8]

Plaintiffs are a putative class of purchasers of GreenSky common stock who allege that:  (1) GreenSky, certain of its officers and directors (the "Individual Defendants," together with GreenSky, the "GreenSky Defendants")[9] and the underwriters of its IPO (the "Underwriter Defendants")[10] violated Section 11 of the Securities Act (Compl. ¶¶ 150-64); (2) GreenSky and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act (*id.* ¶¶ 165-74); and (3) the Individual Defendants are liable as control persons under Section 15 of the Securities Act (*id.* ¶¶ 175-84).

Plaintiffs allege that "the Offering Documents fail to disclose the diminution in transaction-fee revenue due to the substantial change in the composition of GreenSky's merchant

---

[8] A virtually identical complaint on behalf of an identical putative class is pending in New York State Supreme Court, Commercial Division, before the Honorable Jennifer A. Schechter.  *See* Class Action Consolidated Complaint, *In re GreenSky, Inc. Sec. Litig.*, No. 655626/2018 (N.Y. Sup. Ct. Mar. 25, 2019) (Dkt. 37).  To avoid duplication and to conserve judicial resources, Defendants have moved to stay the state court action.  *See* Defendants' Memorandum of Law in Support of Their Motion to Stay the Proceedings or, in the Alternative, Discovery, *In re GreenSky, Inc. Sec. Litig.*, No. 655626/2018 (N.Y. Sup. Ct. Apr. 26, 2019) (Dkt. 52).

[9] The Individual Defendants are GreenSky's Chairman and Chief Executive Officer David Zalik, Chief Financial Officer Robert Partlow and directors Joel Babbit, Gerald Benjamin, John Flynn, Gregg Freishtat, Nigel Morris and Robert Sheft.

[10] The Underwriter Defendants are Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, SunTrust Robinson Humphrey, Inc., Raymond James & Associates, Inc., Sandler O'Neill & Partners, L.P., Fifth Third Securities, Inc. and Guggenheim Securities, LLC.

business mix, and the associated risks for the Company's revenue, profitability, and EBITDA."
(*Id.* ¶ 52.)  In particular, Plaintiffs allege three types of omissions or misrepresentations:  (1) "the
Offering Documents fail to disclose the outsized role that solar transaction fee rates played on
overall transaction fee rates, due to the significantly higher transaction fee rate for solar
business" (*id.* ¶ 53); (2) "the Prospectus makes numerous references to the Company's expansion
into elective healthcare, misleadingly presenting that change as a growth opportunity" (*id.* ¶ 70);
and (3) "the Prospectus fails to disclose that certain risks about which they warned had already
come to fruition" because "GreenSky had already begun aggressively terminating its solar panel
merchants as early as 2016, and had already lost the vast majority of its solar panel merchants,
and the infrastructure to support its solar business, by the time of the IPO" (*id.* ¶¶ 74-75).  For
the Court's convenience, each of the statements that Plaintiffs allege to be false or misleading is
reproduced in full in Exhibit A of the DeMasi Declaration.

<u>Argument</u>

## I.      THE SECTION 11 CLAIMS SHOULD BE DISMISSED.

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead
enough facts to state a claim to relief that is plausible on its face."  *In re Sanofi Sec. Litig.*, 87
F. Supp. 3d 510, 525 (S.D.N.Y. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007)).  "A claim will only have facial plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A complaint is properly
dismissed, where, as a matter of law, the allegations in a complaint, however true, could not raise
a claim of entitlement to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 558).  "Although the court
must accept as true all well-pled factual allegations in the complaint and draw all reasonable
inferences in the plaintiff's favor, that tenet 'is inapplicable to legal conclusions.'"  *Id.* at 525-26

(quoting *Iqbal*, 556 U.S. at 678) (citation omitted).  In addition, under the Private Securities

Litigation Reform Act ("PSLRA"), any complaint that alleges a misrepresentation or omission

must "specify each statement alleged to have been misleading [and] the reason or reasons why

the statement is misleading."  *Id.* at 526 (quoting 15 U.S.C. § 78u-4(b)(1)).

>        To state a claim under Section 11 of the Securities Act, a plaintiff must plead that

(1) it purchased a registered security; (2) the defendant participated in the offering; and (3) the

registration statement contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements therein not

misleading.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).

To plead a claim based on a material omission, a plaintiff must allege that the defendants had a

duty to disclose the omitted information, either because of an affirmative legal obligation or

because disclosure was necessary to prevent existing disclosures from being misleading.  *See id.*

(citing 15 U.S.C. §§ 77k(a), 77*l*(a)(2)).

>        To create liability under the securities laws, any alleged omission must have been

known to defendants but not disclosed to investors—that is, there is no liability if the allegedly

omitted information in fact was disclosed.  *See, e.g.*, *White v. Melton*, 757 F. Supp. 267, 272

(S.D.N.Y. 1991).  Further, pleading omissions based on hindsight is insufficient:  plaintiffs must

"plead facts to demonstrate that allegedly omitted facts both existed, and were known or

knowable, *at the time of the offering*."  *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 393-94

(S.D.N.Y. 2014) (emphasis added) (citation omitted); *see also Panther Partners, Inc. v. Ikanos*

*Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("[C]ourts may not employ 20/20

hindsight; instead, they must consider whether the misrepresentation or omission was material on

the date the prospectus or registration statement was issued." (citation omitted)).

Moreover, there is no "generalized duty requiring defendants to disclose the entire corpus of their knowledge." *In re Morgan Stanley*, 592 F.3d at 366. Rather, defendants are required only to disclose material information, *i.e.*, information that "would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information already made available." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (citation omitted); *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976) (corporations are not required to disclose *any* fact that a reasonable shareholder *might* consider important as such a standard could "bury the shareholders in an avalanche of trivial information"). Indeed, "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). "The materiality hurdle is, therefore, 'a meaningful pleading obstacle.'" *In re Sanofi*, 87 F. Supp. 3d at 528 (citation omitted). Courts review "allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted).

Based on these well-established standards, Plaintiffs have failed to allege any actionable misstatements or omissions in the Offering Documents.

### A.     Defendants Had No Duty To Disclose the Allegedly Omitted Information.

Plaintiffs' allegations about false or misleading statements (Compl. ¶¶ 51-76) boil down to the assertion that "the Offering Documents fail to disclose the diminution in transaction-fee revenue ***due to*** the substantial change in the composition of GreenSky's merchant business mix" (*id.* ¶ 52 (emphasis added)). In other words, Plaintiffs say, GreenSky disclosed that its mix was changing, and disclosed that its transaction fee rate had declined, but did *not* adequately disclose that the former caused the latter. Plaintiffs assert that GreenSky was obligated to disclose this information because (1) SEC regulations require such disclosure and (2) this

information was necessary to make other statements not misleading.  They are wrong on both counts.

1.    Defendants Had No Duty To Disclose Under SEC Regulations.

Plaintiffs claim that Defendants had an affirmative duty to disclose the omitted information under Items 303 and 503 of SEC Regulation S-K.  (Compl. ¶¶ 122-34.)  Under Item 303, a registrant must "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . unfavorable impact."  17 C.F.R. § 229.303(a)(3)(ii).  To trigger a duty to disclose, a trend must have been "both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484-85 (2d Cir. 2011) (citation omitted).  A trend must reflect "persistent" conditions that would cause reported financial results to no longer indicate the company's future financial condition.  *See Stadnick v. Vivint Solar, Inc.*, Nos. 14 Civ. 9283(KBF), 14 Civ. 9709(KBF), 2015 WL 8492757, at *13 (S.D.N.Y. Dec. 10, 2015).  Isolated incidents or short-term declines do not constitute a "trend."  *See In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203(RJS), 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010).  As for knowledge, a plaintiff must plead "with some specificity, facts establishing that the defendant had *actual knowledge* of the purported trend" before filing.  *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) (emphasis added).  "It is not enough that [the registrant] *should have known* of the existing trend, event, or uncertainty."  *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758 n.90 (S.D.N.Y. 2018) (emphasis added) (citation omitted).

Plaintiffs claim GreenSky should have disclosed that when it "aggressively reduced its solar business and instead expanded into elective health care—a lower-fee business—

13

it was reasonably likely that GreenSky would be unable to keep up the same rates of growth in revenue and EBITDA."  (Compl. ¶ 128.)  But the Complaint itself reveals that there was no material undisclosed trend.  GreenSky's overall transaction fee rate remained steady in 2018: 6.87% in the first quarter (P 90); 6.84% in the second quarter (Compl. ¶ 80); and actually increased to 6.91% in the third quarter (*id.* ¶ 90), which belies any "trend or uncertainty" at all.

Nor did management expect any undisclosed changes in GreenSky's business mix or transaction fee rates.  In November 2018, for instance, GreenSky's CEO stated at an earnings conference that "fundamentally, we thought that our average take rate [transaction fee rate] was going to be the same as our take rate in 2017."  (*Id.* ¶ 91.)  Although GreenSky "thought solar would come down" it "did not think it would come down as far as it did."  (*Id.*)  That unexpected development, not known until months after the IPO, "change[d] the average take rate in 2018."  (*Id.*)  Similarly, GreenSky's Chief Administrative Officer told analysts at another November 2018 conference that "[w]e expected [the solar] business to go down from . . . 20% to about 8%" of GreenSky's annual loan volume, but "[i]t actually went down a little quicker than expected and actually dropped below 5% to 4%."  (*Id.* ¶ 95.)  "[T]hat delta, watching the solar business drop a little quicker than we thought, really gave rise to the shortfall" in GreenSky's transaction fee rate.[11]  (*Id.*)

Similarly, Item 503 requires registrants to include in their offering materials "where appropriate . . . a discussion of the most significant factors that make the offering

---

[11] For this reason, Plaintiffs have no claim based on their allegation that post-IPO statements indicate Defendants knew before the IPO "that the decision to reduce GreenSky's solar business was reasonably likely to negatively affect GreenSky's average transaction fee rate."  (Compl. ¶ 124.)  As the post-IPO statements make clear, GreenSky management did not expect any decrease in transaction fees *beyond the decrease that GreenSky already disclosed in the Offering Documents*.  (*Id.* ¶¶ 125-28.)  It is clear from the Complaint and the documents it cites that post-IPO guidance revisions stemmed from developments that were unknown and unexpected at the time of the IPO.

speculative or risky."  17 C.F.R. § 229.503(c).  Item 503 claims typically are "derivative" of Item 303 claims, and courts dismiss them together.  *See, e.g.*, *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 154 (S.D.N.Y. 2015).  Plaintiffs' Item 503 claim fails for the same reason as their Item 303 claim:  Plaintiffs have not adequately pleaded that Defendants failed to disclose any "of the most significant factors" that its management knew made the offering "speculative or risky."

      2.    <u>Disclosure of the Alleged Omissions Was Not Necessary To Prevent Existing Statements in the Offering Documents from Being Misleading.</u>

Plaintiffs also claim that Defendants had a duty to disclose the impact of the shift in business mix in order to render two types of statements in the Offering Documents not misleading.  *First*, Plaintiffs assert that statements that the mix shift presented "significant growth opportunities" and that discussed a reduction in solar in the context of GreenSky's growth strategy were misleading without an accompanying disclosure that the shift was reducing transaction fee rates.  (Compl. ¶¶ 54-55, 68-75.)  That is wrong.  As the Offering Documents make clear, the shift in business mix created a growth opportunity for reasons having nothing to do with transaction fee rates, including:  creditworthy consumers who tend to make large-ticket purchases (P 3, 9, 115); increased spending in the healthcare industry (*see* P 114-15); and massive potential transaction *volume* (P 3, 115).  The shift presented an opportunity to access new transaction *volume*, regardless of transaction *fee rates*.  Again, Plaintiffs confuse the distinction.

    *Second*, Plaintiffs point to statements that GreenSky had a "strong and recurring" revenue model and derived "a substantial majority of revenue and profitability from upfront transaction fees."  (Compl. ¶¶ 56-67, 72-73.)  But those entirely true statements merely describe GreenSky's overall prospects.  Even if true, the fact that GreenSky's shift away from solar could

reduce transaction fee rates *does not conflict* with the Company's statements about the strength

of a revenue model built on many components, with transaction *volume* as the critical driver of

revenue. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135

S. Ct. 1318, 1328-29 (2015) (requiring particularized allegations that the omitted information

"conflict[s] with what a reasonable investor would take from the statement itself").

### B.     The Alleged Omissions Were Fully Disclosed.

Even if there had been a duty to disclose (and there was not), Plaintiffs' claims

based on omissions about the reduced solar business, increased healthcare business and alleged

negative effects on GreenSky's transaction fee rate (Compl. ¶¶ 54-75) would still fail because

Defendants *fully disclosed* the information available at the time of the IPO.  The Offering

Documents disclosed that GreenSky had "actively reduced" its position in solar (P 7, 118) and

that the Company's transaction fee rate had decreased and was continuing to decrease (P 90-94).

The Offering Documents also explained that GreenSky's estimates of future performance

depended on assumptions that could later prove to be wrong (P 37) and that adverse market

conditions could significantly decrease the price of GreenSky's shares after the IPO (P 56-57).

IPO investors therefore knew or should have known everything that Plaintiffs allege was

omitted:  that GreenSky's business mix was shifting away from solar and that its transaction fee

rate had fallen (P 7, 90-94, 118); and that reduced transaction fee rates might mean less earnings

for its shareholders (P 2, 7, 8, 90-94).

In fact, the Offering Documents contained specific, up-to-date disclosures of

known transaction fee rate data as of the time of the IPO.  The Offering Documents disclosed

that GreenSky's transaction fee rate fell by 53 basis points (from 7.93% to 7.40%) from 2016 to

2017, and *another* 53 basis points (to 6.87%) for the first quarter of 2018.  (P 6, 58.)  On

November 6, 2018, when GreenSky revised its fiscal year 2018 guidance and its stock price

bottomed out (Compl. ¶ 118), GreenSky announced a 6.91% transaction fee rate, which was *higher*—*i.e.*, more favorable for GreenSky and its shareholders, according to Plaintiffs—than the rate disclosed in the Offering Documents for the first quarter of 2018.  And in the fourth quarter of 2018, the transaction fee rate increased again, to 7.11%.  (*Id.* ¶ 100.)  Because post-IPO transaction fee rates were entirely "consistent with" historical rates that GreenSky disclosed before the IPO, GreenSky provided "ample warnings and disclosures" and made no actionable omissions.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38-39 (2d Cir. 2017) (dismissing Section 11 claim because omitted information about a company's revenue and income was consistent with disclosed historical fluctuations).  Recognizing that this information was fully disclosed at the time of the IPO, Plaintiffs point instead to information about solar business that came many months *after* the IPO.  In other words, Plaintiffs assert that Defendants should have disclosed in May 2018 what they learned for the first time in November 2018.  That is not the law:  the securities laws "do not require clairvoyance in the preparation of offering documents." *Panther Partners*, 538 F. Supp. 2d at 664.  Plaintiffs cannot maintain claims that rest on cherry-picked, post-IPO statements made by GreenSky officers as supposed evidence of what GreenSky should have disclosed in its Offering Documents.[12]  (*See supra* Section I.A.1.)

Indeed, GreenSky's later statements—quoted in the Complaint—only confirm that its management *did not* know in May 2018 the information Plaintiffs claim was omitted, but instead expected that the mix shift would have other "offsetting benefit[s]."  (Ex. H at 5-6.)

---

[12] For example, Plaintiffs quote a November 2018 statement by GreenSky Vice-Chairman Gerald R. Benjamin that "93%, 94% of our plan is baked" and the Company had "tremendous visibility" going into 2019.  (Compl. ¶ 97.)  That is plain hindsight.  And even if it were not, this statement refers to transaction *volume*—not transaction fee rate.  Indeed, in the very next sentence, Mr. Benjamin states:  "Meaning, on a dollar basis, they do more business year after year after year after year."  (Ex. I at 5 (11/27/2018 Credit Suisse Presentation) (cited at Compl. ¶¶ 95-97).)  That is the definition of transaction volume.

Defendants believed—correctly, it turns out—that GreenSky's "lifetime profitability" would not be adversely affected by the mix shift because revenues and profits would not be eliminated; at most, they would be "pushed into future period[s]." (*See* Ex. F at 10-11, 16-17.) These post-IPO statements make clear that GreenSky did not have any of the purportedly omitted information at the time of the Offering Documents. *See Panther Partners*, 538 F. Supp. 2d at 669. Thus, Plaintiffs' claims fail.

### C. The Alleged Omissions Were Not Material.

Plaintiffs also fail to state any claim under Section 11 because none of the alleged omissions was material. Plaintiffs allege that omissions about the effects of a shift away from solar on transaction fee rates would have been material to investors. (Compl. ¶ 52.) That is wrong for two reasons. *First*, by isolating transaction fee rates—and, more specifically still, transaction fee rates relating to the declining solar business—Plaintiffs fundamentally distort the revenue model described in detail in the Offering Documents. (*See* Compl. ¶¶ 56-73.) Although transaction fees make up the majority of GreenSky revenue (Compl. ¶ 44; P 87), Plaintiffs ignore that transaction fees are made up of two components—transaction fee rate *and transaction volume.* As GreenSky disclosed, "our profitability is strongly correlated with merchant transaction volume," defined "as the dollar value of loans facilitated on our platform during a given period." (P 2, 84, 114.) Transaction volume "directly affect[s] . . . revenue and financial results . . . [and] therefore, the fees that we earn and the per unit cost of the services that we provide." (P 85.)

Because Plaintiffs focus exclusively on a single revenue factor—the fee rate—while ignoring "more accurate indicator[s]" of GreenSky's overall performance—its dollar volume of business—the alleged omissions cannot be materially misleading as a matter of law. *See Stadnick*, 861 F.3d at 38-39 (dismissing claims based on alleged omissions about "income

available to shareholders" and "earnings-per-share" when defendants disclosed "*total* revenue and *total* income," which were "more accurate indicator[s] of the company's performance"). Plaintiffs make no allegation whatsoever that transaction volume was misstated (nor could they).

*Second*, Plaintiffs are wrong to suggest that "the market's reaction demonstrates materiality." (Compl. ¶¶ 117-21.)  If GreenSky's post-IPO earnings demonstrate anything, it is that alleged omissions about the transaction fee rate for solar must have been immaterial.  From the first quarter to the third quarter in 2018, GreenSky's overall transaction fee rate *increased*— which, under Plaintiffs' theory, indicates better results.  Plaintiffs allege, however, that "GreenSky's share price declined steadily after the IPO" and "the biggest drops in price occurred on the days surrounding GreenSky's second and third quarter earnings announcements." (Compl. ¶ 118.)  Those price drops cannot be attributed to GreenSky's announcement of transaction fee rates in line with, or *greater than*, those disclosed in the Offering Documents. Moreover, analyst reports that Plaintiffs cite (*id.* ¶¶ 119-21) indicate that many factors contributed to lower-than-expected earnings.  (*See* Ex. G at 1-2 (J.P. Morgan Analyst Report) (cited at Compl. ¶ 119) (citing "lower volume growth and bank partner incentives").)  In this context, Plaintiffs cannot reasonably claim that additional disclosures about transaction fee rates would have been material.  *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 120-21 (S.D.N.Y. 2010) (later financial results "belie[d] any . . . claim" of material omissions).

## D.    Plaintiffs Fail To Plead Any Actionable Misstatements.

Although Plaintiffs primarily plead an omissions case—focusing on what each of the Offering Documents supposedly "omits," "hid," "fails to disclose," "neglects to mention" and "obscures," (Compl. ¶¶ 51-75)—they assert as an afterthought that the Offering Documents contain certain affirmative misrepresentations.  Rather than clearly identifying affirmative misstatements as required under the PSLRA, however, Plaintiffs reproduce large chunks of the

19

Offering Documents.  *See* DeMasi Decl. Ex. A; *see also* 15 U.S.C. § 78u-4(b)(1) (providing that a "complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading").  Failure to specifically identify alleged misstatements alone is grounds for dismissal.  *See In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 416 (S.D.N.Y. 2013).

To the extent Plaintiffs allege specific misrepresentations, the allegations are of two types:  (1) statements about GreenSky's "strong recurring revenue model" (Compl. ¶¶ 62-63); and (2) statements that refer to GreenSky's expansion into elective healthcare as a growth opportunity (*id.* ¶¶ 70-73).  All are inactionable statements of puffery, opinion or historical financial performance.  They also are protected by the bespeaks caution doctrine because GreenSky gave ample warnings about future performance.

1.     Alleged Misstatements About Growth Opportunities and Revenues Are Inactionable Puffery.

Expressions of puffery and corporate optimism that paint "rosy but general portraits" of business activity do not support securities violations.  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013) (Engelmayer, J.); *Rombach*, 355 F.3d at 174; *Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012) (finding statements that programs were "moving forward well" were inactionable puffery); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (same for statements that a company was able "to compete successfully . . . today and . . . in the future"); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (same for statements that a company would "continue to reposition and strengthen").

Most of the alleged misstatements are statements of puffery or corporate optimism, including "our existing markets . . . are sizeable and growing" (Compl. ¶¶ 70-71), GreenSky's "market opportunity is significant" and the Company "ha[d] significant opportunities to expand our business" (*id.* ¶¶ 72-73). Similarly, statements about GreenSky's "attractive unit economics" (*id.* ¶¶ 54-55), "strong recurring revenue model" and "stable" revenues that "align[] our incentives . . . and enable[] us to grow along with our ecosystem" (*id.* ¶¶ 62-65) are classic puffery and optimism. Plaintiffs allege that these statements "paint a rosy picture of the Company's growth and financial performance" (*id.* ¶ 73); these statements cannot give rise to liability. *Rombach*, 355 F.3d at 174.

2.   Alleged Misstatements About GreenSky's Belief in Growth Opportunities Are Inactionable Statements of Opinion.

Statements of opinion do not give rise to liability under the securities laws unless "the speaker did not hold the belief she professed" or "the supporting fact[s] she supplied were untrue." *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (citation omitted). Statements that express "a view, not a certainty" are opinion. *Omnicare*, 135 S. Ct. at 1326. Prediction of a company's future performance is also opinion. *In re Sanofi*, 87 F. Supp. 3d at 531.

Several alleged misstatements about growth opportunities reflect subjective beliefs or views, including: "We believe the elective healthcare market rivals in size the home improvement market in terms of annual spending volume, based on the number and cost of annual procedures performed" and "[w]e believe that because of population aging, innovations in medical technology and ongoing healthcare cost inflation, we are well-positioned to increase volume in the growing elective healthcare industry vertical." (Compl. ¶¶ 70-71.) Additionally, misstatements about the potential benefits of the shift into elective healthcare are plainly predictions of GreenSky's future performance and are thus inactionable. (*Id.* ¶¶ 70-72.)

Plaintiffs do not dispute that Defendants held these beliefs at the time of the IPO.  Thus, these statements cannot support a claim.

      3.      <u>Alleged Misstatements About Past Revenues Are Inactionable Because They Are Accurate Statements of Historical Performance.</u>

Defendants also "may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy," as "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."  *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (citation omitted).

Plaintiffs' allegations that the Offering Documents "paint a rosy picture of the Company's growth and financial performance" and "emphasize GreenSky's past growth" (Compl. ¶ 73) must fail.  Statements about GreenSky's past successes accurately reported the Company's results and cannot, as a matter of law, be misleading.[13]  *See In re Duane Reade*, 2003 WL 22801416, at *6.

      4.      <u>Alleged Misstatements About Future Growth and Revenues Are Protected by the Bespeaks Caution Doctrine</u>

Under the "bespeaks caution" doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016) (citation omitted).

---

[13] Plaintiffs' assertion that the representation of historical performance was rendered misleading because GreenSky "neglect[ed] to mention the contemporaneous deterioration in GreenSky's transaction-fee revenue" (Compl. ¶ 73) also fails.  The suggestion that there was a "contemporaneous deterioration" in revenue is demonstrably false.  Indeed, transaction fee revenue increased dramatically from $152,678,000 in 2015 to $278,958,000 in 2017.  (P 94.)

The Offering Documents contained substantial cautionary language.  For example, in describing "growth opportunities" created by its mix shift, GreenSky warned that it could make no "assurance that we will achieve similar levels of success, if any, in [the healthcare] vertical," where there could be "unanticipated challenges."  (P 39.)  The same was true for other industries:  GreenSky warned that "[t]here is no assurance that we will be able to successfully develop consumer financing products and services" or "forecast demand" or "growth accurately in new industries," which "could have a materially adverse impact on our business."  (*Id.*)  With these cautions, no reasonable investor could have been misled by alleged misstatements about future performance.

### E.   Plaintiffs' Red Herring Allegations Are Irrelevant to the Section 11 Claims.

Quoting from detailed disclosures in the Offering Documents, Plaintiffs make a series of allegations that certain Individual Defendants retained voting power, received cash distributions, benefited from a tax receivable agreement and collected IPO proceeds. (Compl. ¶¶ 136-43.)  Each item was disclosed in the Offering Documents and Plaintiffs make no attempt to connect them to their Section 11 claims.  Such irrelevant digressions should be ignored.

## II.   THE SECTION 12(A)(2) CLAIMS SHOULD BE DISMISSED.

Sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel elements."  *In re Morgan Stanley*, 592 F.3d at 359.  These claims "are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)."  *Vaccaro v. New Source Energy Partners L.P.*, No. 15 Civ. 8954(KMW), 2016 WL 7373799, at *4 (S.D.N.Y. Dec. 19, 2016) (citation omitted).

A Section 12(a)(2) claim requires a plaintiff to establish that (1) the defendant is a "seller" as defined by Section 12; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of

material fact or omitted to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.  15 U.S.C. § 77*l*(a)(2); *In re Morgan Stanley*, 592 F.3d at 359.  To be a "seller," a defendant must have "(1) directly passed title to the securities, or (2) solicited the purchase of securities out of a desire to (a) serve their own interests or (b) serve the interests of the securities' owner."  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 719-20 (S.D.N.Y. 2013).  For those who do not pass title to securities—like the Individual Defendants here—a complaint must plead with particularity "the role played by the [individual] defendants in the solicitation of the securities at issue."  *In re Am. Realty Cap. Props., Inc. Litig.*, No. 15-mc-40(AKH), 2015 WL 6869337, at *3 (S.D.N.Y. Nov. 6, 2015).

A.    **The Section 12 Claims Should Be Dismissed for All the Same Reasons as the Section 11 Claims.**

For the same reasons that their Section 11 claims are not supportable, Plaintiffs have failed to identify any alleged misstatement or omission that could support a securities law claim.  *See supra* Section I.  On that basis alone, all of the Section 12(a)(2) claims must be dismissed.

B.    **Plaintiffs Fail To Plead that They Purchased GreenSky Shares in the IPO.**

Unlike for Section 11, claims under Section 12(a)(2) may be brought only by individuals who purchased shares *in*, not *traceable to* the public offering.  *See, e.g.*, *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005); *see also Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005) (Section 12(a)(2) does not create standing for those who purchased in private or secondary securities sales).  Plaintiffs do not plead the requisite clear, unqualified allegation of an IPO share purchase because they allege only that "Lead Plaintiffs purchased shares of GreenSky Class A common stock issued pursuant *and/or traceable to* the Registration Statement

and Prospectus." (Compl. ¶ 20 (emphasis added); *see id.* ¶¶ 144, 160.) Courts routinely dismiss claims under Section 12(a)(2) for lack of standing when plaintiffs use this language because it does "not allege[] that they purchased their shares in the IPO." *In re Cosi*, 379 F. Supp. 2d at 589. "If plaintiffs did in fact purchase the [c]ertificates directly from the defendants, they should have said so. An evasive circumlocution does not serve as a substitute." *N.J. Carpenters Health Fund v. DLJ Mortg. Cap. Inc.*, No. 08 Civ. 5653(PAC), 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010) (citation omitted). Thus, Plaintiffs lack standing and their Section 12(a)(2) claims should be dismissed.

## III.    THE SECTION 15 CLAIMS SHOULD BE DISMISSED.

Section 15 imposes liability on a person who controls a person liable under Sections 11 or 12. 15 U.S.C. § 77o. To establish Section 15 liability, a plaintiff must show a "primary violation" of Sections 11 or 12 and control of the primary violator by defendants. *See, e.g.*, *ECA, Local*, 553 F.3d at 207. Because Plaintiffs have failed to plead a claim under either Section 11 or Section 12(a)(2), their Section 15 claims must be dismissed.

## <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request an order from the Court dismissing the Complaint in its entirety with prejudice pursuant to Rule 12(b)(6).

June 13, 2019

CRAVATH, SWAINE & MOORE LLP,

by

/s/ Karin A. DeMasi

Karin A. DeMasi
Lauren R. Kennedy
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants GreenSky, Inc., David
Zalik, Robert Partlow, Joel Babbit, Gerald
Benjamin, John Flynn, Gregg Freishtat, Nigel
Morris and Robert Sheft*