**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GREENSKY<br>SECURITIES LITIGATION | Case No.: 18 Civ. 11071<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................ 2

JURISDICTION AND VENUE .................................................................................. 7

PARTIES .................................................................................................................. 7

SUBSTANTIVE ALLEGATIONS ........................................................................... 12
    A.    Background and Pre-IPO Events ........................................................ 12
    B.    The Offering Documents' False Statements ...................................... 14
    C.    The Truth Emerges ............................................................................ 26
          1.    Second Quarter 2018.............................................................. 26
          2.    Third Quarter 2018 ................................................................ 28
          3.    Fourth Quarter 2018 and 2018 Fiscal Year Summaries............ 33
    D.    The False Statements and Omissions Were Material .......................... 36
          1.    The Omitted Facts Had Substantial Implications for Core Aspects of GreenSky's Business ............................................. 36
          2.    Defendants' Post-IPO Statements Demonstrate Materiality.................... 40
          3.    The Market's Reaction Demonstrates Materiality .................... 42
    E.    Greensky Violated Items 303 and 503 of Regulation S-K ................... 44
    F.    The Individual Defendants Exercised Significant Control over GreenSky and Used the Proceeds of the Materially False IPO Almost Exclusively to Benefit Themselves ............................................... 46

LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................... 50

COUNT I ................................................................................................................. 52

COUNT II ................................................................................................................ 53

COUNT III............................................................................................................... 55

PRAYER FOR RELIEF ........................................................................................... 56

JURY TRIAL DEMANDED..................................................................................... 57

Lead Plaintiffs Northeast Carpenters Annuity Fund, El Paso Firemen & Policemen's Pension Fund, and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge (collectively, the "Fund Group" or "Lead Plaintiffs") allege the following based on the investigation conducted by their counsel, which included, among other things, a review of: United States Securities and Exchange Commission ("SEC") filings by GreenSky, Inc. ("GreenSky" or the "Company"); securities analyst reports and advisories about GreenSky; press releases and other public statements issued by GreenSky; media reports about GreenSky; court records; other public documents readily obtainable on the Internet; interviews with former employees; and consultations with experts. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons other than Defendants and their affiliates who purchased GreenSky Class A common stock pursuant or traceable to the Company's false and misleading registration statement and prospectus (collectively, "Offering Documents") for its initial public offering ("IPO" or "Offering"),[1] who were damaged thereby, and who seek to pursue remedies under the Securities Act of 1933 ("Securities Act").[2]

---

[1] The registration statement was first filed with the SEC on Form S-1 on April 27, 2018 and subsequently amended two times. Amendment No. 2, filed with the SEC on Form S-1 on May 14, 2015, was declared effective by the SEC on May 23, 2018. The original Form S-1 and its amendments are collectively referred to herein as the "Registration Statement." The prospectus was filed with the SEC on Form 424B4 on May 25, 2018, and is referred to herein as the "Prospectus."

[2] As described further below, Defendants in this action include: (i) the Company; (ii) members of executive management and directors of the Company who signed or authorized the signing of the Offering Documents (David Zalik (co-founder, CEO and Chairman of the Board of Directors), Robert Partlow (CFO), Joel Babbit (Director), Gerald Benjamin (Director), John Flynn (Director), Gregg Freishtat (Director), Nigel Morris (Director), and Robert Sheft (Director)) (collectively, the "Individual Defendants"); and (iii) the underwriting banks for the IPO (Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Citigroup Global Markets Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit

2.      GreenSky is a financial technology company that operates an online platform which enables third-party businesses to process loan applications at their point of sale. Transaction fees from processing those applications, which vary by business (or merchant) type and are set in advance with specific merchants, constitute a significant majority of GreenSky's revenue. Historically, GreenSky generally obtained a transaction fee rate averaging around 14% for solar panel merchants, more than double the average non-solar transaction fee rate of 6.5%.

3.      In GreenSky's May 2018 Offering Documents, Defendants hid the impact of a key, risky decision that GreenSky had made roughly two years prior—to shift away from the profitable solar merchants with their associated higher transaction fees, and instead move toward the less-profitable, significantly lower transaction fee, elective healthcare merchants. In fact, GreenSky's Offering Documents failed to mention the seismic effect of GreenSky's decision to transition from solar to elective healthcare, which had *already* negatively impacted the average transaction fee it was recouping from its merchants. This meant, and the Offering Documents further omitted, that GreenSky was *already* facing a significant risk that its substantially lower average transaction fee would likely harm the Company's profitability, growth, and EBITDA.

4.      These omissions pertained to core financial information about GreenSky, making them material. GreenSky management's decision to transition out of the solar panel industry and expand into the elective healthcare market was made by at least early 2016, well before its May 2018 IPO. Following this decision, GreenSky began to aggressively reduce its solar panel relationships. As a result, the percentage of solar transactions drastically dropped from almost 20%

_____

Suisse"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), SunTrust Robinson Humphrey, Inc. ("SunTrust"), Raymond James & Associates, Inc. ("Raymond James"), Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), Fifth Third Securities, Inc. ("Fifth Third"), and Guggenheim Securities, LLC ("Guggenheim")) (collectively, the "Underwriting Defendants"). GreenSky, the Individual Defendants, and the Underwriter Defendants are referred to collectively hereinafter as "Defendants."

of GreenSky's total business by volume in 2016, to 4% by the third quarter of 2018. Given that this material shift was well underway by the first quarter of 2018—along with the corresponding material trend of declining average transaction fees—Defendants were required to include this information in the May 2018 Offering Documents, which were issued well after the end of that quarter and included discussion of, among other things, the decrease in transaction fees earned per dollar originated, factors contributing to the transaction fee rate, and the expansion into elective healthcare.

5.     Contravening that strict-liability obligation, Defendants failed to mention, at all, the issues and risks that GreenSky's transition from solar to elective healthcare was then posing to the Company. Specifically, the Offering Documents failed to disclose: (i) the outsized role that solar transaction fee rates had played in elevating GreenSky's overall transaction fee rates and the impact of GreenSky's shifting merchant mix on its transaction fee revenue model; (ii) the significance of merchant mix to the Company's profitability and EBITDA; and (iii) that risks created by GreenSky's change in strategy, which should have been disclosed to investors, had already come to fruition. Indeed, the undisclosed risks posed by the expensive and risky decision to shift away from the profitable solar business were already having a significant, negative impact on GreenSky's average transaction fee rate, profitability, and EBITDA in the months leading up to the IPO.

6.     Based on these material omissions, GreenSky sold over 43.7 million shares, for gross proceeds of over $1 billion, pursuant to the Offering Documents in its May 2018 IPO. The Individual Defendants are officers and directors of the Company who signed or authorized the signing of the materially false and misleading Offering Documents, and exercised control over the Company and the contents of the Offering Documents. The Underwriter Defendants participated

in drafting the Offering Documents, caused the Offering Documents to be filed with the SEC and to be declared effective in connection with the Offering, and participated in the dissemination of the Offering Documents.

7.     Following the IPO, the omitted facts began to become known to the market. In November 2018, less than six months after the IPO, GreenSky announced that it was revising both its 2018 and 2019 guidance downward significantly after two disappointing quarters. Defendants expressly admitted that this was caused entirely by their decision to reduce GreenSky's solar business.

8.     Notably, the Company's third quarter 2018 investor presentation in November included multiple slides explaining the impact of the transition away from solar merchants, and observed that its 2018 results were already "impacted by 0.5% decline in Transaction Fee Rate, resulting in $25M reduction in Revenue and Adjusted EBITDA in 2018."

9.     During the same quarter, the Individual Defendants repeatedly explained to investors that the Company's declining transaction fee rate was a primary driver of the Company's poor performance. They further admitted that the decline was foreseeable. For instance, on a November 12, 2018 call, Defendant Zalik, GreenSky's founder and CEO, stated: "*We knew going into 2018* that historically, outside of our solar business, our average take rate had been *incredibly stable for years*. We knew that we had made a decision at the end of 2016 to reduce our concentration on solar. *We knew that solar had an outsized average take rate of 14%. And as solar as a percentage of our business was coming down that our average take rate would go down.*" Thus, there is little question that the omitted facts were readily available to Defendants, and, had Defendants conducted a reasonable investigation prior to the IPO, Defendants could have uncovered and disclosed those omitted facts in the Offering Documents.

10.    The omitted facts had a material, quantifiable effect on GreenSky's financials: the declining transaction fee rate reduced GreenSky's profitability and growth. In addition, in their post-IPO public statements and conduct, Defendants acknowledged the importance of the omitted facts to investors, including by explaining at length the impact of the shift away from solar merchants and by enthusiastically describing even minor improvements to the Company's deteriorated transaction fee rate. Notably, the first Form 10-Q issued after the IPO on August 10, 2018, and each SEC filing thereafter concerning the 2018 fiscal year, included key facts that had been omitted from the Offering Documents, such as the fact that: ***"[t]he mix of loans offered by merchants generally varies by merchant category.*** Therefore, as the mix of merchants evolves over time, the mix of loan products and transaction fees will evolve accordingly."

11.    The stock market reacted negatively to these new disclosures, further underscoring the materiality of the omitted information. The IPO was priced at $23.00 per share, and reached a post-offering high of $26.77 per share. On August 6, the day before GreenSky revealed its disappointing second quarter numbers, the Company's stock closed at $21.23 per share. By August 10, however, after Defendants revealed key omitted facts to the market, GreenSky's Class A shares closed at $15.59. On August 13, the stock fell still further to close at $14.50. And on November 6, 2018, after the full impact of the omitted facts was revealed, GreenSky's stock price plummeted to $9.28 per share, a ***60% reduction*** from the IPO price advertised less than six months earlier.

12.    In sum, Lead Plaintiffs and the Class were harmed by Defendants' negligent failure to disclose material facts in GreenSky's Offering Documents, on which Lead Plaintiffs and the other Class Members relied when they purchased GreenSky's Class A shares. Lead Plaintiffs now bring these claims under the Securities Act on behalf of all Class Members damaged by Defendants' conduct.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

14.     The claims asserted arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and Section 22 of the Securities Act (15 U.S.C. § 77v), because the majority of the Underwriter Defendants are headquartered here, all Defendants had agents in this District or transacted or were licensed to transact business in this District, and a significant portion of the alleged acts and omissions, and consequential harm to investors, occurred in this District. During the relevant period the Company's shares were traded over the NASDAQ, an electronic securities exchange located in this District.

16.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff **Northeast Carpenters Annuity Fund** ("Northeast Carpenters") is a $2 billion annuity fund operated on behalf of construction professionals in the Northeast. Northeast Carpenters purchased shares of GreenSky Class A common stock in the Offering.

18.     Lead Plaintiff **El Paso Firemen & Policemen's Pension Fund** ("El Paso") is a $1.5 billion pension fund operated for the benefit of firefighters and police officers in El Paso, Texas.

19.     Lead Plaintiff **Employees' Retirement System of the City of Baton Rouge and**

**Parish of East Baton Rouge** ("CPERS") is a $1.2 billion defined benefit fund operated for the benefit of employees in the City of Baton Rouge, as well as its firefighters and police officers. CPERS purchased shares of GreenSky Class A common stock in the Offering.

20.     Lead Plaintiffs and the Class purchased shares in the Offering from the Underwriter Defendants. Lead Plaintiffs purchased shares of GreenSky Class A common stock issued pursuant and/or traceable to the Registration Statement and Prospectus, and suffered damages as a result of Defendants' violations of the federal securities laws. Lead Plaintiffs' certifications listing their purchases of GreenSky stock were previously filed with the Court and are incorporated by reference herein. *See* ECF Nos. 42-2; 42-4; 42-6.

21.     Defendant **GreenSky** is a financial technology company incorporated in Delaware. GreenSky sold 38,000,000 Class A common shares in its May 25, 2018 IPO. GreenSky Class A common shares trade on the NASDAQ Global Select Market under the ticker symbol "GSKY." GreenSky has two authorized classes of common stock: Class A and Class B. All Class B common stock was held by the owners of units and/or profits interests in GreenSky's holding company, GreenSky Holdings, LLC, prior to the Offering. Class B common stock owners own approximately 96% of the combined voting power of Class A and Class B common stock, and therefore control the Company.

22.     Defendant **David Zalik** was, at all relevant times, co-founder and Chief Executive Officer of the Company and Chairman of the Board of Directors, and signed or authorized the signing of the Offering Documents. By virtue of his positions at GreenSky as well as holding 52.4% of combined voting power prior to the Offering, Defendant Zalik exercised control over GreenSky and the contents of the Offering Documents. Defendant Zalik received over $468 million in proceeds from the IPO.

23.     Defendant **Robert Partlow** was, at all relevant times, the Chief Financial Officer of the Company, and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky, Defendant Partlow exercised control over GreenSky and the contents of the Offering Documents. Defendant Partlow received over $2.3 million in proceeds from the IPO.

24.     Defendant **Joel Babbit** was, at all relevant times, a Director of the Company and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky, Defendant Babbit exercised control over GreenSky and the contents of the Offering Documents. Defendant Babbit received over $1.6 million in proceeds from the IPO.

25.     Defendant **Gerald Benjamin** was, at all relevant times, a Director of the Company and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky, Defendant Benjamin exercised control over GreenSky and the contents of the Offering Documents. Defendant Benjamin received over $8.7 million in proceeds from the IPO.

26.     Defendant **John Flynn** was, at all relevant times, a Director of the Company and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky, Defendant Flynn exercised control over GreenSky and the contents of the Offering Documents.

27.     Defendant **Gregg Freishtat** was, at all relevant times, a Director of the Company and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky, Defendant Freishtat exercised control over GreenSky and the contents of the Offering Documents. Defendant Freishtat received over $2.1 million in proceeds from the IPO.

28.     Defendant **Nigel Morris** was, at all relevant times, a Director of the Company and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky, Defendant Morris exercised control over GreenSky and the contents of the Offering Documents. Defendant Morris received over $11.4 million in proceeds from the IPO.

29.     Defendant **Robert Sheft** was, at all relevant times, a Director of the Company and signed or authorized the signing of the Offering Documents. By virtue of his position at GreenSky as well as holding 16.2% of combined voting power prior to the Offering, Defendant Sheft exercised control over GreenSky and the contents of the Offering Documents. Defendant Sheft received over $105.8 million in proceeds from the IPO in conjunction with a related individual.

30.     Defendant **Goldman Sachs** was an underwriter for the Company's IPO. In the Offering, Goldman Sachs agreed to purchase 10,108,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Goldman Sachs has offices located at 200 West Street, New York, New York 10282.

31.     Defendant **J.P. Morgan** was an underwriter for the Company's IPO. In the Offering, J.P. Morgan agreed to purchase 10,108,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. J.P. Morgan has offices located at 383 Madison Avenue, New York, New York 10179.

32.     Defendant **Morgan Stanley** was an underwriter for the Company's IPO. In the Offering, Morgan Stanley agreed to purchase 6,498,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Morgan Stanley has offices located at 1585 Broadway, New York, New York 10036.

33.     Defendant **Citigroup** was an underwriter for the Company's IPO. In the Offering, Citigroup agreed to purchase 2,736,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Citigroup has offices located at 388 Greenwich Street, New York, New York 10013.

34.     Defendant **Credit Suisse** was an underwriter for the Company's IPO. In the Offering, Credit Suisse agreed to purchase 2,736,000 shares of the Company's Class A common

stock, exclusive of the over-allotment option. Credit Suisse has offices located at 11 Madison Avenue, New York, New York, 10010.

35.     Defendant **Merrill Lynch** was an underwriter for the Company's IPO. In the Offering, Merrill Lynch agreed to purchase 2,736,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Merrill Lynch has offices located at 250 Vesey Street, New York, New York 10080.

36.     Defendant **SunTrust** was an underwriter for the Company's IPO. In the Offering, SunTrust agreed to purchase 1,026,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. SunTrust has offices located at 303 Peachtree Center Ave., Atlanta, Georgia, 30308.

37.     Defendant **Raymond James** was an underwriter for the Company's IPO. In the Offering, Raymond James agreed to purchase 684,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Raymond James has offices located at 880 Carillon Parkway, St. Petersburg, Florida 33716.

38.     Defendant **Sandler O'Neill** was an underwriter for the Company's IPO. In the Offering, Sandler O'Neill agreed to purchase 684,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Sandler O'Neill has offices located in 1251 Avenue of the Americas, New York, New York 10020.

39.     Defendant **Fifth Third** was an underwriter for the Company's IPO. In the Offering, Fifth Third agreed to purchase 342,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Fifth Third has offices located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.

40.     Defendant **Guggenheim** was an underwriter for the Company's IPO. In the

Offering, Guggenheim agreed to purchase 342,000 shares of the Company's Class A common stock, exclusive of the over-allotment option. Guggenheim has offices located at 330 Madison Avenue, New York, New York 10017.

41.     Each Defendant participated in the solicitation and sale of GreenSky Class A common shares to investors in the IPO, motivated in part to serve their own financial interests and the interests of GreenSky.

42.     The Underwriter Defendants participated in drafting the Offering Documents, caused the Offering Documents to be filed with the SEC and to be declared effective in connection with the Offering, and participated in the dissemination of the Offering Documents. However, the Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the Offering and were negligent in failing to ensure that the Offering Documents were prepared properly, accurately, and were free of misstatements or omissions, and allowing dissemination of the material misstatements and omissions contained in the Offering Documents as detailed herein. The Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Offering Documents.

## SUBSTANTIVE ALLEGATIONS

### A.     Background and Pre-IPO Events

43.     GreenSky is a financial technology company headquartered in Atlanta, Georgia. GreenSky operates an online platform that enables businesses to process loan applications at the point of sale. Consumers who seek to make a purchase from such a business can apply for on-the-spot financing via the GreenSky mobile app, which connects consumers with GreenSky's bank partners. As of March 31, 2018, over 12,000 businesses were active users of GreenSky's platform.

These businesses ranged from owner-operated home improvement contractors and healthcare providers to national home improvement brands, such as Home Depot. These businesses had used GreenSky's platform to enable approximately 1.7 million consumers to finance over $12 billion of transactions since GreenSky's inception.

44.     GreenSky has two principal sources of revenue. First, GreenSky receives upfront "transaction fees" when a consumer secures a loan through its platform and pays for the purchase. Transaction fees constitute a substantial majority of GreenSky's revenue; in 2017, transaction fees accounted for approximately 86% of GreenSky's total revenue. Transaction fees vary by merchant type and by the financing terms of the loan selected by the consumer. Second, GreenSky receives "servicing fees" from banks on a recurring basis over the lives of the loans it facilitates.

45.     GreenSky traditionally catered to home improvement businesses. In 2016, GreenSky had over 7,000 active home improvement merchants making loans available through the GreenSky app.

46.     Prior to the IPO, GreenSky derived a substantial portion of its revenue from one particular sector of the home improvement market—solar panel merchants. In 2016, solar merchants contributed almost 20% of GreenSky's transaction volume. This large concentration was a result of the high profits GreenSky collected from its solar business, which dwarfed the profits from its other business lines. The average transaction fee rate for solar panel transactions is approximately 14%, which is more than double the average transaction fee rate for non-solar merchants of around 6.5%. Moreover, both these average rates were extremely stable, and had remained at those percentages for at least four, and up to seven, years prior to the IPO.

47.     GreenSky executive management strongly encouraged its salespeople to pursue solar panel merchants prior to mid-2016. Salespeople found solar panel opportunities attractive

because the higher transaction fees and higher returns associated with loans in the solar panel industry meant the possibility of a higher commission.

48. However, sometime in 2016—roughly two years before the May 2018 IPO—GreenSky's management decided to transition out of the solar panel industry and expand into the elective healthcare market due to a perceived riskiness of the solar panel industry. Beginning in mid-2016, GreenSky's management began discouraging salespeople from pursuing new solar panel opportunities. Upon orders from management, GreenSky's salespeople rejected a high number of applications from new solar merchants, subjected the small handful of successful new applicants to a heightened underwriting procedure, and began terminating its agreements with numerous existing solar panel merchants. By 2017 all existing solar customers were transitioned to a single salesperson.

49. As a result of GreenSky's aggressive efforts to reduce its solar business, the volume of solar transactions as a percentage of GreenSky's business drastically dropped from almost 20% in 2016, to 12% in 2017, and to only 8% in the first quarter of 2018. GreenSky's aggressive efforts to reduce its solar business ensured that the volume of solar transactions would continue to rapidly and significantly shrink after the IPO, ultimately dropping to 5% by Q2 2018.

50. At the same time, also contributing to that trend, GreenSky began its initiative to expand into the elective healthcare industry—an area that had an average transaction fee rate of 6.5% (less than half of the average fee rate for solar panel merchants) and that also yielded smaller-sized loans. Unsurprisingly, this move affected GreenSky's average transaction fee rate, which sharply and consistently declined from 7.9% in 2016, to 7.44% in 2017, and to 6.9% in the first quarter of 2018 prior to the IPO.

**B.    The Offering Documents' False Statements**

51. On April 27, 2018, GreenSky filed the Registration Statement, which incorporated

14

the Prospectus by reference, with the SEC. On May 25, 2018, GreenSky filed the final version of

the Prospectus. GreenSky's IPO closed on May 29, 2018. The Company sold 43.7 million shares

of Class A common stock at $23.00 per share in its IPO, for gross proceeds of over $1 billion.[3]

52.     The Offering Documents omit material facts necessary to make the statements

contained therein not misleading, contain untrue statements of material fact, and fail to make

adequate disclosures required under the rules and regulations governing the preparation of such

documents. As GreenSky later admitted, detailed *infra* in Section C, the Offering Documents fail

to disclose the diminution in transaction-fee revenue due to the substantial change in the

composition of GreenSky's merchant business mix, and the associated risks for the Company's

revenue, profitability, and EBITDA.

53.     ***First***, the Offering Documents fail to disclose the outsized role that solar transaction

fee rates played on overall transaction fee rates, due to the significantly higher transaction fee rate

for solar business.

54.     For instance, despite the fact that GreenSky decided to reduce the volume of its

solar business in mid-2016—roughly two years before the May 2018 IPO—the sole reference to

that decision in the Prospectus is as follows:

> Attractive Unit Economics
>
> Our low-cost go to market strategy, combined with our visible and
> recurring revenue model, provides for a fast payback period and
> strong dollar-based retention:
>
> . . .
>
> Strong dollar-based retention. We measure "dollar-based retention"
> on an annual cohort basis and define a cohort as the merchants that
> enroll for the first time on our platform within a given year. Our

---

[3] As further discussed below in section F, the Individual Defendants used the IPO as a means to change the capital structure of the Company, ensuring that they would retain voting control disproportionate to their economic investment in the Company, while at the same time diverting the funds raised in the IPO for their own benefit.

dollar-based retention calculation is adjusted to exclude Home Depot, which we count as a single merchant despite it having approximately 2,000 locations, and **to exclude solar panel merchants, as we actively reduced our transaction volume with such merchants in 2017**. "Dollar-based retention" refers to the transaction volume generated during a given year by each cohort of merchants relative to the transaction volume generated by that same merchant cohort in the prior year, and the calculation is adjusted for a two quarter seasoning period. Our dollar-based retention has exceeded 100% on our platform for each annual cohort in the past three years.

55.     The above statement is false and misleading because although it discloses that GreenSky was reducing its solar business, it omits that solar merchants contributed over 20% of its transaction volume in 2016 and 12% in 2017, with an average transaction fee rate ***double*** that of other merchant types, and that the decision to reduce solar business would have a significant, quantifiable effect on transaction fee revenue and on GreenSky's broader financial metrics. Moreover, the above statement is false and misleading because, by omitting solar panel merchants from its dollar-based retention metrics, GreenSky hid the financial impact of the reduction in solar transaction volume in favor of elective healthcare. Indeed, the foregoing passage creates the exact opposite impression, by stating that GreenSky has "Attractive Unit Economics" that will remain stable because its "dollar-based retention has exceeded 100% on our platform for each annual cohort in the past three years."

56.     In addition, the Prospectus disguises the impact that the reduction in solar business was already having on GreenSky's transaction fee rates in its summary of the prior year's performance. For instance, the Prospectus compares total revenue from 2018 to 2017 as follows:

Total revenue increased $20.0 million, or 31%, in the first three months of 2018 compared to the same period in 2017. The increase was primarily due to the net effect of a 29% increase in transaction fees, from $54.9 million in the first three months of 2017 to $70.9 million in the first three months of 2018. The increase in transaction fees was driven by a 47% increase in transaction volume. **The impact of higher transaction volume was offset by a decrease in**

**transaction fees earned per dollar originated from 7.79% in the first three months of 2017 to 6.87% in the same period in 2018. Transaction fee rates vary based on the financing terms selected by consumers at the point of sale and, in general, loans with higher annual percentage yields carry lower transaction fee rates. In the first three months of 2018, relative to the same period in 2017, we facilitated a larger volume of loans with higher annual percentage yields, resulting in the decrease in transaction fees earned per dollar originated.** The impact of higher transaction volume was further offset by promotional pricing we offered to certain merchants during the first three months of 2018, which reduced transaction fees by $2.4 million.

57.     The statement that there was a "decrease in transaction fees earned per dollar originated from 7.79% in the first three months of 2017 to 6.87% in the same period in 2018" is false and misleading because it fails to disclose that the main driver of the decrease was the change in merchant mix from solar to elective healthcare. The statement is also false and misleading because it asserts that the transaction fee rate primarily depends on the "financing terms selected by consumers at the point of sale," but fails to disclose that those terms vary significantly and predictably by merchant type—a fact ultimately disclosed in GreenSky's post-IPO disclosures (detailed *infra* in Section C). It also obscures the primacy of merchant mix as a driver of the Company's transaction-fee revenue when stating that the "decrease in transaction fees earned per dollar originated" was the result of a "larger volume of loans with higher annual percentage yields" and "promotional pricing." Moreover, it is false and misleading because it does not disclose that the transaction fee rate was in the midst of a systemic and continuing decline, due to the continuing elimination of the solar business, and the steady long-term history of solar having twice the transaction fee rate of GreenSky's other businesses.

58.     The Prospectus makes similar false and misleading statements when comparing revenue in 2017 and 2016:

> *2017 Compared to 2016*. Total revenue increased $62.0 million, or 24%, in 2017 compared to 2016. The increase was primarily due to

a 22% increase in transaction fees from $228.4 million in 2016 to $279.0 million in 2017. The increase in transaction fees was driven by a 31% increase in transaction volume. **The impact of higher transaction volume was offset by a decrease in transaction fees earned per dollar originated from 7.93% in 2016 to 7.40% in 2017. Transaction fee rates vary based on the financing terms selected by consumers at the point of sale and, in general, loans with higher annual percentage yields carry lower transaction fee rates**. In 2017, relative to 2016, we facilitated a larger volume of loans with higher annual percentage yields, resulting in the decrease in transaction fees earned per dollar originated.

59.     The above-referenced statement is false and misleading because it notes that there was a "decrease in transaction fees earned per dollar originated" from 2017 to 2016, but again fails to disclose that the main driver of the decrease was the change in merchant mix from solar to elective healthcare. The statement again falsely implies that the transaction fee rate primarily depends on the "financing terms selected by consumers at the point of sale," but fails to disclose that those terms vary significantly and predictably by merchant type—a fact ultimately disclosed in GreenSky's post-IPO disclosures (detailed *infra* in Section C). The statement again deceptively suggests that a "larger volume of loans with higher annual percentage yields [resulted] in the decrease in transaction fees earned per dollar originated," which obscures the primacy of merchant mix as a driver of the Company's transaction-fee revenue.

60.     The Prospectus continues to omit the impact of merchant mix on the Company's transaction fee revenue when disclosing the mechanics of its transaction fees:

> We earn a specified transaction fee in connection with purchases made by borrowers that are financed by our Bank Partners. The transaction fee is a one-time fee payable by the merchant that **includes a merchant fee component and an interchange fee component**. . . . The merchant fee is calculated by multiplying a set fee percentage (**as outlined in a schedule provided to the merchants**) by the dollar amount of a loan at the point of origination. **As merchant fees are billed to, and collected directly from, the merchant at least monthly, the transaction volume is known and there is no unresolved variable consideration as of the end of a quarterly reporting period**. We recognize revenue at

the point of sale by applying the expected value method, wherein we
assign 100% probability to the transaction price as calculated using
actual transaction volume. . . . The value of our service transferred
to the merchants is represented by the merchant fee rate, **as agreed
upon at contract inception**.

61.     This statement is false and misleading because it provides what appears to be

fulsome detail about the composition of transaction fees, but omits the importance of merchant

mix to the average transaction fee rate, and therefore the ultimate transaction fee revenue. For

instance, while GreenSky discloses that the merchant fee rate, a component of the transaction fee

rate, is "agreed upon at contract inception," the Company neglects to mention that the agreed-upon

merchant fee rate heavily depends on the merchant's industry, and that the solar merchants carry

a much larger transaction fee rate than non-solar merchants.

62.     The Offering Documents characterize GreenSky's transaction-fee revenue

generally as follows:

> **We have a strong recurring revenue model built upon repeat
> and growing usage by merchants. We derive most of our
> revenue and profitability from upfront transaction fees that
> merchants pay us every time they facilitate a transaction using
> our platform. Thus, our profitability is strongly correlated with
> merchant transaction volume. The transaction fee rate depends
> on the terms of financing selected by a consumer.**

63.     However, the characterization of GreenSky's fee revenue model as "strong" and

"recurring" is false and misleading because the Company was winding down its solar panel

business and ramping up its activity in the elective healthcare market. The statement "our

profitability is strongly correlated with merchant transaction volume" also deceptively equates

profitability with "merchant transaction volume," without disclosing the effect on profitability of

the significant differences in the transaction fees GreenSky charged to different types of

merchants. Finally, the statement "[t]he transaction fee rate depends on the terms of financing

selected by a consumer" is false and misleading because it suggests that the transaction fee rate "depends" on financing choices made by the consumer, again obscuring the primacy of merchant mix as a driver of the Company's transaction-fee revenue.

64.     Indeed, GreenSky repeats the misleading characterization of its transaction fee revenues as "stable" and "recurring" throughout its Prospectus:

> Although we offer our technology at no upfront cost, **we monetize through an upfront transaction fee every time a merchant receives a payment using our platform. This creates stable, recurring revenues,** aligns our incentives with the interests of our merchants, and enables us to grow along with our ecosystem. In 2017, 93% of our transaction volume was generated from merchants that were enrolled on our technology platform as of December 31, 2016. In addition, our Bank Partners pay us a recurring servicing fee over the lives of their loans.

65.     The statement that the usage of transaction fees "creates stable, recurring revenues" is false and misleading because it omits the significant differences in transaction fee rate between solar and non-solar merchants when characterizing its transaction fee model. Characterization of GreenSky's fee revenue model as "stable" and "recurring" is false and misleading because it neglects to mention that the Company was winding down its solar panel business and ramping up its activity in the elective healthcare market.

66.     Indeed, the Prospectus repeatedly omits the effect of merchant mix on transaction fees when explaining how transaction fees are calculated:

> *Transaction fees.* **We earn a specified transaction fee in connection with each purchase made by a consumer based on a loan's terms and promotional features**. Transaction fees are billed to, and collected directly from, the merchant and are considered to be earned at the time of the merchant's transaction with the consumer. We also may earn a specified interchange fee in connection with purchases where payments are processed through a credit card payment network. **Transaction fees constitute the majority of our total revenues, accounting for approximately**

**83% of our total revenues for the three months ended March 31, 2018.**

67.     The statement that the transaction fee is "based on a loan's terms and promotional features" is false and misleading because it fails to disclose that the transaction fee rate is heavily dependent on the relevant merchant's industry, with solar merchants carrying a much higher transaction fee rate than non-solar merchants. The statement also fails to disclose the risk that the shift from solar to elective healthcare posed to transaction fee revenue and EBITDA.

68.     The Prospectus further omits the significance of merchant mix to the Company's transaction fee revenue when discussing growth trends:

> *Growth in Active Merchants and Transaction Volume.* **Growth trends in active merchants and transaction volume are critical variables directly affecting our revenue and financial results. Both factors influence the number of loans funded on our platform and, therefore, the fees that we earn and the per unit cost of the services that we provide.** Growth in active merchants and transaction volume will depend on our ability to retain our existing platform participants, add new participants and expand to new industry verticals. To support our efforts to increase our network of merchants, we expanded our sales and marketing groups, which focus on merchant acquisition, from 37 full-time-equivalents as of December 31, 2015 to 120 as of March 31, 2018.

69.     This statement is false and misleading because it omits to mention the significance of merchant mix to the Company's transaction fee revenue when stating that "[g]rowth trends in active merchants and transaction volume are the critical variables directly affecting our revenue and financial results." It also states that "[g]rowth in active merchants and transaction volume will depend on our ability to retain our existing platform participants," while neglecting to mention that GreenSky's decision to wind down its solar panel business and ramp up its activity in the elective healthcare market would significantly affect those trends.

70.     ***Second,*** the Prospectus makes numerous references to the Company's expansion

into elective healthcare, misleadingly presenting that change as a growth opportunity:

> *Our Existing Markets—Home Improvement and Elective Healthcare—are Sizeable and Growing*
>
> The home improvement market is large, fragmented and growing, representing approximately $315 billion in spending volume in 2017, according to the Joint Center for Housing Studies of Harvard University, although not all home improvement projects are of a size suitable for financing. Merchants in this market range from small, owner-operated contractors to large national brands and retailers. From our inception through March 31, 2018, our Bank Partners have used our program to extend over $12 billion of financing, primarily including loans for home improvement sales and projects involving, among other things, windows, doors, roofing and siding; kitchen and bath remodeling; and heating, ventilation and air conditioning units. We believe that spending on home improvement goods and services will continue to increase as the national housing stock ages and existing home sales increase.
>
> In 2016, we began expanding into elective healthcare, which, like the home improvement market, is a large, fragmented market featuring creditworthy consumers who tend to make large-ticket purchases. **We believe the elective healthcare market rivals in size the home improvement market in terms of annual spending volume, based on the number and cost of annual procedures performed.** Elective healthcare providers include doctors, dentists, outpatient surgery centers and clinics providing orthodontics, cosmetic and aesthetic dentistry, vision correction, bariatric surgery, cosmetic surgery, hair replacement, reproductive medicine, veterinary medicine and hearing aid devices. We believe that because of population aging, innovations in medical technology and ongoing healthcare cost inflation, we are well-positioned to increase volume in the growing elective healthcare industry vertical.
>
> \*\*\*
>
> ***Expand into New Industry Verticals, Including Online Retail and Traditional Store-Based Merchants***
>
> ***We recently expanded into the elective healthcare industry vertical and intend to explore other large, fragmented markets with creditworthy consumers who tend to make large-ticket purchases online and in-store.*** For example, online retail represents an attractive and low cost acquisition channel ripe for penetration that fits synergistically with our existing point-of-sale mobile platform. In 2017, domestic retail sales through the e-commerce platform

exceeded $453 billion, growing by almost 16% over the prior year according to the U.S. Census Bureau. The consumer credit and payments industry in the online retail market is highly competitive. In the online retail market, we would expect to face competition from a diverse landscape of consumer lenders, including credit card issuers, traditional banks and new technology-centric payment tools. In addition, efforts by us and our merchants to promote use of the GreenSky program in the online retail market may not be as effective as promotion in-person at the point of sale. We also may face greater fraud-related risk, which generally is low in our traditional in-person model.

We expect to seek out additional attractive industry verticals (whether online or in-store) based on our ability to efficiently go to market, grow market share, generate attractive risk-adjusted yields for our Bank Partners and continue to maximize value for our constituents.

\*\*\*

**In addition to the home improvement market, we recently entered the elective healthcare industry vertical**, where our technology platform facilitates the offering of payments and financing solutions to patients of healthcare providers, from small solo and multi-provider practices to large national provider groups. We had 921 active merchants in the elective healthcare industry vertical as of December 31, 2017, which grew to 1,472 as of March 31, 2018.

71.     The statement that "Our Existing Markets—Home Improvement and Elective Healthcare—are Sizeable and Growing," as well as all statements that the home improvement market was growing, are false and misleading because they fail to mention that GreenSky had already begun aggressively terminating its solar panel merchants as early as 2016, and had already lost the vast majority of its solar panel merchants by the time the Prospectus was issued. The statement that "the elective healthcare market rivals in size the home improvement market in terms of annual spending volume" is also false and misleading because it fails to disclose the markedly lower transaction fee rates GreenSky charges its healthcare merchants as compared to its solar merchants, and the resulting decline in transaction fee revenue. Finally, the above-referenced

statements are false and misleading because, although they depict the move toward healthcare as a means of increasing growth, in fact, GreenSky collected a significantly reduced average transaction fee from healthcare merchants as compared to solar merchants.

72.     The Prospectus also describes GreenSky's purported "significant growth" and "significant market opportunity":

> **We have achieved significant growth in active merchants, transaction volume, total revenue, net income and Adjusted EBITDA**. Our low-cost go-to-market strategy, coupled with our recurring revenue model, has helped us generate strong margins. **Transaction volume (which we define as the dollar value of loans facilitated on our platform during a given period) was $3.8 billion in 2017, representing an increase of 31% from $2.9 billion in 2016. Further, transaction volume was $1.0 billion in the three months ended March 31, 2018, representing an increase of 47% from $0.7 billion in the three months ended March 31, 2017**. Active merchants (which we define as home improvement merchants and healthcare providers that have submitted at least one consumer application during the 12 months ended at the date of measurement) totaled 12,231 as of March 31, 2018, representing an increase of 52% from 8,048 as of March 31, 2017. **Our total revenue grew 23% from $264 million in 2016 to $326 million in 2017, net income grew 12% from $124 million in 2016 to $139 million in 2017, and Adjusted EBITDA grew 21% from $131 million in 2016 to $159 million in 2017.** For the period ended March 31, 2018, total revenue was $85 million, net income was $19 million and Adjusted EBITDA was $27 million.
>
> ***
>
> **Our market opportunity is significant.** In 2017, there was approximately $315 billion of spending volume in the home improvement market, which historically has represented substantially all of our transaction volume, **and substantial opportunities in the elective healthcare market, which we entered in 2016**. In addition, at year end 2017, according to the Federal Reserve System, there was approximately $3.8 trillion of U.S. consumer credit outstanding across a fragmented landscape of lenders, providing a significant opportunity for us to extend our platform to other markets where transactions are financed at the point of sale.

***

**Our Growth Opportunities**

We have significant opportunities to expand our business. Our growth strategy focuses on the following efforts to continue to deliver value for our constituents and expand our ecosystem.

73.    The statements "[w]e have achieved significant growth in active merchants, transaction volume, total revenue, net income and Adjusted EBITDA," "[o]ur market opportunity is significant," "[i]n 2017, there was . . . substantial opportunities in the elective healthcare market," and "[w]e have significant opportunities to expand our business" are false and misleading because they paint a rosy picture of the Company's growth and financial performance while neglecting to mention the contemporaneous deterioration in GreenSky's transaction-fee revenue. The statements "Adjusted EBITDA grew 21% from $131 million in 2016 to $159 million in 2017" and "[w]e have achieved significant growth in active merchants, transaction volume, total revenue, net income and Adjusted EBITDA," further omit the specific deleterious effects of the Company's changing merchant mix on EBITDA. In addition, the statements "[t]ransaction volume (which we define as the dollar value of loans facilitated on our platform during a given period) was $3.8 billion in 2017, representing an increase of 31% from $2.9 billion in 2016" and "[o]ur total revenue grew 23% from $264 million in 2016 to $326 million in 2017, net income grew 12% from $124 million in 2016 to $139 million in 2017, and Adjusted EBITDA grew 21% from $131 million in 2016 to $159 million in 2017" are also false and misleading because they emphasize GreenSky's past growth without disclosing its reliance on the high transaction fee rates collected from solar panel merchants.

74.    ***Third***, the Prospectus fails to disclose that certain risks about which they warned had already come to fruition:

There is significant competition for our existing merchants. **If we fail to retain any of our larger merchants or a substantial number of our smaller merchants, and we do not acquire new merchants of similar size and profitability, it would have a material adverse effect on our business and future growth. We have experienced some turnover in our merchants, as well as varying activation rates and volatility in usage of the GreenSky program by our merchants, and this may continue or even increase in the future**. Program agreements generally are terminable by merchants at any time. Also, we generally do not have exclusive arrangements with our merchants, and they are free to use our competitors' programs at any time and without notice to us. If a significant number of our existing merchants were to use other competing programs, thereby reducing their use of our program, it would have a material adverse effect on our business and results of operations.

75.     The above-referenced statement is false and misleading because the potential risk described had already come to fruition. GreenSky had already begun aggressively terminating its solar panel merchants as early as 2016, and had already lost the vast majority of its solar panel merchants, and the infrastructure to support its solar business, by the time of the IPO.

76.     Thus, the Offering Documents were negligently prepared and contain untrue statements of material fact as well as omissions of facts necessary to render the statements made not misleading.

### C.     The Truth Emerges

*1.     Second Quarter 2018*

77.     On August 7, 2018, less than three months after the IPO, GreenSky issued a release announcing its financial results for the second quarter of 2018. It stated that the Company generated transaction fees of $90.2 million on a transaction volume of $1.32 billion during the quarter and indicated that the Company's transaction-fee rate was approximately 53 basis points below the rate achieved in the second quarter of 2017.

78.     The release also provided financial guidance for the full 2018 fiscal year. In

particular, it predicted that transaction volume would reach a range of $5.1 to 5.3 billion; revenue would reach $433 to 445 million; and adjusted EBITDA would reach $192 to 199 million, representing a 20 to 25 percent increase from the prior year.

79.     In an earnings call the same day, Defendant Zalik acknowledged that the substantial reduction in transaction fee rate was attributable to the transition away from solar panel merchants and toward elective healthcare companies. Specifically, when an analyst asked why the transaction fee rate had "ticked down . . . sequentially," Zalik responded, "**Yeah, so that's mix shift**." Defendant Zalik subsequently explained that "**particularly as we have de-volumed in solar, the average transaction fee or take rate has gotten to a stable place**"—that is, a resting point far below the rates advertised in the Company's Offering Documents.[4]

80.     On August 10, 2018, GreenSky filed a Form 10-Q discussing the results of the second quarter, in which the Company admitted that although it had achieved higher transaction volume during that quarter, "[t]he impact of higher transaction volume was offset by a decrease in transaction fees earned per dollar originated from 7.36% in the three months ended June 30, 2017 to 6.84% during the same period in 2018. Similarly, transaction fees earned per dollar originated declined from 7.54% during the six months ended June 30, 2017 to 6.85% in the same period in 2018."

81.     The August 10, 2018 Form 10-Q further admitted—for the first time—that *"[t]he mix of loans offered by merchants generally varies by merchant category.* Therefore, as the mix of merchants evolves over time, the mix of loan products and transaction fees will evolve accordingly." This language, which was omitted from the Prospectus, consistently appeared in

---

[4] On the August 7, 2018 call, Defendant Benjamin explained that the Company was also adding new accounts in the HVAC industry and noted that this industry "comes with a little bit more modest transaction fee," again indicating that the impact of changing GreenSky's merchant mix could easily have been disclosed, especially with an adequate investigation.

each of GreenSky's subsequent quarterly and annual filings for the 2018 fiscal year.

82.    The stock market reacted negatively to these new disclosures. On August 6, the day before GreenSky revealed its disappointing numbers, the Company's stock closed at $21.23 per share. By August 10, however, it lost 26% of its value, closing at $15.59 per share, and on August 13, the stock fell still further to close at $14.50.

83.    These revelations, coming less than three months after the IPO, underscore that, Defendants could easily have disclosed in the Offering Documents, especially with an adequate investigation, both: that the shift away from solar merchants had already caused a decline in average transaction fee rates and would continue to do so; and that there was a substantial risk that the Company would be unable to make up for the declining fee rates with a higher volume of loans in other categories of merchants, thus negatively impacting the Company's profitability and EBITDA.

### 2.    Third Quarter 2018

84.    On November 6, 2018, less than six months after the IPO, GreenSky issued a release announcing disappointing financial results for the third quarter of 2018. The release stated that GreenSky generated $96.7 million in transaction fees on $1.41 billion in transaction volume, indicating that the Company's transaction-fee rate was 35 basis points below the rate achieved in the third quarter of 2017. In addition, the release announced that GreenSky had significantly revised its financial guidance for the 2018 fiscal year. In particular, the Company's predictions for adjusted EBITDA growth fell to only $165 to 175 million, representing between 4 and 10% growth, a significant deviation from the 21% growth rate the Company had achieved between 2016 and 2017 and advertised in the Offering Documents, and the 20 to 25% growth rate it had predicted just three months earlier.

85.    In an earnings call the same day, Defendant Zalik bluntly admitted that GreenSky's

"average transaction fee take rate year-over-year is down **70 basis points, *entirely driven by our solar mix*** going from a high of almost 20% of our business in '17 [*sic*][5] to 4% of our business. And just to remind you, our solar business had an average take rate of 14—nearly 14%. So you take nearly 20% of your business at a 14% and drop it to 4% and replace it with 7%, *you can see what the impact is*."

86.   Zalik further explained that, outside of the solar market, transaction fee rates had historically been stable at around 7%, as follows:

> And so what we've seen is that in a higher rate environment, the merchant still want [*sic*] to spend roughly 700 basis points in most industries. In solar, they'll spend 14%. But everywhere else, it's averaging 7%. ***And it's been averaging 7%.***

87.   Following these disclosures, the Board of Directors approved the repurchase of $150 million of GreenSky common stock.

88.   The market again reacted strongly and negatively to GreenSky's third quarter announcements and results. On November 6, 2018, GreenSky's stock price plummeted to $9.28 per share, sharply down from the IPO price of $23.00 per share and post-offering high of $26.77 per share.

89.   Throughout the rest of the third quarter, Defendants made additional statements underscoring that the likely impact of the 2016 decision to reduce GreenSky's solar business either was readily apparent to Defendants or could easily have been discovered, and thus should have been included in the Offering Documents.

90.   For instance, on November 9, 2018, the Company filed a Form 10-Q discussing its third quarter results. The Company again admitted that "[t]he impact of higher transaction volume

---

[5] In subsequent statements, the Individual Defendants, including Zalik, indicated that GreenSky's solar business had reached a peak of nearly 20% of the Company's transaction volume in *2016*, rather than 2017. This is also consistent with GreenSky's third quarter 2018 investor presentation, which indicates that GreenSky's solar transactions dropped from 15% to 12% of the Company's transaction volume over the 2017 fiscal year.

was offset by a decrease in transaction fees earned per dollar originated from 7.26% during the

three months ended September 30, 2017 to 6.91% during the same period in 2018. Similarly,

transaction fees earned per dollar originated declined from 7.44% during the nine months ended

September 30, 2017 to 6.88% during the same period in 2018." The November 9, 2018 10-Q also

repeated that changes in the merchant mix had affected, and would continue to affect, the

Company's transaction fees.

91.     On a November 12, 2018 call conducted as part of the JPMorgan Ultimate Services

Investor Conference, Defendant Zalik admitted that the Company's 2018 guidance had been

revised downward because of the effect of the shift away from solar merchants on GreenSky's

financials. He further explained that the impact of this shift had been apparent to GreenSky's

management "going into 2018"—that is, months before GreenSky's IPO. His comments, in full,

are as follows:

> So fundamentally, we thought that our average take rate in 2018 was
> going to be the same as our take rate in 2017. *We knew going into
> 2018 that historically, outside of our solar business, our average
> take rate had been incredibly stable for years. We knew that we
> had made a decision at the end of 2016 to reduce our
> concentration on solar. We knew that solar had an outsized
> average take rate of 14%. And as solar as a percentage of our
> business was coming down that our average take rate would go
> down.* What we believe was that we were taking solar from a high
> in Q1 of '14—of '17, 15%. Then we saw stability at 8%—or 12%,
> 3 quarters in a row. We thought that in '18, it would get stable at
> 8%. It actually went down below 4%. So the first thing we got wrong
> throughout 2018 is that we thought solar would come down. We did
> not think it would come down as far as it did. *That changes the
> average take rate in '18.* The second thing that we got wrong was
> we knew that rates were going up. Rates going up are neutral for us
> and—generally, and what we've shown is that as rates have gone up
> year-over-year, the average APR of our origination portfolio has
> gone up 177 basis points. Take rate flat, average APR portfolio gone
> up 177 basis points, bank margin has gone up a fraction of that. The
> delta makes up the 50 basis points less take rate. But the second
> thing we got wrong is historically when we raised rates on products

to merchants, the merchants just paid 10, 20, 30 basis points more. But interest rates over the last year have gone up so dramatically, we didn't have to raise rates 10 or 20 basis points. We had to raise rates—ease to the merchants 100 basis points, 150 basis points. The merchants took that as an opportunity to say, "Instead of paying 7% last year to give my customer a 5.99% APR product, I'm not going to pay 8.5% to give them the same 5.99% product. I'm going to still pay 7%, let them have a 6.99% product." So we got no benefit in the average take rate from raising rates. We got benefit in average APR. **_So the big picture or first thing we got wrong was we did not believe that solar would go from well over 15% to well under 4%._** We saw it stable at 12% for all of '17, so that's the big picture. But if you fast forward to August, we knew that solar had come down. We knew that it was coming down more than we thought it would, but we also had lots of rate increases. We did not see though that the merchants were going to be picking exclusively neutral to them and passing it all onto the consumer. So that's the fundamental.

92.     Defendant Zalik thus suggested that GreenSky's disappointing results were due to an unanticipated speed in the reduction of the Company's solar transaction volume. But, Defendants knew it had dropped from 20% in 2016 to 12% in 2017, a 40% drop, and that it had dropped to 8% in the first quarter of 2018, another drop of 33 1/3%. Thus, even if GreenSky's 2018 volume of solar transactions had remained at 8%, the Company's pre-IPO results in the first quarter of 2018 demonstrate that decline still created a substantial risk for the Company's profitability, growth, and EBITDA, and should have been disclosed. Moreover, in light of GreenSky's aggressive efforts to reduce its solar business, which included actively discouraging salespeople from pursuing that sector, and the drop from 20% to 15% to 12% and then to 8%, all in 15 months, there was no reasonable basis to assume that the volume of solar business would remain stable. More importantly, however, Defendants had no need to rely on such assumptions given their much-touted visibility into GreenSky's business. By the time of the IPO, five months into the 2018 fiscal year, Defendants should have been able to discover that solar volume was dropping rapidly, and disclose that trend, and its risks, in the Offering Documents.

93.     Later in the call, Zalik addressed the newly announced fact that GreenSky would

miss its 2018 earnings predictions by $100 million, asserting that the Company was surprised by

the speed of reduction in the solar business, and its inability to offset that reduction with other

efforts as follows:

> So first thing we got wrong was we didn't think solar was going to
> go down as deeply and as fast. Second thing is we thought we were
> going to get offsetting benefit. . . . Now we missed—we'll miss by
> $100 million, $100 million relative to going from $3.8 billion to $5.2
> billion. It's going to be $5.1 billion. **I'm going to do a mea culpa
> about take rate, about solar, about raising rates, offsetting the
> lower take rate.** I'm not feeling terrible about $3.8 billion to $5.1
> billion. That—arguably that miss is arguably a function of solar
> went down by more than $100 million more than we expected; in
> terms of the core business, ***everything else was exactly as we
> expected from a volume standpoint***.

94.     This statement again makes clear that, prior to the IPO, GreenSky was well aware

that it was engaged in a concerted effort to quickly reduce its lucrative solar business. It also

underscores that the serious and material risk that such a rapid reduction could pose to the

Company's transaction fee rates and profits was either readily apparent to all Defendants or would

have been, had they bothered to investigate.

95.     In the same vein, on a November 27, 2018 call conducted as part of the Credit

Suisse Technology, Media & Telecom Conference, in response to questions regarding why the

Company's average transaction fee was below expectations in the second and third quarters,

Defendant Benjamin explained:

> ***This is all driven by mix.*** We were very determined and it's been
> well chronicled, ***we made the decision at the end of 2016 to
> radically cull our home improvement business.*** We were concerned
> about the level of consumer satisfaction and really the value
> proposition in that vertical. And we took it down from what was
> approaching 20% of our annual originations down to a number that
> was single digits. And we took it down to basically 2 handfuls of
> merchants where the customer satisfaction rate was outstanding. . .

. We expected that business to go down from, as I said, approaching 20% to about 8%. It actually went down a little quicker than expected and actually dropped below 5% to 4%. And candidly, that difference in solar dropping from 8% to 4% and that business came with a 14% transaction fee. ***So when we made the decision to cull that business, it was with full acknowledgment and realization that it was highly profitable business with an upfront transaction fee of 140 basis points. But that delta, watching the solar business drop a little quicker than we thought, really gave rise to the shortfall. So we have basically 50 basis point variance in transaction fee, based on that solar penetration dropping.*** When you take solar out of the equation, the take rate or transaction fee has been incredibly consistent for the last 4 years. So that is the preponderance of the delta.

96. Benjamin's statements reveal that Defendants were on notice of the risks posed by the transition away from solar merchants as early as ***2016***, including the fact that solar was a "highly profitable business" with an average transaction fee that was significantly higher than those available in other industries, but nevertheless failed to disclose the risks of that transition in the Offering Documents.

97. During the same call, Benjamin also asserted that GreenSky enters each new fiscal year with "tremendous visibility" into its ability to originate new loans and attract new merchants. He explained that "[t]ypically, 93%, 94% of our plan is baked." Thus, by the time of the IPO in May 2018—five months into the 2018 fiscal year—the declining transaction fee rates caused by the shift away from solar merchants and the risks posed by that decline to the Company's profitability were readily apparent to all Defendants, or would have been apparent upon even a cursory investigation.

### 3. Fourth Quarter 2018 and 2018 Fiscal Year Summaries

98. On a February 26, 2019 call conducted as part of the Morgan Stanley Technology, Media & Telecom Conference, Defendant Benjamin revealed that, "historically, when we took out the solar business, which we jettisoned . . . ***take rate's been incredibly stable at about 700 basis***

***points for the last 7 years***." This statement indicates that a reasonable investigation of GreenSky's finances should have uncovered the seven years of historical data indicating that when GreenSky made the decision to "jettison" the solar business—which pulled in a transaction fee rate of ***twice*** GreenSky's average—its transaction fee rates would go down, materially impacting the Company's bottom line.

99.     On a March 5, 2019 call discussing GreenSky's fourth quarter results in 2018, Defendant Zalik again explained that the profit structure of the solar business differed considerably from GreenSky's other businesses. In response to an analyst question concerning the Company's 2019 guidance, Zalik stated: "[N]ot having the noise of solar is really great. Because from a—on a relative basis when as much as 20% of your business at 13% transaction fee evaporates to 4% by design that will, on a relative basis, make anything look not so good." But Defendants failed to explain the true significance of that information, which was anything but "noise," for investors when they bought into the IPO, and instead misleadingly told investors that they should continue to expect transaction fee performance based on outdated, solar-dependent data.

100.     GreenSky's Form 10-K for the 2018 fiscal year, filed on March 15, 2019, also clearly disclosed that reduced transaction fees had negatively impacted the Company's profitability as compared to 2017. In total, the transaction fee rate dropped by ***46 basis points*** between 2017 and 2018. The Form 10-K disclosed that the decline was "related to the types of loans originated on our platform," which, in turn, "varies by merchant category. ***Therefore, shifts in merchant mix have a direct impact on our transaction fee rates.***" The relevant disclosure is as follows:

> ***2018 vs. 2017.*** Total revenue increased during the year ended December 31, 2018 compared to 2017 primarily due to an increase in transaction fees. During the year ended December 31, 2018, transaction volume increased by 34% compared to 2017. ***The***

> *impact of higher transaction volume was offset by a decrease in*
> *transaction fees earned per dollar originated to 6.94% during the*
> *year ended December 31, 2018 from 7.40% during 2017.* More
> recently, our transaction fee rate increased to 7.11% in the fourth
> quarter of 2018 from 6.91% in the third quarter of 2018. *The period*
> *over period transaction fee rate decline is related to the types of*
> *loans originated on our platform.* Loans with lower interest rates
> generally carry relatively higher transaction fee rates. Conversely,
> loans with higher interest rates generally carry relatively lower
> transaction fee rates. *The mix of loans offered by merchants*
> *generally varies by merchant category, and is dependent on*
> *merchant and consumer behavior. Therefore, shifts in merchant*
> *mix have a direct impact on our transaction fee rates. During the*
> *year ended December 31, 2018 relative to 2017,* there was a shift in
> loan originations from lower to higher annual percentage yields and
> *shifts in merchant mix, which resulted in the decrease in*
> *transaction fees earned per dollar originated.*

101.   The Form 10-K goes on to disclose that the transaction fee rate also dropped 53

basis points between 2016 and 2017 "*due to similar factors* as outlined in the foregoing 2018 vs.

2017 variance discussion"—in other words, GreenSky finally admitted that its 2017 financials,

too, had been negatively impacted by the change in merchant mix. The relevant disclosure is as

follows:

> *2017 vs. 2016.* Total revenue increased during the year ended
> December 31, 2017 compared to 2016 primarily due to an increase
> in transaction fees. During the year ended December 31, 2017,
> transaction volume increased by 31% compared to 2016. The impact
> of higher transaction volume was offset by a decrease in transaction
> fees earned per dollar originated to 7.40% during the year ended
> December 31, 2017 from 7.93% during 2016, which was *due to*
> *similar factors as outlined in the foregoing 2018 vs. 2017 variance*
> *discussion*.

102.   This explanation—which Defendants agree is correct—varies noticeably from the

discussion of the differences between 2016 and 2017 in the Prospectus, in which the lower

transaction fee rate is attributed only to GreenSky "facilitat[ing] a larger volume of loans with

higher annual percentage yields." That is, the Prospectus did not disclose that the drop in

GreenSky's transaction fee rate resulted from a systemic and ongoing management policy to cull the highly profitable solar business. Thus, as the disclosures in GreenSky's 2018 Form 10-K make clear, the Company's financials were already being impacted by the shift away from solar merchants in 2017, months before the May 2018 IPO. In turn, all Defendants negligently failed to disclose facts in the Offering Documents that were readily apparent to them, or that they would have uncovered had they conducted even a cursory investigation.

### D. The False Statements and Omissions Were Material

103. As described above, the Prospectus failed to disclose that, as a result of GreenSky's 2016 decision to transition away from solar merchants and to increase business with merchants in industries paying much lower transaction fees, the Company's transaction fee rate had steadily declined. It further failed to disclose that this had created a significant risk to GreenSky's profitability and EBITDA if the Company was unable to generate a sufficient volume of loans to offset the declining transaction fee rates—a risk that, as noted above, came to pass. These false statements and omissions were material to investors because they pertained to core aspects of GreenSky's business as well as its future prospects for success. The materiality of these statements is demonstrated by: (1) the actual financial impact of the declining transaction fee rate on the Company's profitability and EBITDA; (2) statements made by Defendants conceding that these negative trends were directly attributable to the change in merchant mix; and (3) the market's strong, negative reaction to disclosure of the omitted facts.

### 1. The Omitted Facts Had Substantial Implications for Core Aspects of GreenSky's Business

104. GreenSky has repeatedly asserted that "[a] substantial majority of our total revenue is generated from the transaction fees." Accordingly, decisions, trends, and risks affecting GreenSky's average transaction fee rate are of great importance to investors.

105.    Two charts GreenSky provided as part of an investor presentation on November 13, 2018 demonstrate the dramatic, quantifiable impact the Company's shift away from solar was having on that crucial metric:





106.    First, these charts demonstrate that the variation between GreenSky's financial results in 2017 as compared to 2016, and in particular, the reduced transaction fee rate, resulted from the reduction in solar business—though these numbers were not made available to investors at the time of the IPO. The transaction fee rate was declining on a percentage basis by over 6% per year. That decline aligned nearly lockstep with the reduction of GreenSky's solar business from 17% of the Company's transaction volume at the end of 2016 to 12% in 2017. Likewise, in the first quarter of 2018, prior to the IPO, solar transactions continued dropping from 12% to 8% of GreenSky's business. In the second and third quarters of 2018, the Company's average transaction fee rate continued its corresponding decline.

107.    Second, these charts demonstrate the substantial, negative impact that the cratering solar business had on GreenSky's earnings, profitability, and growth. It was that impact, which continued after the IPO, that resulted in GreenSky's poor financial results in the second and third

quarters of 2018. Indeed, GreenSky's third quarter 2018 investor presentation frankly admits that its financials that year were already "impacted by 0.5% decline in Transaction Fee Rate, resulting in $25M reduction in Revenue and Adjusted EBITDA in 2018" (the 0.5% arithmetic decline translated into the transaction fee rate dropping by over 6% on a percentage basis, for the second consecutive year). As a result, GreenSky's third quarter guidance projected that its Adjusted EBITDA for the 2018 fiscal year would grow at *a rate of only 6.6%* in 2018, a dramatic slowdown from the 21.9% growth achieved on Adjusted EBITDA in 2017 and advertised in the IPO.[6] That is, the reduction in GreenSky's transaction fee rate compromised its ability to grow its bottom line at the much higher historic rate Defendants touted in the Prospectus.

108.    Further undermining that growth, implementing GreenSky's decision to shift from merchants that generated high transaction fees to higher-volume, lower-fee merchants also proved to be expensive. The Company's pre-IPO first quarter 2018 gross profits were *28% lower* than in the previous quarter, and its cost of revenue, which includes the cost of originating new loans, was over *70%* higher.[7] GreenSky's results for the 2018 fiscal year demonstrate that the trend continued and accelerated: the Company's total cost of revenue in 2018 was *78.8% higher* than the same metric in 2017, while its gross profits increased by *only 7.6%*, demonstrating that GreenSky was not able to even come close to its pre-IPO earnings growth.

109.    Finally, in order for GreenSky to maintain its historical rates of growth and profitability despite the decline in transaction fee rates as a result of its shift away from solar merchants, the Company would have had to substantially increase both the volume of its lower-

---

[6] By the end of 2018, GreenSky slightly outpaced these grim predictions, achieving a growth rate of only 7.6%, which was far below its second quarter predictions and its growth rate in 2017.

[7] GreenSky's first quarter 2018 revenue costs were also *55% higher* than the same metric in the first quarter of 2017, while gross profits increased by only 17%, again demonstrating that GreenSky's new strategy had proven to be expensive and inefficient well before the IPO.

fee loans and the revenue it collected from servicing those products. But even if the Company could have increased its volume sufficiently to offset the declines in transaction fee revenue— which, in 2018, it clearly did not—this change in strategy also affected the risk profile of GreenSky's earnings. Transaction fees are paid to GreenSky upfront by the merchant at the outset of a loan, whereas incentive and servicing fees are paid out over the life of the loan and are therefore subject to additional risks related to whether and when the loan is paid back. Thus, a shift from the former to the latter inherently increases the potential that GreenSky will be unable to realize revenue for completed transactions.

### 2.  *Defendants' Post-IPO Statements Demonstrate Materiality*

110.    Defendants' post-IPO statements, which emphasize the importance of transaction fee rate to GreenSky's profitability and the effect that the shift in merchant mix had on that metric, underscore that the omitted facts would have been important to investors.

111.    ***First,*** the Company's public filings and statements discuss transaction fees and the impact of the shift away from solar but failed to provide the full picture pre-IPO. In a public filing less than ***three*** months after the IPO—and in each public filing thereafter concerning the 2018 fiscal year—GreenSky disclosed the effect that changes in merchant mix will have on its transaction fee rate. *See, e.g.*, 2Q 2018 10-Q at 56 ("The mix of loans offered by merchants generally varies by merchant category. Therefore, as the mix of merchants evolves over time, the mix of loan products and transaction fees will evolve accordingly."); 3Q 2018 10-Q at 65 (same); 2018 10-K at 55 ("The mix of loans offered by merchants generally varies by merchant category, and is dependent on merchant and consumer behavior. Therefore, ***shifts in merchant mix have a direct impact on our transaction fee rates***."). GreenSky's third quarter 2018 investor presentation similarly included a prominent, two-slide discussion of the "impact of decline in solar originations" on the "trend" of its declining transaction fee rates.

40

112.   ***Second,*** the Individual Defendants' public comments following the IPO demonstrate an understanding that factors affecting the Company's transaction fee rate would be important to investors. For instance, on a November 12, 2018 conference call, Defendant Zalik explained: "[T]he take rate is ***the first thing I'm looking at*** . . . So the first thing is take rate, simply because it has such an impact on EBITDA perception or GAAP EBITDA."

113.   Furthermore, the Individual Defendants repeatedly and emphatically explained that the shift away from solar merchants was ***wholly responsible*** for GreenSky's declining transaction fee rates, and the corresponding declines in the Company's relative profitability and EBITDA. For instance, on a November 6, 2018 conference call, Defendant Zalik began the call by stating: "***We are encouraged as our transaction fee percentage this quarter was up*** 7 basis points over the second quarter, and we expect that we have passed the point of inflection as the decline in the transaction fee rate attributable to solar merchants has run its course."[8] By emphasizing this small recovery, which still left the Company far behind its 2016 and 2017 average transaction fee rates, Defendant Zalik effectively acknowledged that investors were focused on this metric and concerned by its decline.

114.   On the same call, Defendant Partlow agreed that:

> Compared to the third quarter of last year, transaction fee rate decreased to 6.91% compared to 7.2%—7% in the third quarter of last year ***as a mix of high transaction fee solar business decreased*** from 12% to just 4% of originations this quarter.

115.   Defendant Zalik further explained that that the declining transaction fee rates responsible for GreenSky's disappointing 2018 results were "entirely driven" by the shift away from solar merchants:

---

[8] Zalik subsequently repeated that "the transaction fee take rate is down 70 basis points year-over-year, ***driven by the reduction in solar***."

And so the disappointment for us in 2018 is our average transaction fee take rate year-over-year is down 70 basis points, ***entirely driven by our solar mix going from a high of almost 20% of our business in '17 to 4% of our business***. And just to remind you, our solar business had an average take rate of 14—nearly 14%. So you take nearly 20% of your business at a 14% and drop it to 4% and replace it with 7%, ***you can see what the impact is***.

116.    Later in the call, Zalik again repeated that the reduction was due to the transition away from solar merchants, explaining that in 2018 "we had a 70 basis point headwind because we slowed down solar from nearly 20% of our business to 4%. ***There's no other piece of our business that would have that impact***."

   *3.    The Market's Reaction Demonstrates Materiality*

117.    Both individual analysts and the stock market at large reacted negatively when the omitted facts were revealed.

118.    GreenSky's share price declined steadily after the IPO, as the omitted facts became known to the market. Notably, the biggest drops in price occurred on the days surrounding GreenSky's second and third quarter earnings announcements, each of which provided previously undisclosed information concerning the effect of changes in merchant mix on the Company's financials. This is demonstrated in the following chart, which shows GreenSky's closing stock price during the relevant period:



119.   Analysts, too, expressed surprise and disappointment. In response to GreenSky's revelation in the third quarter of 2018 that, as a result of the shift away from solar merchants, the Company's 2019 guidance would be revised downward by a considerable margin, the North America Equity Research division of J.P. Morgan cut its estimates for the Company, stating that "the reduction was a surprise" and that "***GSKY faces a tough road to restore credibility***."

120.   Compass Point similarly cut its estimates for GreenSky's share price target in half, and downgraded its desirability, based on the Company's "weaker-than-expected 4Q18 guidance, and a softer 2019 preliminary outlook." Like JPMorgan, Compass Point stated: "[w]e were admittedly surprised at how significant the guidance revisions were," given the proximity in time to the IPO. It also noted skeptically that the Company's 2019 revenue projections "remain somewhat aggressive ***given the evolving product mix.***"

121.   Other analysts, including BTIG Equity Research, Guggenheim Securities LLC, and Morgan Stanley Research also downgraded GreenSky's stock or reduced their estimates for GreenSky's predicted performance on the basis of the Company's reduced transaction fee rates and disappointing third quarter results.

**E.   Greensky Violated Items 303 and 503 of Regulation S-K**

122.   Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires companies, in their Registration Statements, to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

123.   Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3. The SEC's interpretive release regarding Item 303 further clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

124.   As described above, Defendants publicly admitted that, prior to the IPO, they were aware that the decision to reduce GreenSky's solar business was reasonably likely to negatively

affect GreenSky's average transaction fee rate, and therefore its overall profitability.

125.    Most notably, on November 12, 2018, Defendant Zalik admitted: "*We knew going into 2018* that historically, outside of our solar business, our average take rate had been *incredibly stable for years*. We knew that we had made a decision at the end of 2016 to reduce our concentration on solar. *We knew that solar had an outsized average take rate of 14%. And as solar as a percentage of our business was coming down that our average take rate would go down.*"

126.    On November 27, 2018, Defendant Benjamin similarly admitted that when GreenSky "made the decision to cull [the solar] business" at the end of 2016, "*it was with full acknowledgment and realization that it was highly profitable business with an upfront transaction fee of 140 basis points.*"

127.    Indeed, in its third quarter 2018 investor presentation, GreenSky included a chart, depicted above, which describes the "Impact of [the] Decline in Solar Originations" as a "*Trend*[]" in Transaction Fee Components" (emphasis added). According to GreenSky's own chart, that "trend" was identifiable at least by the first quarter of 2017, more than a year before the IPO.

128.    In sum, the Defendants knew that as the Company aggressively reduced its solar business and instead expanded into elective health care—a lower-fee business—it was reasonably likely that GreenSky would be unable to keep up the same rates of growth in revenue and EBITDA.

129.    At the time when GreenSky filed its Registration Statement, these trends and circumstances were either readily apparent to Defendants, or they could easily have discovered them with a reasonable investigation, but negligently failed to disclose them in the Offering Documents.

130.     As a result, Defendants caused GreenSky to violate Item 303 of Regulation S-K by failing to disclose this known trend and uncertainty to the marketplace.

131.     Similarly, Item 503 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).

132.     The Offering Documents make no mention of the substantial risk posed by the decision to shift away from a business that provided a significant source of GreenSky's pre-IPO revenue, despite the fact that, as discussed above, Defendants were well aware of that risk.

133.     Defendants' public statements also make clear that this decision was one of the "most significant factors" creating risk to the Company during the IPO—for instance, when discussing the Company's reduced 2019 guidance, Defendant Zalik explained that the shift away from solar was entirely to blame because "[t]here's *no other piece of our business that would have that impact*."

134.     As a result, Defendants caused GreenSky to violate Item 503 of Regulation S-K by failing to disclose this known trend and uncertainty to the marketplace.

**F.      The Individual Defendants Exercised Significant Control over GreenSky and Used the Proceeds of the Materially False IPO Almost Exclusively to Benefit Themselves**

135.     As demonstrated by the foregoing allegations, the Individual Defendants exercised control over GreenSky and its Offering Documents by virtue of their leadership positions at the Company. In addition, the extent of their control is demonstrated by the Individual Defendants' unchallenged exercise of that control to extract significant wealth for themselves from the Company before, during, and after the IPO, and to solidify their voting control over the Company even after it went public.

136.     *First*, the Individual Defendants caused the Company to pay special cash

distributions to themselves, their associates and other pre-IPO owners of GreenSky. In 2017, GreenSky declared non-tax distributions of $346.5 million to its unit holders and holders of profit interests and a related party when it entered into a term loan. In December 2017, the Company declared a $160 million special cash distribution to its unit holders and holders of profit interests using the proceeds from a sale of loan receivables and cash from operations. In May 2018, just prior to the IPO, the Company declared a $75 million special cash distribution to its unit holders and holders of profit interests using the proceeds from the modified term loan and cash from operations. Certain Individual Defendants received tens of millions of dollars in cash from these distributions. For example, in 2017 alone, Defendant Sheft received almost $89 million, Defendant Morris received over $5.5 million, and Defendant Benjamin received over $2.3 million in tax and special distributions.

137.   *Second*, the Individual Defendants caused GreenSky to enter into a tax receivables agreement that was particularly beneficial for the Individual Defendants. The tax receivables agreement provides that the Individual Defendants (and certain of their affiliates and other pre-IPO investors) will receive approximately 85% of the amount of tax savings, if any, that GreenSky realizes as a result of the reorganization transactions prior to the IPO. The Offering Documents estimated that, as a result of this agreement, in the 15 years following the IPO, GreenSky would be required to pay approximately $928 million (based on the $23 per share IPO price) in payments to the beneficiaries of the agreement, which included many, if not all, of the Individual Defendants. Even if the tax receivables agreement were terminated, GreenSky would be required to pay approximately $556 million to the Individual Defendants and related parties.

138.   *Third,* the IPO itself effectuated a change in GreenSky's capital structure, which benefited the Individual Defendants economically, while simultaneously cementing their voting

control over the Company through a two-class share structure. GreenSky is a holding company with no material assets other than an equity interest in GreenSky Holdings, LLC ("GS Holdings"). Prior to the IPO, GS Holdings held 100% of the economic interests and 100% of the management and voting power of GreenSky; in turn, Company insiders—including nearly all of the Individual Defendants—held shares in GS Holdings (referred to in the Offering Documents as "Holdco Units"). In connection with the IPO, GreenSky undertook several reorganization transactions and changed its capital structure to include two types of stock: Class A shares, which were publicly sold in the IPO and entitle the holder to one vote per share, and Class B shares, which are not publicly traded, but entitle the holder to *ten* votes per share. Holders of GreenSky's pre-IPO Holdco Units were given an option to exchange those units for either: (1) an equivalent number of Class B shares, for a *de minimis* fee of $0.001 per Class B share; (2) an equivalent number of Class A shares; or (3) the cash value of an equivalent number of Class A shares, as determined by the market price.

139.    As a result of these transactions, immediately following the IPO, Class B shareholders—including Defendants Zalik, Sheft, Babbit, Benjamin, Flynn, Freishtat, and Morris—controlled 95.8% of the voting power in GreenSky despite holding a minority economic stake in the Company. Defendant Zalik alone held 48.6% of the voting power, while Defendant Sheft (with his investment partner, Jeffrey Gold) held 15.6% of the Company's share voting power. Investors in the offering held only 3.2% of GreenSky's share voting power.[9]

140.    For further detail, the voting power of certain of the Individual Defendants and Company insiders is summarized in the following chart provided in the Registration Statement.

---

[9] Former corporate investors held the remaining 1.0% voting power.

| Name of Beneficial Owner | Class A Common Stock[1][2] | | | | | Class B Common Stock[1][2] | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | No. of Shares before offering | % of combined voting power before offering | No. of Shares after offering | % of combined voting power after offering | % of combined voting power after offering including full option exercise | No. of Shares before offering | No. of Votes (10:1) | % of combined voting power before offering | No. of Shares after offering | No. of Votes (10:1) | % of combined voting power after offering | % of combined voting power after offering including full option exercise |
| **5% Stockholders** | | | | | | | | | | | | |
| David Zalik[3] | | | | | | 90,061,738 | 900,617,382 | 52.4% | 68,637,930 | 686,379,300 | 49.2% | 48.6% |
| Robert Sheft and Jeffrey Gold[4] | | | | | | 27,858,118 | 278,581,181 | 16.2% | 23,013,228 | 230,132,281 | 16.5% | 16.5% |
| Pacific Investment Management Company LLC[5] | 7,027,264 | * | 7,027,264 | * | * | 3,074,728 | 30,747,284 | 1.8% | 3,074,728 | 30,747,284 | 2.2% | 2.3% |
| TPG Funds[6] | 1,732,075 | * | 1,320,050 | * | * | 8,376,708 | 83,767,076 | 4.9% | 6,384,064 | 63,840,636 | 4.6% | 4.5% |
| **Named Executive Officers and Directors (other than those listed above)** | | | | | | | | | | | | |
| Joel Babbit[7] | 36,550 | * | 36,550 | * | * | 288,502 | 2,885,023 | * | 211,179 | 2,111,791 | * | * |
| Gerald Benjamin[8] | 246,520 | * | 246,520 | * | * | 1,440,774 | 14,407,742 | * | 1,039,402 | 10,394,021 | * | * |
| Tim Kaliban[9] | 767,666 | * | 767,666 | * | * | 1,767,427 | 17,674,274 | 1.0% | 1,164,382 | 11,643,816 | * | * |
| John Flynn[10] | | | | | | | | | | | | |
| Gregg Freishtat[11] | 123,260 | | 123,260 | * | | 291,181 | 2,911,805 | * | 192,594 | 1,925,937 | * | * |
| Nigel Morris[12] | | | | | | 2,200,298 | 22,002,981 | 1.3% | 1,676,893 | 16,768,931 | 1.2% | 1.2% |
| Executive Officers and Directors as a group (16 persons)[13] | 1,233,375 | * | 1,233,375 | * | * | 125,827,911 | 1,258,279,106 | 73.2% | 97,504,444 | 975,044,440 | 69.9% | 69.2% |

141.    Accordingly, the Prospectus described the Class B shareholders, which include all but one of the Individual Defendants, as having the ability to "strongly influence or effectively control [GreenSky's] decisions" through their concentrated control of a significant amount of GreenSky's combined voting power. The Offering Documents further acknowledge that the Individual Defendants "will be able to control the election and removal of directors and thereby determine [GreenSky's] corporate and management policies, including potential mergers or acquisitions, payment of dividends, asset sales, amendment of our certificate of incorporation and bylaws and other significant corporate transactions." *Id.*

142.    In addition, the majority of the proceeds from the IPO was used to purchase Holdco Shares from Company insiders, again, including nearly every Individual Defendant. Defendant Zalik alone received over $468 million in IPO proceeds. Further, Defendant Sheft received over

$105 million, Defendant Morris received over $11 million, Defendant Benjamin received over $8 million, Defendants Partlow and Freishtat each received over $2 million, and Defendant Babbitt received over $1 million in IPO proceeds.

143.    For further detail, the proceeds received by certain of the Individual Defendants and Company insiders are summarized in the following chart provided in the Registration Statement:

| Name of Beneficial Owner[1] | Number of Holdco Units or Shares of Class A common stock redeemed by us | Aggregate purchase price($) |
|---|---|---|
| **5% Stockholders** | | |
| David Zalik | 21,423,808 | $  468,110,205 |
| Robert Sheft and Jeffrey Gold | 4,844,890 | $  105,860,847 |
| TPG Funds | 2,404,668 | $   52,541,996 |
| **Executive Officers and Directors (other than those already listed above)** | | |
| Gerald Benjamin | 401,372 | $    8,769,978 |
| Chris Forshay | 26,783 | $      585,209 |
| Steven Fox | 53,839 | $    1,176,382 |
| Tim Kaliban | 603,046 | $   13,176,555 |
| Dennis Kelly | 87,964 | $    1,922,013 |
| Alan Mustacchi | 35,891 | $      784,218 |
| Robert Partlow | 106,379 | $    2,324,381 |
| Lois Rickard | 40,181 | $      877,955 |
| Joel Babbit | 77,323 | $    1,689,508 |
| Gregg Freishtat | 98,587 | $    2,154,126 |
| Nigel Morris | 523,405 | $   11,436,399 |
| **Other Employees and Former Employees** | 3,191,329 | $   69,730,539 |
| **Other Investors** | 4,080,535 | $   89,159,689 |

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

144.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased GreenSky Class A common stock issued pursuant or traceable to the Offering Documents and were damaged thereby. Excluded from the Class are Defendants; the officers and directors of the Company; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

145.    The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Lead Plaintiffs at this time, but it is believed to be in the thousands. Members of the Class may be identified by records maintained by GreenSky or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

146.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

147.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b.    whether the Offering Documents issued by Defendants to the investing public omitted and/or misrepresented material facts about the Company and its business; and

c.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

149.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 11 of the Securities Act
### Against All Defendants

150. Lead Plaintiffs repeat and reallege each of the allegations contained above as if fully set forth herein.

151. This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

152. This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

153. GreenSky is the registrant for the IPO.

154. As the issuer of the shares, GreenSky is strictly liable for the contents of the Offering Documents.

155. The Individual Defendants are responsible for the contents of the Offering Documents based on their status as officers and directors of the Company and because they signed or authorized the signing of the Offering Documents.

156. The Underwriter Defendants are responsible for the contents of the Offering Documents based on their status as underwriters.

157. Each of the Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Offering Documents inaccurate.

158. Defendants failed to make a reasonable and diligent investigation, and thus lacked

reasonable grounds to believe the statements contained in the Offering Documents were truthful and accurate.

159.    By virtue of the Defendants' failure to make a reasonable and diligent investigation, the Offering Documents were false and misleading, contained untrue statements of material fact, omitted to state other facts needed to render the statements made not misleading, and omitted to state material facts required to be stated therein. As such, the Defendants are strictly liable to Lead Plaintiffs and the Class.

160.    Lead Plaintiffs and the Class obtained GreenSky shares pursuant and/or traceable to the Offering Documents. All of the GreenSky shares in the market are traceable to the Offering Documents. There has been no prior or subsequent offering.

161.    When Lead Plaintiffs and the Class obtained their shares of GreenSky, they did so without knowledge of the misstatements and omissions alleged herein.

162.    Lead Plaintiffs and members of the Class have sustained damages. The value of their shares has declined substantially, subsequent to, and due to, the violations of the Defendants. The value of GreenSky shares has declined substantially as a result of Defendants' misconduct.

163.    This claim is brought within one year after discovery of the untrue statements and omissions in and from the Offering Documents, which should have been corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

164.    By reason of the misconduct alleged herein, Defendants are liable to Lead Plaintiffs and the Class for damages suffered under Section 11 of the Securities Act.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
### Against GreenSky and the Underwriter Defendants

165.     Lead Plaintiffs Northeast Carpenters and CPERS repeat and reallege each of the allegations contained above as if fully set forth herein.[10]

166.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against GreenSky and the Underwriter Defendants.

167.     GreenSky and the Underwriter Defendants promoted and sold GreenSky Class A common stock to Lead Plaintiffs and other members of the Class through the Prospectus.

168.     GreenSky and the Underwriter Defendants owed Lead Plaintiffs and the other members of the Class who purchased GreenSky common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that the statements were true and that no material facts were omitted from the Prospectus.

169.     The Prospectus contained untrue statements of material fact and/or failed to disclose material facts. Lead Plaintiffs did not know and could not have known of the untruths and omissions contained in the Prospectus at the time Lead Plaintiffs acquired GreenSky common stock.

170.     If GreenSky and the Underwriter Defendants had exercised reasonable care in the preparation and dissemination of the Prospectus, they would have known of the misstatements and omissions contained therein as set forth above.

171.     Accordingly, GreenSky and the Underwriter Defendants violated Section12(a)(2) of the Securities Act.

172.     Lead Plaintiffs suffered significant damages in connection with their purchases of GreenSky stock and as a result of GreenSky and the Underwriter Defendants' misconduct.

173.     This action is brought within one year of the date of the alleged violation and within

---

[10] Lead Plaintiff El Paso does not join in this claim.

three years of the date the relevant securities were first offered to the public.

174.    By reason of the misconduct alleged herein, GreenSky and the Underwriter Defendants are liable to Lead Plaintiffs and the Class for damages suffered under Section 12 of the Securities Act.

## COUNT III

### For Violations of Section 15 of the Securities Act
### Against the Individual Defendants

175.    Lead Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

176.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants.

177.    The above allegations show a primary violation of the Securities Act.

178.    This claim is asserted against the Individual Defendants, each of whom was a control person of GreenSky during the relevant time period.

179.    The Individual Defendants were control persons of GreenSky by virtue of, among other things, their positions as senior officers and directors of the Company. They were in positions to control, and did control, the false and misleading statements and omissions contained in the Offering Documents.

180.    The Individual Defendants at all relevant times participated in the operation and management of GreenSky, and conducted and participated, directly and indirectly, in the conduct of GreenSky's business affairs. The Individual Defendants were under a duty to disseminate accurate and truthful information with respect to GreenSky's financial condition. Because of their positions of control and authority as officers and directors of GreenSky, the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially

untrue and/or misleading statements.

181.    The Individual Defendants' control, ownership, and positions made them privy to and provided them with knowledge of the material facts concealed from Lead Plaintiffs and members of the Class.

182.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

183.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after GreenSky common stock was sold to the Class in connection with the Offering.

184.    By reason of the misconduct alleged herein, for which GreenSky is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as GreenSky pursuant to Section 15 of the Securities Act. As a direct and proximate result of the conduct of the Individual Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of shares pursuant to the Offering Documents.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.      Declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Plaintiffs' Counsel as Lead Counsel.

B.      Awarding damages in favor of Lead Plaintiffs and the other Class members against

all Defendants, jointly and severally, for all damages sustained as a result of Defendants'
wrongdoing, together with interest thereon;

      C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses
incurred in this action, including counsel fees and expert fees;

      D.      Awarding Lead Plaintiffs and the Class such other relief as may be deemed
appropriate by the Court.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Date:  June 26, 2019                    Respectfully submitted,

                                      */ s / Steven J. Toll*
                                      COHEN MILSTEIN SELLERS & TOLL PLLC
Steven J. Toll (admitted *pro hac vice*)
S. Douglas Bunch (SB-3028)
1100 New York Avenue, N.W. │ Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

Alice Buttrick (5444120)
Jessica (Ji Eun) Kim (5326129)
88 Pine St. │ 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax.: (212) 838-7745
abuttrick@cohenmilstein.com
jekim@cohenmilstein.com

Manuel J. Dominguez (*pro hac vice* application
pending)
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: (561) 515-1400
Fax.: (561) 515-1401
jdominguez@cohenmilstein.com

SCOTT + SCOTT ATTORNEYS AT LAW LLP
Max Schwartz (MS-2517)
Tom Laughlin (TL-8888)
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
mschwartz@scott-scott.com
tlaughlin@scott-scott.com

*Attorneys for Lead Plaintiffs Northeast Carpenters Annuity Fund, El Paso Firemen & Policemen's Pension Fund, and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge*