## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE GREENSKY
SECURITIES LITIGATION

Case No.: 18 Civ. 11071 (PAE)

## LEAD PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# **TABLE OF CONTENTS**

Preliminary Statement ......................................................................................................... 1

Statement of Facts .............................................................................................................. 4

    I.      GreenSky's Profitability Depends on Transaction Fee Rates ................................. 4

    II.     Prior to the IPO, Defendants Shift Away from the Profitable Solar Business ..................................................................................................................................... 5

    III.    Defendants Fail to Disclose These Facts and Trends in the Offering Documents ............................................................................................................ 6

    IV.    Amid Poor Performance, the Truth Emerges Shortly After the IPO ..................... 8

Legal Standard ................................................................................................................... 9

Argument ........................................................................................................................... 9

    I.      PLAINTIFFS ADEQUATELY ALLEGE SECTION 11 CLAIMS ...................... 9

          1.     Defendants Omitted Information Necessary to Make the Offering Documents "Complete and Accurate" .................................................... 10

          2.     Defendants Had an Additional Affirmative Duty to Disclose Omitted Facts Under Items 303 and 503 ................................................ 12

          3.     The Offering Documents Also Included Actionable Affirmative Misstatements ........................................................................................ 15

          4.     The Misstatements and Omissions Were Material to Investors ............... 19

    II.     PLAINTIFFS ADEQUATELY ALLEGE SECTION 12(A)(2) CLAIMS ......... 23

          1.     Defendants Have Not Proven Negative Loss Causation .......................... 23

          2.     The Underwriter Defendants' Standing Argument Lacks Merit ............. 24

    III.    PLAINTIFFS ADEQUATELY ALLEGE SECTION 15 CLAIMS .................... 25

Conclusion ....................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*In re Agria Corp. Sec. Litig.*,
    672 F. Supp. 2d 520 (S.D.N.Y. 2009)....................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................9

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017).....................................................................17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)...............................................................................................19

*Billhofer v. Flamel Techs., S.A.*,
    No. 07 Civ. 9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ...........................18

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ............................................................................18

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009)....................................................................23

*In re CitiGroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010)....................................................................25

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)....................................................................18

*In re Deutsche Bank AG Sec. Litig.*,
    No. 09 CV 1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016)................13

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................................................18

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)..............................................12, 20, 22, 23

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)...................................................................................23

*Goldstein v. Pataki*,
    516 F.3d 50 (2d Cir. 2008)....................................................................................9

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ..................................................................................10

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010) ...................................................................19

*Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008) ...................................................10

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) .............................................12, 13, 19, 21

*Lopez v. CTPartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) .....................................................19

*Manavazian v. Atec Group, Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...................................................17

*In re MF Glob. Holdings Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...................................................24

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) .......................................................10, 11, 24

*Mullins v. City of New York*,
    653 F.3d 104 (2d Cir. 2011) ...................................................................16

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...................................................................17

*Nurlybayev v. ZTO Express*,
    No. 1:17-cv-6130 (S.D.N.Y. July, 17, 2019) ........................................23

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) .....................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*,
    -- U.S. --, 135 S. Ct. 1318 (2015) ..........................................................18

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) .............................................................9, 15

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...................................................17

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013) .....................................................................20

*In re Signet Jewelers Ltd. Sec. Litig.*,

No. 16 Civ. 6729, 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...........................................17

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ...........................................................................................16

*In re UBS AG Sec. Litig.*,
    No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ..................................25

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ..............................................................................18

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) .............................................................................18

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ........................................................................24, 25

**STATUTES**

15 U.S.C. § 77k(a) ....................................................................................................................10, 13

15 U.S.C. § 77l(b) ...........................................................................................................................23

**OTHER AUTHORITIES**

17 C.F.R. § 229.105 .........................................................................................................................13

17 C.F.R. § 229.303(a)(1) ................................................................................................................13

17 C.F.R. § 229.503(c) (2019), Effective May 2, 2019 ...................................................................13

54 Fed. Reg. 22427 (May 18, 1989) ................................................................................................13

64 Fed. Reg. 45150 (Aug. 19, 1999) ..........................................................................................20, 21

84 Fed. Reg. 12674-01 (Apr. 2, 2019) ............................................................................................13

Fed. R. Civ. P. 8 .......................................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) .....................................................................................................................9

Lead Plaintiffs Northeast Carpenters Annuity Fund ("Northeast Carpenters"), El Paso Firemen & Policemen's Pension Fund ("El Paso"), and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS") (collectively, "Plaintiffs"), hereby submit this memorandum of law in opposition to the motions to dismiss filed by: (1) the GreenSky Defendants (ECF. No. 101); and (2) the Underwriter Defendants (ECF No. 99).[1]

## Preliminary Statement

In this case, Plaintiffs allege that Defendants violated the Securities Act by selling stock to investors in GreenSky's May 2018 initial public offering ("IPO") using Offering Documents that omitted the material facts that, prior to the IPO, Defendants intentionally jettisoned a group of merchants that historically made up a material part of GreenSky's transaction volume and also accounted for GreenSky's most profitable transactions, and that this decision had resulted in a dramatic slowdown in GreenSky's profitability and growth.

When it facilitates a loan, GreenSky receives a percentage of the dollar amount of the loan as an upfront "transaction fee." Transaction fees contribute the vast majority of GreenSky's revenue—approximately 86% in 2017. GreenSky's solar merchants—which made up nearly 20% of its transaction volume in 2016—paid Greensky a transaction rate of about 14%, consistently about twice as high as the average rate paid by other merchants. These merchants thus generated far more transaction fee revenue per transaction for GreenSky than any other class of merchants.

But in 2016, two years prior to the IPO, GreenSky made a decision to wind down its very profitable solar business, terminating accounts with solar panel merchants and actively

---

[1] Internal citations and quotation marks are omitted from all legal authority unless otherwise noted. For the Court's convenience, Plaintiffs adopt Defendants' definitions of "Prospectus," "Offering Documents," and "Individual Defendants." *See* GreenSky Br. at 4 & nn.4.

1

discouraging sales. At the same time, GreenSky attempted to grow a new business line for merchants who provide elective healthcare. Elective healthcare merchants paid an average 6.5% transaction rate, which was in line with the average for other non-solar merchants. GreenSky's new elective healthcare business depended on a large volume of transactions and uncertain backend revenue, and was thus fundamentally different than the high-margin solar business with its substantial, upfront transaction fees. As a result of GreenSky's move from solar to elective healthcare, its transaction fee rates declined and its profitability and growth slowed.

The Company's Offering Documents for its IPO, however, failed to disclose those facts in any discernable way: they made no mention of the exceptionally high transaction fee rates and volume GreenSky had collected from solar merchants historically, the effect that changing categories of merchants ("merchant mix") was already having on the Company's declining transaction fee rate, or the current and future impact on GreenSky's profitability and growth.

Reviewing the entire Prospectus is revealing.[2] The Prospectus spans 234 pages, yet in only one phrase in one sentence on page 7 (repeated again on page 118) does the Prospectus refer to the solar business *at all*. Even there, the statement is oblique—it notes only that GreenSky's dollar-based retention calculation has been adjusted to exclude solar panel merchants "as we actively reduced our transaction volume with such merchants in 2017." That is the entirety of Defendants' disclosure about a major change to GreenSky's most profitable segment that was initiated nearly two years before the IPO, one which posed a significant risk to GreenSky's future success.

Defendants had every opportunity to make a proper disclosure in the Prospectus. Yet,

---

[2] The Prospectus, which is incorporated by reference in the Complaint, is also included as Exhibit C to the DeMasi Declaration submitted in support of the GreenSky Defendants' motion. *See* ECF No. 103-3. Citations to the Prospectus are abbreviated as "P. at ___." Citations to the Complaint are abbreviated as "¶ ___."

despite setting forth 11 bullet points in the "Risk Factors Summary" (P. at 10) and 69 "Specific Risk Factors" (P. at 26-61), including 35 specific risk factors related to GreenSky's core business (P. at 26-42), not once did Defendants inform investors of the clear risks stemming from GreenSky's decision to wind down an extremely profitable part of its business. Defendants even explained that GreenSky's failure to retain "merchants of similar size and profitability . . . would have a material adverse effect on [GreenSky's] business and future growth," ¶ 74, without mentioning that the Company had already lost important solar merchants because, on its own volition, it was eliminating that profitable segment.

A comparison of GreenSky's own pre- and post-IPO descriptions of the factors affecting transaction fee rate also demonstrates how thoroughly the Prospectus conceals the above facts. Whereas the discussion of the Company's declining transaction fee rate in the May 2018 Prospectus made no mention of the impact of merchant mix, each of GreenSky's *post*-IPO filings in 2018 offered increasingly detailed explanations of that relationship. The August 2018 Form-10Q, filed less than three months after the IPO, disclosed for the first time that "the mix of loans offered by merchants generally varies by merchant category. Therefore, as the mix of merchants evolves over time, the mix of loan products and transaction fees will evolve accordingly." ¶ 58. By the 2018 Form 10-K, filed in March 2019, GreenSky admitted that "shifts in merchant mix have a ***direct impact*** on our transaction fee rates." ¶ 100 (emphasis added).

Likewise, in November 2018, six months after the IPO, Defendants publicly released two charts, made up predominantly of pre-IPO data, that clearly demonstrated how significant solar merchants had been to GreenSky's business and how sharply GreenSky's average transaction fees had dropped as a consequence of the declining solar business. *See* ¶ 105 (charts). But the Prospectus did not include these charts, nor did it mention the obvious trends they depicted, which

stemmed from Defendants' policies long-predating the IPO.

Defendants attempt to avoid liability for their clearly misleading and material misstatements and omissions by claiming that half-truths buried in the Prospectus qualify as sufficient disclosures. This contention lacks merit. Defendants know how to make a meaningful disclosure, and did so repeatedly just months after the IPO, sharing for the first time information that was readily available to them when the Prospectus was being prepared. In the words of Defendant Benjamin, a GreenSky Director, "when [GreenSky] made the decision to cull th[e solar] business, it was with full acknowledgment and realization that it was highly profitable business with an upfront transaction fee of 140 basis points." ¶ 95. Thus, the Offering Documents were required to, but did not, disclose the negative impact that the change in merchant mix and transaction rate was having on GreenSky's profitability and growth.

In sum, Plaintiffs have alleged straightforward violations of the Securities Act that easily meet Rule 8's notice pleading standard. Defendants' motions should be denied in their entirety.

**Statement of Facts**

I.   **GreenSky's Profitability Depends on Transaction Fee Rates**

GreenSky is a financial technology company that enables merchants to process loan applications at the point of sale. ¶ 43. GreenSky has two principal sources of revenue. ¶ 44. First, GreenSky receives an upfront "transaction fee" from the merchant when a consumer secures a loan through GreenSky's platform and pays for the purchase. *Id.* Second, GreenSky receives "servicing fees" on the loan portfolios the Company services. *Id.*; *see also* P. at 2.[3] Servicing fees are an

_____

[3] GreenSky also receives "incentive" fees from its bank partners if the portfolios of loans generated on its platform exceed certain thresholds. P. at 85. The Company reports the revenue generated from these fees under the header, "Servicing and Other." *See id.* at 80.

inherently less certain source of revenue than upfront transaction fees, because of the potential that a customer could pay off a loan early or go into default. ¶ 109.

Transaction fees, paid upfront by merchants at the outset of the loan, are, by far, the more important source of revenue for GreenSky. Transaction fee revenue accounted for about 86% of GreenSky's total revenue in 2017. *See* ¶ 44. The overall revenue GreenSky derives from transaction fees is a product of the dollar volume of the underlying loans ("transaction volume") multiplied by the rate GreenSky receives from a merchant on a given loan ("transaction fee rate"). Thus, it is clear that changes to *either* the transaction volume or the transaction fee rate will affect the Company's overall transaction fee revenue.

## II.     Prior to the IPO, Defendants Shift Away from the Profitable Solar Business

As GreenSky admitted only *after* the IPO, transaction fee rates "var[y] by merchant category. Therefore, shifts in merchant mix have a direct impact on [the Company's] transaction fee rates." *See*, *e.g.*, 2018 Form 10-K (quoted at ¶ 100). For at least four years prior to the IPO, however, the transaction fee rate was "incredibly stable at about 700 basis points" across the merchants on GreenSky's platforms, with one notable exception: solar panel merchants, who generated average rates of around 14%, ***double*** the averages of all other merchants. ¶¶ 46, 86, 98.

GreenSky initially took advantage of solar merchants' high transaction fee rates and encouraged its salespeople to pursue the solar business. ¶ 47. In 2016, solar merchants accounted for nearly 20% of GreenSky's transaction volume (and inflated the Company's average transaction fee rates and revenue accordingly). ¶ 46. Beginning in 2016, however, GreenSky decided to transition out of the solar panel industry. ¶ 48. The Company actively discouraged its salespeople from pursuing new solar business and began terminating its agreements with existing merchants. ¶ 48. By 2017, a single salesperson handled all of GreenSky's solar business. *Id*. Solar transaction volume dropped precipitously. ¶ 49.

5

During the same period, GreenSky began expanding its business into the elective healthcare industry, which had a much lower average transaction fee rate of 6.5%. ¶ 50. As a result, the Company's average transaction fee rate declined, offsetting increases in the Company's transaction volume. *Id.*; *see also* ¶¶ 56, 58. By the first quarter of 2018, just before the IPO, solar merchants dropped to 8% of GreenSky's transaction volume and the Company's average transaction fee rate fell to 6.9%, nearly a full percentage point below the rate in the first quarter of 2017. ¶¶ 50, 92, 106. In turn, the Company's cost of revenue was 55% higher than in 2017, while gross profit growth slowed. ¶ 108 & n.7. Six months after the IPO, Defendant Zalik, GreenSky's CEO, admitted that, *prior to* the IPO, GreenSky was aware of these trends:

> We knew going into 2018 that historically, outside of our solar business, our average take rate had been incredibly stable for years. We knew that we had made a decision at the end of 2016 to reduce our concentration on solar. We knew that solar had an outsized average take rate of 14%. And as solar as a percentage of our business was coming down that ***our average take rate would go down***. ¶ 91.

### III.    Defendants Fail to Disclose These Facts and Trends in the Offering Documents

In May 2018, GreenSky went public. ¶ 51. Although Defendants knew—or reasonably should have known—about the risks of replacing the high-fee solar business with the lower-fee healthcare business and the impact that shift was already having on the Company's profitability, GreenSky's Offering Documents concealed those trends from investors. *See* ¶¶ 52-76.

First, and most notably, the Prospectus makes no mention of the outsized role the solar business played in GreenSky's historical revenues and transaction fee rate. ¶ 53. Instead, the sole reference to the solar business in the entire Prospectus is hidden in a section on "Attractive Unit Economics," which explains that solar panel merchants will be excluded from a measure of "dollar-based retention" because "we actively reduced our transaction volume with such merchants in 2017." ¶ 54. This statement does not come close to revealing the impact of these changes on the

6

Company. To make matters worse, the Prospectus did not exclude the solar business's outsized transaction fee rates and resulting revenues from other important metrics, giving investors a false picture of the Company's current position and potential. *See* ¶¶ 56-59.

Second, the Prospectus touted the Company's "recurring" revenue model, without disclosing that loans for solar merchants made up *one fifth* of GreenSky's transaction volume in 2016 and 12-13% of its volume in 2017, just months before the IPO, nor that reducing the solar business would accordingly impact the potential for that revenue to recur going forward. ¶¶ 62-65. Similarly, the Prospectus made no mention of outsized volume and revenues the Company had historically obtained from its solar business, even as it discussed the importance of "[g]rowth trends in active merchants and transaction volume" to GreenSky's business. ¶¶ 68-69.

Third, the Prospectus also provided what appeared to be detailed information about the mechanics of its transaction fees, without mentioning the relationship between merchant mix and transaction fee rates and revenue. *See* ¶¶ 58-61, 64-67. Without any explanation of this relationship, investors were unable to identify or evaluate the risks and likely impact of GreenSky's pre-IPO decision to dramatically change its merchant mix by replacing the high-fee solar merchants with the low-fee elective healthcare business.

Fourth, the Prospectus misleadingly presented GreenSky's expansion into the elective healthcare market as a growth opportunity, without disclosing the specific, known risks resulting from the Company's decision to shift from the solar business, which had yielded high, upfront transaction fees, to the healthcare business, which would rely on much higher transaction volumes and uncertain, backend servicing payments to offset that sector's lower transaction fees. ¶¶ 70-73. Although the Prospectus warned that any inability to retain or acquire "merchants of similar size and profitability . . . would have a material adverse effect on [GreenSky's] business and future

7

growth," ¶ 74, it did not mention that two years earlier, GreenSky had decided to replace its uniquely profitable high-fee solar business with a low-fee elective healthcare business, thereby ensuring that, months prior to the IPO, this risk *already transpired*. ¶ 75.

## IV.    Amid Poor Performance, the Truth Emerges Shortly After the IPO

In the months after the IPO, as a result of the transition away from solar, GreenSky's transaction fee rates continued to fall: the second quarter of 2018 was 53 basis points behind the same quarter in 2017, ¶ 77; the third quarter was 35 basis points behind 2017's third quarter, ¶ 84; and the overall 2018 average was 46 basis points below that of 2017, ¶ 100. Worse yet, the 2018 average rate was nearly a full percentage point below the average achieved in 2016. ¶¶ 58, 100.

This decline negatively impacted GreenSky's financials. By the third quarter of 2018, just months after the IPO, GreenSky reduced its 2018 guidance, predicting that its Adjusted EBITDA for the 2018 fiscal year would grow at a rate of between 4 and 10%, in stark contrast to the 21.9% growth achieved in Adjusted EBITDA in 2017 and advertised in the Offering Documents. ¶ 107.

Under pressure, Defendants revealed that GreenSky's decision to reduce its profitable solar business was the primary cause of its declining transaction fee rates and weak performance. Each of the Company's post-IPO public filings in 2018 offered material information about the relationship between merchant mix and transaction fee rates that had been omitted from the Prospectus. ¶ 111. In its November 2018 investor presentation, GreenSky included charts demonstrating that, beginning at least as early as January 2017, a sharp "decline in solar originations" was causing a negative "trend" in transaction fee rates. ¶ 105. Summing up these charts, the presentation explained that GreenSky's 2018 fiscal year was "impacted by a 0.5% decline in transaction fee rate, resulting in $25M reduction in revenue and Adjusted EBITDA." ¶ 105-06. The Individual Defendants were even more explicit: for instance, on a November 6 call, Defendant Zalik confessed that "***the disappointment for us in 2018 is our average transaction fee***

8

*take rate year-over-year is down 70 basis points*, entirely driven by our solar mix going from a

high of almost 20% of our business in '17 to 4% of our business." ¶ 115 (emphasis added).[4]

With GreenSky's disclosures, its stock dropped 60% from its IPO price, causing substantial

investor losses. ¶¶ 118-19. In contrast, however, the Individual Defendants personally received

hundreds of millions of dollars from the IPO, the proceeds of which went almost exclusively to

pay themselves and their earlier private investors. ¶¶ 142-43.

## Legal Standard

Securities Act claims are governed by a Rule 8(a)(2) notice pleading standard, which

requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."

*See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). To survive

a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted

as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). In considering a motion to dismiss, the Court should accept as true all factual allegations

in the complaint and draw all reasonable inferences in the plaintiff's favor. *See, e.g., Goldstein v.*

*Pataki*, 516 F.3d 50, 53 (2d Cir. 2008).

## Argument

## I.     PLAINTIFFS ADEQUATELY ALLEGE SECTION 11 CLAIMS

Section 11 of the Securities Act imposes liability on Defendants if "any part of the

registration statement . . . contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements therein not

_____

[4] *See also*, *e.g.*, ¶ 95 (Defendant Benjamin, explaining that the declines were "all driven by
[merchant] mix").

misleading." 15 U.S.C. § 77k(a).[5] Section 11 imposes liability on Defendants for negligence, and sets a low standard for Plaintiffs: "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Contrary to Defendants' implications,[6] "plaintiffs bringing claims under section[] 11 . . . need not allege scienter." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

1. **Defendants Omitted Information Necessary to Make the Offering Documents "Complete and Accurate"**

"In evaluating claims under Section[] 11 . . . , the court must review the Offering Documents as a whole[.]" *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366.

Viewing the Offering Documents as a whole, Defendants did not fulfill their obligation to provide "complete and accurate" information, but instead negligently omitted significant facts that they knew, or easily could have discovered, at the time of the IPO. As described above:

- The Prospectus did not disclose that: (1) GreenSky's solar business historically made up 20% of the Company's transaction volumes; (2) its solar business offered

---

[5] Defendants do not dispute that Plaintiffs have standing to bring a Section 11 claim, or that, due to their role in GreenSky's IPO, they are proper defendants for a Section 11 claim.

[6] *See* GreenSky Br. at 11 (asserting that "any alleged omission must have been known to defendants"). *White v. Melton*, the case on which Defendants rely, makes no such assertion and expressly declines to reach the issue of scienter. *See* 757 F. Supp. 267, 269 n.1 (S.D.N.Y. 1991).

an average transaction fee rate double that of other merchants; (3) by the time of the IPO, GreenSky was actively discouraging salespeople from pursuing solar contracts; (4) GreenSky's projected growth was based on an unreasonable assumption that its solar business would remain stable, despite GreenSky's own aggressive efforts to close down that business; and (5) the declining solar business was negatively impacting GreenSky's average transaction rate and profitability;

- The Prospectus did not disclose that merchant mix impacted transaction fee rate at all, let alone that merchant mix was a primary driver of the downward trend in that metric;

- The Prospectus stated that GreenSky was expanding into the healthcare market, but did not disclose that: (1) this industry averaged transaction fee rates that were less than half the average of the industry it was replacing; (2) the success of this new strategy was premised on much higher transaction volume, and GreenSky's ability to collect uncertain servicing fees over the life of the loan in lieu of up-front costs; and (3) as a result, healthcare was fundamentally different from and not a replacement for the unique solar business; and

- The Prospectus touted GreenSky's "recurring revenue" model without disclosing that the decision to transition away from its solar business meant that a major portion of its historical business would not "recur."

Those omissions are irrefutable, and constitute a complete failure to disclose material information to investors in the Offering Documents. Thus, it is not, as Defendants assert, that Plaintiffs fault Defendants for failing to disclose "historical fluctuations" in the business's financials. *See* GreenSky Br. at 17. Rather, Defendants failed to disclose a significant, deliberate, and risky change in business strategy to investors that was already negatively impacting the Company. *See* ¶¶ 108-09; *cf. In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (plaintiffs' claims failed because, *inter alia*, they "ha[d] not alleged that [Defendant's] managers pursued an undisclosed objective or investment strategy").

Moreover, the partial and misleading information that *was* disclosed in the Prospectus was not sufficient to put a reasonable investor on notice of the scope of GreenSky's change in strategy, or its risks. For instance, Defendants note that GreenSky provided the declining transaction fee rates in the Prospectus. GreenSky Br. at 16. But although the overall 2016 and 2017 numbers were

11

there, they were presented without any explanation about the cause of those declines or any indication that the declines were part of a consistent trend, rather than isolated events resulting from disparate factors. In other words, investors had no way to evaluate the materiality of that information. By contrast, the charts GreenSky provided in its post-IPO November 2018 investor presentation—which primarily consist of *pre*-IPO data that was not disclosed in the Prospectus— clearly show the relationship between GreenSky's 2016 decision to jettison its solar business and the declining transaction fee rate, and make clear that those trends had, and would continue to have, a negative impact on GreenSky's financials.

These half-truths do not excuse Defendants from liability. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011), makes the point clear. There, the Second Circuit held that Plaintiffs adequately alleged a Section 11 claim where Defendants failed to disclose how a trend would impact the issuer-defendants' business, even though some facts concerning that trend were already in the public domain. *Id.* at 716, 718-19. The *Litwin* court explained that "the potential future *impact* [of the publicly available facts] was certainly not public knowledge," and because that impact was reasonably likely to be material, the defendants had a duty to disclose it. *Id.* at 719; *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 510 (S.D.N.Y. 2013) ("[T]he mere identification of a trend is, in some cases, not sufficient disclosure."). Defendants offered investors even less here: they failed to provide sufficient information to even identify the trend, much less its causes and impact, notwithstanding that all of those facts were known or knowable to Defendants.

### 2. Defendants Had an Additional Affirmative Duty to Disclose Omitted Facts Under Items 303 and 503

As noted above, Section 11 liability attaches if the Offering Documents in an IPO failed to include material facts that were legally required to be included therein. *See* 15 U.S.C. § 77k(a).

Item 303 of SEC Regulation S-K required Defendants to disclose in the Offering Documents "any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(1). The SEC has explained that: "[a] disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." Mgmt.'s Discussion & Analysis of Financial Condition & Results of Operations, Securities Act Release No. 6835, 54 Fed. Reg. 22427, 22429 (May 18, 1989); *see also Litwin*, 634 F.3d at 716. At the time of GreenSky's IPO, Item 503(c) also required that the Prospectus include "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2018).[7] Item 503's requirements substantially overlap with those of Item 303. *See In re Deutsche Bank AG Sec. Litig.*, No. 09 CV 1714 (DAB), 2016 WL 4083429, at *27 (S.D.N.Y. July 25, 2016) (denying motion to dismiss Section 11 claims premised on Item 503 disclosure obligation "for many of the same reasons" as claims premised on Item 303).

Defendants had a duty to disclose the omitted facts under Items 303 and 503. First, there can be no serious debate that GreenSky's declining volume of solar transactions, and the resulting impact on transaction fee rates, were "trends," because GreenSky itself described them as such in its post-IPO November 2018 investor presentation. In that presentation, GreenSky included a chart describing the "Impact of [the] Decline in Solar Originations" as a "***Trend***[] in Transaction Fee Components," which (according to GreenSky's chart) had been identifiable for over a year prior

---

[7] Effective May 2, 2019, this requirement was moved to 17 C.F.R. § 229.105 (Item 105). *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674-01 (Apr. 2, 2019).

to the IPO.[8] ¶¶ 105, 127. GreenSky's 2018 Form 10-K similarly indicated that the shift in "merchant mix" had negatively affected the Company's transaction fee rates and therefore its transaction fee revenue in 2017 and 2018. ¶¶ 100-01. Second, Defendants admitted that they knew about these trends, which were, of course, the direct result of their own strategic decisions. For instance, Defendant Zalik stated in November 2018 that GreenSky "knew going into 2018"—five months before the IPO—that, as a result of its 2016 decision to shift away from the solar business, "our average take rate would go down." ¶ 91; *see also* ¶ 126 (Defendant Benjamin, admitting that when GreenSky "made the decision to cull [the solar] business" at the end of 2016, "it was with full acknowledgment and realization that it was highly profitable business with an upfront transaction fee of 140 basis points"). Third, as discussed below, these trends were reasonably likely to—and did—have a material impact on GreenSky's business.

In an effort to dispute these points, Defendants rely on *post*-IPO developments. They assert that transaction rates slightly increased in the second and third quarters of 2018, as compared to the first quarter. GreenSky Br. at 14. Those numbers may suggest that GreenSky was beginning to increase its non-solar volume to partially offset the loss of the solar business, but they do not change that material facts about the decision to jettison the solar business were omitted from the Prospectus, including the negative impact therefrom. Defendants also fail to recognize that the transaction rates had declined over the previous two years, and, post-IPO, remained well below

---

[8] The Underwriter Defendants suggest that there was no obligation to disclose the omitted facts because they were "isolated occurrences," Underwriter Br. at 3; however, courts have identified events with shorter durations as "trends." *See, e.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (nine months sufficient). Here, GreenSky's November 2018 chart identified the "trend" as early as January 2017, over 16 months before the IPO. Regardless, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." *Id.*

the comparable quarters of previous years. Moreover, the post-IPO numbers have no bearing on whether, at the time of the IPO, Defendants should have disclosed what they knew: because solar transaction volume was being deliberately reduced, the transaction fee rate and, in turn, GreenSky's growth were "reasonably likely" to decline. *See Panther Partners Inc.*, 681 F.3d at 121 (post-IPO discovery that product defect rate was 25-30% did not undermine plausible pre-IPO inference that defect might affect *all* products); *cf. In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 526 (S.D.N.Y. 2009) ("The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective.").

Defendants' argument that no disclosure was required because certain Defendants claimed after the IPO that they were surprised by the speed with which the solar business declined is similarly unavailing. GreenSky Br. at 14 & n.11. It would be nonsensical to permit Defendants to avoid disclosure obligations under Items 303 and 503 because, in hindsight, a trend was actually *worse* than expected. Indeed, the existence of uncertainty about how a trend might develop is the motivating principle of these disclosure requirements. *See Panther Partners Inc.*, 681 F.3d at 120 (emphasizing that Item 303 is concerned with "the manner in which uncertainty surrounding [a trend] . . . might reasonably be expected to have a material impact on future revenue"). Moreover, this is a fact dispute not properly raised on a motion to dismiss: Plaintiffs plausibly allege that, because of Defendants' own aggressive efforts to shut down GreenSky's solar business and the resulting trend in transaction fee rates that was already visible in 2017 and early 2018, there was no reasonable basis for this feigned surprise. ¶¶ 92, 105.

### 3. The Offering Documents Also Included Actionable Affirmative Misstatements

Defendants fail to challenge affirmative misstatements that the Complaint specifically

identifies, with bold text and explanations,[9] and thereby concede those statements are actionable. *See Mullins v. City of New York*, 653 F.3d 104, 118 n.2 (2d Cir. 2011) ("[C]ourts are not to consider arguments raised for the first time in a reply."). For instance, Defendants fail to address Plaintiffs' allegations concerning a misleading "risk factor" in the Prospectus purporting to warn that "if we fail to retain any of our larger merchants . . . and we do not acquire new merchants of similar size and profitability, it would have a material adverse effect on our business and future growth." ¶¶ 74-75. That statement affirmatively mischaracterizes a "risk" as potential when it had already come to fruition. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010) (statement couched as "risk factor" describing conditions that "might" occur is actionable where adverse events had already occurred). By the time of the IPO, GreenSky had already terminated nearly all of its solar merchants—by far the Company's most profitable sector—and was attempting to replace them with much less profitable merchants, decisions which were already having an adverse impact on GreenSky's profitability and growth.[10]

To the extent Defendants attempt to challenge other affirmative misstatements, their arguments fail. For example, Defendants argue—incorrectly—that several misstatements in the Prospectus are puffery. GreenSky Br. at 20-21. But statements are inactionable "puffery" only if "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646

---

[9] The Complaint clearly and specifically identifies the actionable statements in bold font and with subsequent explanations as to why they are actionable. Defendants' conclusory argument to the contrary fails. GreenSky Br. at 19-20.

[10] Meanwhile, Defendants' assertion that certain other statements are nonactionable is irrelevant, because the Complaint never identified those other statements as actionable in the first place. *See* GreenSky Br. at 21 (quoting the statements concerning "attractive unit economies," "align[] our incentives," and "[w]e believe because of population aging . . . .")).

(S.D.N.Y. 2017). Moreover, statements may not be "viewed in isolation" in an attempt to cast them as "mere puffery" because, when viewed in the context in which they were made, investors may reasonably rely on those statements as reflecting the "true state of affairs." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("[D]efendants may be liable for misrepresentations of existing facts.").

Defendants contend that statements in the Offering Documents concerning GreenSky's "strong recurring revenue" and "significant opportunities to expand" simply expressed optimism. GreenSky Br. at 19, 21; ¶¶ 68-72. But a purportedly strong recurring revenue model that would remain intact as GreenSky attempted to expand was the core of GreenSky's value proposition, and a selling point that Defendants repeatedly hammered home to investors. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6729, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) ("[if] made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors"). In truth, at the time of the IPO, the Company had already taken steps to ensure that a major historical driver of its revenue would *not* recur: the Company was radically culling the profitable solar business it had relied on in the past, in favor of businesses that were new, much less profitable, and had more long-term risk. Accordingly, GreenSky's misrepresentations are actionable, just like the substantially similar misstatements other courts routinely hold to be materially misleading. *See, e.g., Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 480 (E.D.N.Y. 2001) (actionable statements included company's claims that it has "framework [for] organic growth," that it is "poised for future growth," and that its "revenue and earnings growth model is 'still on track'"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650 (E.D. Pa. 2015) (statement that

sales were "still going strong" was actionable).[11]

Next, Defendants claim certain misstatements are inactionable statements of opinion, but the law is clear that Defendants cannot convert an actionable statement of fact into one of opinion simply by inserting the word "believe" in front it. *Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, -- U.S. --, 135 S. Ct. 1318, 1326-27 (2015). Moreover, an opinion is actionable when the "issuer's basis for offering" it is called into question, or when it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion." *Id*. at 1328, 1332. Even if the few statements Defendants point to were opinions, such as the claim that there were "substantial opportunities in the elective healthcare market," those statements are still actionable because Defendants did not discuss countervailing material facts underlying them—namely, whatever opportunities elective healthcare might present, that business was materially different from the profitable solar business it was replacing, and accordingly, the transition also carried significant risk. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) ("[u]nder the circumstances, the alleged failure to disclose the true sources of such revenue could give rise to liability").

Defendants also argue that statements they characterize as "accurate statements of historical performance" are inactionable. GreenSky Br. at 22. However, this case is not about the

---

[11] The "puffery" decisions Defendants cite are inapposite, as none involved repeated representations regarding stable revenue. GreenSky Br. at 20-21. Instead, Defendants rely on Securities Exchange Act cases that centered on statements regarding subjects that are not analogous to the misstatements regarding revenue, growth, and transaction fees at issue here. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp*., 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013) (due diligence); *Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012) (clinical drug trials); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (company's integrity); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187 (2d Cir. 2009) (same).

accuracy of historical performance. Rather, it concerns the misleading impression that historical performance would recur, *when the basis for much of that performance had ended*. ¶¶ 72-75.

Finally, the "bespeaks caution" doctrine does not save Defendants either. "[B]espeaks caution does not apply insofar as those characterizations communicate present or historical fact"; rather, it only applies to forward-looking statements. *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010). Significantly, Defendants do not argue that any statements at issue are forward-looking, *see* GreenSky Br. at 22-23, so the doctrine is irrelevant here. Further, Defendants do not cite any sufficiently cautionary language, which is also necessary to invoke the doctrine, because the "bespeaks caution doctrine indeed do[es] not preclude liability for a statement warning of a risk that a company knows has already transpired." *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016).

Thus, Plaintiffs adequately allege affirmative misstatements.

### 4.   <u>The Misstatements and Omissions Were Material to Investors</u>

Materiality under Section 11 is an "inherently fact-specific finding," *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988), that is satisfied when a plaintiff alleges a statement or omission that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," *id.* at 231-32; *see also Litwin*, 634 F.3d at 717 n.10 (materiality requirement is the same under Sections 10(b), 11, and 12). At the pleading stage, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin*, 634 F.3d at 717 (alterations omitted). In sum, "[w]here the principal issue is materiality, . . . the burden on plaintiffs to state a claim is even lower than the relatively minimal burden applicable to other elements of their claims under Rule 8[.]" *In re Facebook, Inc. IPO*, 986 F. Supp. 2d at 519. Multiple factors demonstrate that the

omitted facts and misstatements were material here.

> ### a.    Defendants' Post-IPO Conduct Indicates Materiality

Defendants' post-IPO disclosures demonstrate materiality. *See In re Facebook, Inc. IPO*, 986 F. Supp. 2d at 520 ("Defendants' actions to disclose the nonpublic information to IPO-critical parties undermine their contention that the information was not material.").

In the present case, Defendants included details about the impact of changes in merchant mix on GreenSky's transaction fee rates and revenue in each of their post-IPO public filings and discussed the solar business's historical contribution to the Company's profitability at length in conference calls and presentations. *See* ¶¶ 110-16. The Individual Defendants also confirmed the importance of this metric to investors. For instance, on a November 12, 2018 conference call, Defendant Zalik, GreenSky's CEO, underscored the importance of the transaction fee rate to GreenSky's financials, stating that "***the take rate***"—meaning transaction rate—"is ***the first thing I'm looking at*** . . . ***simply because it has such an impact on EBITDA perception or GAAP EBITDA***." ¶ 112. Further, GreenSky's own investor presentation attributed its weak 2018 performance to "a 0.5% decline in transaction fee ***rate***, resulting in $25M reduction in revenue and Adjusted EBITDA." ¶ 107 (emphasis added).

> ### b.    Transaction Fees Play a "Significant Role" in GreenSky's Business

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 19, 1999) [hereinafter "SAB No. 99"] directs courts to consider "whether the misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business." *Id.* at 45,152. Defendants' misstatements and omissions relate to GreenSky's solar business, which historically made up nearly a fifth of the Company's transaction volume, and GreenSky's ability to earn transaction fee revenue, which was a critical aspect of the business because transaction fees contributed about

86% of the Company's revenue in 2017. ¶ 44.[12] That alone establishes materiality.

Nevertheless, Defendants try to downplay this obvious significance by asserting that other aspects of the Company's business would offset the losses from lower transaction fee rates. That speculative possibility has no bearing on whether the omitted facts and misstatements were, themselves, material. *See Litwin*, 634 F.3d at 719 (rejecting defendants' efforts to net out the positive and negative effects of a trend to avoid materiality determination); *cf.* SAB No. 99 at 45,153 (pointing out that one material misstatement cannot be offset by another).

Moreover, Defendants' arguments are factually inconsistent with Plaintiffs' plausible allegations. First, Defendants argue that transaction fee rates are less important to the Company's transaction fee revenue than transaction volume. *See* GreenSky Br. at 5 n.6; Underwriter Br. at 4. But, as Defendants themselves admit, "transaction fees—the component of GreenSky's revenue—are the *product of the transaction fee rate* and transaction volume." GreenSky Br. at 10 (emphasis added); *see also, e.g.*, ¶ 58 (Prospectus, explaining that "higher transaction volume was *offset* by a decrease in transaction fees" (emphasis added)).

Second, Defendants seize on certain post-IPO statements to suggest that servicing fees over the life of the loan would compensate for lower transaction fee rates. GreenSky Br. at 14, 18. Even if that were accurate—which is unlikely given that transaction fees consistently contributed over 80% of the Company's revenues—shifting from transaction fees to servicing fees nevertheless materially changes GreenSky's risk profile: instead of upfront payments, the Company would have

---

[12] Defendants' omissions concerning the outsized role that solar merchants played in GreenSky's pre-IPO business also qualify under a related SAB No. 99 factor: the omissions "mask[ ] a change in earnings or other trends." *Id.* at 45,152.

to rely on the receipt of future cash flows that are not guaranteed, particularly because consumers are often incentivized to pay back their loans early with special promotions. ¶ 109.[13]

      c.        **The Market's Reaction Indicates Materiality**

The market's reaction when the truth was revealed also indicates materiality. *See In re Facebook, Inc. IPO*, 986 F. Supp. 2d at 520 ("The market reaction to the revenue projections also supports the adequacy of the materiality allegations."). GreenSky's stock price dropped significantly each time the Company corrected its misstatements and omissions. ¶ 118.

Defendants argue that these drops cannot be connected to the misstatements and omissions in the Offering Documents because GreenSky's transaction fee rates were increasing after the IPO as compared to the first quarter of 2018, which, under Plaintiffs' theory, means better results. GreenSky Br. at 19; Underwriter Br. at 4. In addition to construing the omitted facts too narrowly, however, that argument does not represent Plaintiffs' allegations. As Plaintiffs alleged, GreenSky's own public filings make clear that the appropriate comparator is the *same* quarter in sequential years, not necessarily one quarter to another. *See, e.g.*, ¶ 80 (Aug. 10, 2018 Form 10-Q, comparing average transaction fee rate in the second quarter of 2018 to that of 2017). And by that measure, transaction fees in each quarter of 2018 were declining.[14]

_____

[13] In fact, the Prospectus discloses that "many of the loans originated" on GreenSky's platform offer promotional financing periods. If consumers pay back the loans during a promotional period, any interest billed on the loan is reversed and GreenSky is obligated to make an offsetting payment to the originating Bank Partner. P. at 32. GreenSky cannot count on the servicing fees collected from such loans to offset lower transaction fees.

[14] Defendants also suggest that other factors may have contributed to the stock drops. GreenSky Br. at 19. That factual dispute is generally inappropriate for resolution at the pleading stage. *See In re Facebook, Inc. IPO*, 986 F. Supp. 2d at 523 (collecting cases).

Accordingly, Plaintiffs adequately allege their Section 11 claims.[15]

## II.      PLAINTIFFS ADEQUATELY ALLEGE SECTION 12(A)(2) CLAIMS

Defendants primarily argue that Northeast Carpenters' and CPERS' Section 12(a)(2) claims should be dismissed for all the same reasons that their Section 11 claims should be dismissed, and those arguments fail for the reasons discussed above. GreenSky Br. at 24; Underwriter Br. at 5.[16] Defendants' other arguments are equally meritless.

### 1.   Defendants Have Not Proven Negative Loss Causation

Defendants argue that one Plaintiff, CPERS, has not demonstrated loss causation under Section 12(a)(2). GreenSky Br. at 24-25; Underwriter Br. at 5. This argument fails.

Loss causation is not a *prima facie* element of a Section 12(a)(2) claim; rather, it is an affirmative defense that Defendants must prove. *See* 15 U.S.C. § 77l(b). "The burden to prove negative loss causation is heavy, given Congress' desire to allocate the risk of uncertainty to the defendants in [Securities Act] cases." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 153 (2d Cir. 2017). A court may only dismiss a claim at the pleading stage based on such an affirmative defense where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009).

Defendants have not carried their "heavy burden" to prove negative loss causation here. They do not challenge Plaintiff Northeast Carpenters' loss causation allegations, and thus there are

_____

[15] To the extent Defendants will seek to rely in their Reply on the recent decision in *Nurlybayev v. ZTO Express*, No. 1:17-cv-6130 (S.D.N.Y. July, 17, 2019) (Dkt. No. 86), that case is fact-bound and distinguishable, especially because the plaintiffs there—unlike in the present case—failed to establish the materiality of the alleged omissions and misstatements.

[16] Plaintiffs do not allege a Section 12(a)(2) claim on behalf of El Paso. ¶ 165 n.10.

no grounds to dismiss its 12(a)(2) claims on this basis. Moreover, Defendants have failed to prove that the loss incurred by CPERS on the shares it purchased in the IPO cannot be linked to Defendants' misstatements and omissions, and it is not CPERS' burden to plead as much. Accordingly, discovery on the Section 12(a)(2) claims must proceed as Congress intended.

### 2.   The Underwriter Defendants' Standing Argument Lacks Merit

The Underwriter Defendants argue separately that Plaintiffs' allegations do not provide sufficient detail to demonstrate standing to bring Section 12(a)(2) claims against the Underwriter Defendants as "statutory sellers." Underwriter Br. at 6-7. An individual is a "statutory seller" if it: (1) directly passed title to the securities, *or* (2) solicited the purchase of securities out of a desire to (a) serve its own interests or (b) serve the interests of the securities' owner. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359. A plaintiff need not identify which underwriter sold to a specific named party. *See In re MF Glob. Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 323-24 (S.D.N.Y. 2013). All that is required are "sufficient allegations, when judged against the requirements of Rule 8, Fed. R. Civ. P., to give the Underwriter Defendants fair notice of the basis for the claims against them, to wit, that they solicited the named plaintiffs in the sale of the [shares] or sold [shares] to them." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003).

Plaintiffs easily clear that low bar. They allege that "Lead Plaintiffs and the Class purchased shares in the Offering from the Underwriter Defendants," ¶ 20, and state the precise allotment of shares sold by each of the eleven Underwriter Defendants in the IPO, ¶¶ 30-40. Plaintiffs also allege that the Underwriter Defendants solicited the purchase of securities for their own, and the securities owners', interests. Specifically, they allege that the Underwriter Defendants: (1) participated in the promotion and sale of GreenSky common stock to Plaintiffs and investors, including through the Prospectus; (2) did so to promote their own financial interests

24

and those of the Company; and (3) drafted and disseminated the Offering Documents. ¶¶ 41, 42, 167. Courts have held that such allegations are sufficient. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 423.[17]

Accordingly, Plaintiffs adequately allege their Section 12(a)(2) claims against the Underwriter Defendants as well.

### III.   PLAINTIFFS ADEQUATELY ALLEGE SECTION 15 CLAIMS

"Section 15 requires only that a plaintiff plead that the relevant defendant controlled the primary violator." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010). The GreenSky Defendants do not contest that Plaintiffs adequately allege such control.[18] *See also* ¶¶ 135-43; 175-84. Instead, their sole argument in support of dismissal of the Section 15 claims is that Plaintiffs have not alleged a primary violation of Section 11 or 12(a)(2). GreenSky Br. at 25. That argument fails for all the reasons set forth above.

### Conclusion

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

---

[17] The Underwriter Defendants rely on *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012). Underwriter Br. at 6-7. In *UBS*, however, the lead plaintiff had not alleged—as Northeast Carpenters and CPERS did here—whether it purchased its securities from any underwriter or as a result of their solicitation. *Id.* at *27.

[18] Defendants contend allegations that the Individual Defendants had the power to dictate GreenSky's governance, which they used to grant themselves considerable financial benefits at the Company's expense, are "irrelevant digressions." GreenSky Br. at 23. To the contrary, however, these facts clearly support Plaintiffs' allegation that the Individual Defendants had "the power to direct . . . the management" of GreenSky. *In re CitiGroup Inc.*, 723 F. Supp. 2d. at 595.

Date:        July 22, 2019                    Respectfully submitted,

/ s / Steven J. Toll
COHEN MILSTEIN SELLERS & TOLL PLLC
Steven J. Toll (admitted *pro hac vice*)
S. Douglas Bunch (SB-3028)
1100 New York Avenue, N.W. | Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com

Alice Buttrick (5444120)
Jessica (Ji Eun) Kim (5326129)
88 Pine St. | 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax.: (212) 838-7745
abuttrick@cohenmilstein.com
jekim@cohenmilstein.com

Manuel J. Dominguez (admitted *pro hac vice*)
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: (561) 515-1400
Fax.: (561) 515-1401
jdominguez@cohenmilstein.com

SCOTT + SCOTT ATTORNEYS AT LAW LLP
Max Schwartz (MS-2517)
Tom Laughlin (TL-8888)
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
mschwartz@scott-scott.com
tlaughlin@scott-scott.com

*Attorneys for Lead Plaintiffs Northeast
Carpenters Annuity Fund, El Paso Firemen &
Policemen's Pension Fund, and the Employees'
Retirement System of the City of Baton Rouge and
Parish of East Baton Rouge*