JBP3GREM

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE: GREENSKY SECURITIES
     LITIGATION
4
                                        New York, N.Y.
5
                                        18 CV 11071 (AKH)
6

7    ------------------------------x        Motion

8                                        November 25, 2019
                                         11:00 a.m.
9
     Before:
10
                        HON. ALVIN K. HELLERSTEIN,
11
                                           District Judge
12

13
                            APPEARANCES
14
     COHEN MILSTEIN SELLERS & TOLL, PLLC
15        Attorneys for Lead Plaintiffs
     BY:  STEVEN J. TOLL
16        S. DOUGLAS BUNCH
          ALICE BUTTRICK
17        JESSICA KIM

18   SCOTT & SCOTT, LLP
          Attorneys for Lead Plaintiffs
19   BY:  MAX SCHWARTZ

20
     CRAVATH, SWAINE & MOORE, LLP
21        Attorneys for Defendants
     BY:  KARIN A. DeMASI
22        LAUREN R. KENNEDY
          SOPHIA SUAREZ
23
     WILLKIE FARR & GALLAGHER, LLP
24        Attorneys for Underwriter Defendants
     BY:  TODD COSENZA
25        MADELEINE L. TAYER

JBP3GREM

1          THE COURT:  All right.  Let's have plaintiffs

2     introduce themselves.  Why don't you introduce all your

3     colleagues.

4          MR. TOLL:  Good morning, your Honor.  For the

5     plaintiff, Steven Toll from Cohen Milstein Sellers & Toll.

6     With me are Doug Bunch, Alice Buttrick, and Jessica Kim from

7     our firm, and our co-lead counsel Max Schwartz from Scott &

8     Scott.

9          THE COURT:  You are Mr. Toll?

10          MR. TOLL:  T-O-L-L.

11          THE COURT:  You will be carrying the arguments for

12     plaintiffs?

13          MR. TOLL:  I will, and Mr. Bunch will be speaking to

14     the Section 12(2) motion, if your Honor wants to hear that as

15     well.

16          THE COURT:  Defendant?

17          MS. DeMASI:  Good morning, your Honor.  Karin DeMasi

18     from Cravath, Swain & Moore and behalf of GreenSky and the

19     individual defendants.  And I am joined by my colleagues Lauren

20     Kennedy and Sophia Suarez, and I will be carrying the

21     government for GreenSky and the individuals, your Honor.

22          THE COURT:  And you, sir?

23          MR. COSENZA:  Todd Cosenza from Willkie Farr &

24     Gallagher, LLP.  I represent the underwriters defendants.  I

25     will probably have a short argument depending on --

JBP3GREM

1          THE COURT:  I don't know that your situation is any

2    different from the arguments that Ms. DeMasi going to make.

3          MR. COSENZA:  That's fair, your Honor.  So I'll see

4    how it goes based on the arguments.

5          THE COURT:  Okay.  Excellent.

6          Ms. DeMasi, if you would take the back podium, and

7    Mr. Toll, it will be a lot of back and forth, so when you get

8    called on, you'll take the front podium.

9          MR. TOLL:  Thank you, your Honor.

10          MS. DeMASI:  Thank you, your Honor.  I have just a

11    short set of materials to guide my argument.

12          THE COURT:  You won't have the luxury of doing that,

13    but you can hand up whatever you wish.  I am going to ask you a

14    lot of questions.

15          MS. DeMASI:  Sure.

16          THE COURT:  Has Mr. Toll and his colleagues seen it

17    before?

18          MS. DeMASI:  No, your Honor, but they are all

19    materials from the record.

20          THE COURT:  I don't want it then.

21          MS. DeMASI:  Okay.

22          THE COURT:  Never spring on me a document that your

23    adversary hasn't had the opportunity to see beforehand.

24          MS. DeMASI:  Understood, your Honor.

25          Your Honor, this is one of two cases, as your Honor is

JBP3GREM

1    aware, that the GreenSky investors have brought in the New York

2    courts arising out of the initial public offering of GreenSky

3    stock in May of 2018.  What I'd like to do in my --

4              THE COURT:  I have not known of another case.

5              MS. DeMASI:  Ah, your Honor.  I think this is

6    mentioned perhaps in a footnote in the brief, but there is a

7    second virtually identical complaint that was filed in New York

8    State court as well as, and we will be before Justice Schecter

9    tomorrow arguing a virtually identical motion.

10             THE COURT:  What's the point of this?

11             MS. DeMASI:  Well, your Honor --

12             THE COURT:  That's a question I should ask Mr. Toll.

13   Mr. Toll, what's the point of having duplicate cases?

14             MR. TOLL:  I have nothing to do with the other case,

15   your Honor.

16             THE COURT:  Who does?

17             MR. TOLL:  I don't know who counsel are, your Honor,

18   truthfully.

19             MS. DeMASI:  Plaintiffs' counsel in the other case are

20   Robbins Geller.

21             THE COURT:  So the Section 11, if I remember, is not

22   an exclusive federal jurisdiction statute.

23             MR. TOLL:  Correct, your Honor.

24             THE COURT:  And that must be true of Section 12 as

25   well.  So, the common law remedies are preserved.  I guess

JBP3GREM

1       that's the case in the state court.

2               MS. DeMASI:  Correct, your Honor.  The relief sought

3       is virtually identical.

4               THE COURT:  They are suing under the Martin Act I

5       guess.

6               MS. DeMASI:  No, they are suing under the Securities

7       Act of 1933.

8               MR. TOLL:  Your Honor, it is the Cyan case from the

9       Supreme Court that basically said that there not is not

10      exclusive jurisdiction --

11              THE COURT:  The law says it.  The statute says.

12              MR. TOLL:  Correct.

13              THE COURT:  Okay.

14              MS. DeMASI:  Defendants have sought to stay the state

15      court in favor of the federal case, given that it is federal

16      law that applies.  But this is one of two actions.  We wanted

17      to make your Honor aware.

18              THE COURT:  You are not going to win the stay unless

19      Justice Schecter doesn't want to deal with the case.

20              MS. DeMASI:  Okay, your Honor.

21              THE COURT:  I tell you, if this case progresses to the

22      discovery stage, and if Justice Schecter's case proceeds to the

23      discovery stage, we'll work in coordination so there won't be

24      duplication.  I'll deal directly with Justice Schecter if and

25      when this situation occurs.

JBP3GREM

1          MS. DeMASI:  Thank you, your Honor.

2          So what I'd like to do in the argument is to lay out

3     the analysis very much in the way that the case law does and

4     the cases that have been cited in parties' briefs.  That is

5     first to talk about the prospectus and GreenSky's business,

6     next to talk about what happened here according to plaintiffs'

7     allegations.

8          THE COURT:  I'm aware of the business.  This is a

9     financing service at the point of sale of a large item, very

10    much like conditional sales contract for an automobile or for a

11    large household implement.  You're involved in the home

12    improvement, among the home improvement are solar panels.  For

13    some reason you switched out of solar panels to concentrate on

14    healthcare, notwithstanding that solar panels are gave you a

15    much larger transaction fee than the healthcare industry would

16    give you.  And the plaintiffs are complaining that this

17    required some more explanation in the disclosure statement,

18    particularly under S-K 303 and 503.

19          So, take it from there.

20          MS. DeMASI:  Thank you, your Honor.

21          THE COURT:  What I'm most interested in is to compare

22    the allegations of the second amended complaint with the

23    disclosures in the prospectus, and put them one next to

24    another, and let's see if there is or is not adequate

25    disclosure.

JBP3GREM

1          MS. DeMASI:  Certainly, your Honor.  So the prospectus

2     set forth on the first page of the prospectus --

3          THE COURT:  Let me turn to it, please.

4          MS. DeMASI:  Certainly.

5          THE COURT:  I have the corrected prospectus.

6          MS. DeMASI:  Thank you, your Honor.  So your Honor

7     will see on the first page of the prospectus in bold about

8     halfway down the prospectus disclosed on its cover page that

9     the stock involved risk and pointed to --

10          THE COURT:  The stock what?

11          MS. DeMASI:  That the stock involved risk.  There is a

12     line in the middle, investing in our class A common stock

13     involves risks, and points to risk factors beginning on page 26

14     of which there are 36 pages of risk factors that are set forth

15     in the prospectus.  Those risk factors, your Honor, cover a

16     large variety of potential risks scenarios, one of which

17     materialized here after the IPO.  And that includes risk

18     involving merchant transaction volume.  That if merchant

19     transaction volume were to decline more than anticipated, that

20     there would be a material adverse effect on the stock price.

21          THE COURT:  I'm not finding that.  Where is it?

22          MS. DeMASI:  So these risk disclosures are --

23          THE COURT:  I have that.

24          MS. DeMASI:  They begin on page 26.

25          THE COURT:  I have that.

JBP3GREM

1          MS. DeMASI:  The risk disclosures with respect to

2     merchant transaction volume commence on page 27.  Specifically,

3     on the top of 27, there is a lengthy risk disclosure that says:

4     Our results of operations and continued growth depend on our

5     ability to retain and attract new merchants and bank partners.

6          THE COURT:  Yes.

7          MS. DeMASI:  The risk disclosure goes on to say that

8     growth trends in merchant and transaction volume --

9          THE COURT:  Where are you reading from?

10          MS. DeMASI:  So if you look in the second paragraph,

11     under that disclosure on page 27, it says:  There is

12     significant competition for our existing merchants.  If we fail

13     to retain any of our larger merchants or a substantial number

14     of our smaller merchants, and we do not acquire new merchants

15     of similar size and profitability, it would have a material

16     adverse effect on our business and future growth.

17          THE COURT:  Yes.

18          MS. DeMASI:  Your Honor, that's precisely what

19     happened here after the IPO.  At the time of the IPO -- and

20     this is contained in the complaint and in what plaintiffs call

21     corrected disclosures and statements following the IPO, in the

22     third quarter of 2018, GreenSky disclosed that although it had

23     anticipated that its declining solar transaction volume would

24     stay at around 8 percent.  It actually fell in an unanticipated

25     way to 4 percent.

JBP3GREM

1    THE COURT:  This is not explained either in the

2    complaint or the prospectus.  Why did GreenSky want to get out

3    of the solar panel business?  It was paying what percentage --

4    20 percent of your volume, it was paying you a transaction fee

5    of 24 percent if I remember.

6    MS. DeMASI:  Back in 2015, 2016, it was up at

7    17 percent.  It was then deliberately declined, reduced over a

8    number of years --

9    THE COURT:  That's the point.  Why would you want to

10   cause a decline in a highly profitable business to concentrate

11   on a less profitable business?  It seems counterintuitive.

12   MS. DeMASI:  Yes, I understand, your Honor.  So let me

13   explain.

14   THE COURT:  It is never explained in the prospectus

15   why that's so.

16   MS. DeMASI:  In the prospectus it is not explained,

17   and not, we submit, required to be explained.

18   In the subsequent statements when this unanticipated

19   decline occurred what Mr. Zalik, who is the CEO, and

20   Mr. Benjamin, who is the chairman of GreenSky, explain, was

21   that they were -- GreenSky had decided to deliberately reduce

22   solar volume because of customer risk and risk around certain

23   solar merchants.  And so what Mr. Benjamin --

24   THE COURT:  That doesn't really make sense.  Because

25   of customer risk.  GreenSky is not on the hook.  It's not a

JBP3GREM

1   guarantor of the debt.

2              MS. DeMASI:  Correct.

3              THE COURT:  It is just in effect a broker of the debt.

4              MS. DeMASI:  Yes.  What GreenSky --

5              THE COURT:  That means that banks didn't want to fund

6   GreenSky -- the solar panels.

7              MS. DeMASI:  Well, what was happening, your Honor,

8   with the solar panels, and again, and this is discussed in

9   detail, in November of 2018 when this unanticipated decline

10  happened, what GreenSky was finding was that certain of the

11  solar panel merchants were not of the standards that GreenSky

12  wanted to maintain.  And the reason that was important to

13  GreenSky's business was precisely because of the reputational

14  risk that would occur to working with solar merchants that were

15  not reputable.  So what Mr. Benjamin --

16             THE COURT:  You're taking a whole field of merchants,

17  clearly in any business, certain number of people are not

18  reputable.  But it's hard to believe that a whole field of

19  profitable business are disreputable.

20             MS. DeMASI:  Well, again, they didn't decline it in

21  full.  What they did was, and what Mr. Benjamin explains in the

22  November --

23             THE COURT:  He wants to decline it.

24             MS. DeMASI:  What he says is we took it down to two

25  handfuls of merchants where customer satisfaction was

JBP3GREM

outstanding.  Those merchants were doing a great job, customer

complaints were minimal, and we felt good that we were enabling

merchants to do a quality job for consumers.  We expected the

business to go down from what was 20 percent back in about 2015

or so, before it was a public company, to 8 percent.

         And GreenSky expected that declining solar volume,

while there were other business opportunities in other sectors,

would be a better business decision because they would be

maintaining a solar business that was truly reputable and could

serve consumers.

         THE COURT:  Why would they say they are going out of

it?  There's something missing here.  It doesn't make sense.

To decide to go out of business that pays you a 14 percent

transaction fee to concentrate on business that makes you an

average transaction fee of 6.5 percent doesn't make sense.

         MS. DeMASI:  Well, there were approximately 14,000

merchants that GreenSky worked with in a number of different

industries, your Honor.  So the average transaction fee rate

was a mix of all of those industries.  Not just solar.  And

so --

         THE COURT:  Solar is excluded from that 6.5 percent.

         MS. DeMASI:  No, your Honor, it's not.  If I might.

The average transaction fee rate does include the solar rate.

That is the impact of declining solar as well as the impact of

all of the other verticals.  That's an average transaction fee

JBP3GREM

1    rate that is disclosed that includes the solar fee rate.

2              THE COURT:  If you drop the solar, that would really

3    drive down the average rate.

4              MS. DeMASI:  Correct.  And that's exactly what was

5    disclosed.  That solar declined, and that the average

6    transaction fee rate was in steep decline by the time of the

7    IPO.  That was disclosed.

8              THE COURT:  Please explain to me how it was disclosed.

9              MS. DeMASI:  If you look at pages 90 and 94.  Again,

10   you have to read the prospectus as a whole.  So the average

11   transaction fee rate for all of the verticals, including some

12   of the largest verticals, windows and doors, at this time was

13   46 percent of volume.  Solar was much smaller.

14             THE COURT:  Take me through it in detail.

15             MS. DeMASI:  Sure.  If you look on page 90, your

16   Honor.  This is set forth in our briefs.  There is detail for

17   the three months ending March 31, 2018, the effective date of

18   the prospectus, as well as fiscal years 2017.

19             THE COURT:  Yes.

20             MS. DeMASI:  And that shows that the increase in

21   transaction fees, so if you go, you see the numbers, the actual

22   dollar amounts are set forth.  There is no allegation that any

23   of these figure false.  There is no allegation that these

24   historical performance figures are untrue.

25             The transaction fees are set forth in dollar amount in

JBP3GREM

1      the detail underneath the prospectus.

2                 THE COURT:  So you're comparing the year ends 2017,

3      2016, and 2015, and you're comparing the three months ending

4      March 31 of 2017 and 2018.  Right?

5                 MS. DeMASI:  That's correct, your Honor.  And what it

6      says in the detail underneath the figures is that the impact of

7      higher --

8                 THE COURT:  Note 1?

9                 MS. DeMASI:  No, I'm sorry.  We are down on total

10     revenue where it says "transaction fees" in the middle of the

11     page, your Honor.

12                THE COURT:  Got it.

13                MS. DeMASI:  Those are the transaction fees, dollars

14     in thousands there.  There is detail underneath.  If you go

15     four lines down in the detail on page 90, this is reporting

16     that transaction fee volume is increasing, 47 percent.  The

17     next sentence says --

18                THE COURT:  Increase in transaction fees was driven by

19     47 percent increase.

20                Is that what you are talking about?

21                MS. DeMASI:  Yes, in transaction volume.  And the next

22     sentence --

23                THE COURT:  The impact of higher transaction volume

24     was offset by a decrease in transaction fees earned per dollar.

25                MS. DeMASI:  Yes.  That there is a decrease in the

JBP3GREM

```
 1   transaction fees earned per dollar which originated.

 2           THE COURT:  From 7.79 percent in the first three

 3   months of 2017 to 6.87 percent in the same period in 2018.

 4           MS. DeMASI:  Correct.  So that is disclosing the

 5   impact of declining the solar volume.  And --

 6           THE COURT:  Without mentioning solar volume.

 7           MS. DeMASI:  There is another disclosure that talks

 8   about solar volume.

 9           THE COURT:  This disclosure does not.

10           MS. DeMASI:  It does not, and we respectfully submit

11   it is not required to.

12           THE COURT:  Let's not worry about whether it is

13   required or not.  I've got to make that ruling.  Let me

14   understand your case.

15           MS. DeMASI:  Certainly, your Honor.

16           THE COURT:  So this is comparing aggregates.

17           MS. DeMASI:  It is comparing --

18           THE COURT:  You're showing that the aggregate of

19   higher transaction and lower fees nevertheless showed an

20   increase in transaction fees.

21           MS. DeMASI:  This is showing an increase in

22   transaction fee volume.  Remember, there are two levers to the

23   fees.  There is the volume and the rate.

24           THE COURT:  A 47 percent increase in volume.

25           MS. DeMASI:  Correct, and a decrease in the rate year
```

JBP3GREM

1    over year in the average transaction fee rate.

2              THE COURT:  And the result of that was that there was,

3    what, a positive change of 29 percent?

4              MS. DeMASI:  Yes.

5              THE COURT:  So, notwithstanding the decrease in solar

6    volume overall, you increased the business 30 percent.

7              MS. DeMASI:  That's correct, your Honor.  And the

8    prospectus again, which needs to be read as a whole, makes very

9    clear that profitability and overall growth is driven by

10   transaction volume.

11             THE COURT:  Yes.

12             MS. DeMASI:  There is --

13             THE COURT:  Rate and volume.

14             MS. DeMASI:  It is rate and volume, your Honor.  But

15   what the prospectus says is that volume is what drives ultimate

16   profitability.  The volume obviously impacts the rate.  If you

17   decrease the volume of one vertical that has a particular rate,

18   like a 14 percent rate in solar, that average transaction fee

19   rate will also decline, but it can be made up for in volume.

20   There is two levers that play into the transaction fee.

21             THE COURT:  Got it.

22             MS. DeMASI:  There is another disclosure about this

23   decline on page 94, which compares 2017, 2016, 2015, and the

24   changes year over year.  The upshot, your Honor, is exactly the

25   same.  Which is there is an increase in transaction volume,

JBP3GREM

1   there is overall increase in growth and profitability, but

2   there is a --

3             THE COURT:  So you had a 50 percent increase in the

4   first quarter -- entire year, I'm sorry.  Between 2016 and

5   2017.  What was the increase?  It doesn't show the percentage.

6             MS. DeMASI:  Which one are you looking at right now,

7   your Honor?

8             THE COURT:  Never mind.  Withdraw my remark.  You tell

9   me what I should look at on this page.

10            MS. DeMASI:  Well, what this page on 94 is comparing

11   is 2017 to '16 and '16 to '15.  So it is giving, again --

12            THE COURT:  Why is that relevant?

13            MS. DeMASI:  Because it is showing the decline in

14   average transaction fee rate.

15            THE COURT:  How do I learn that?

16            MS. DeMASI:  If you look in the detail underneath, if

17   you look at 2017 compared to 2016, again, it talks about the

18   increase in transaction fees is driven by a 31 percent increase

19   in volume.  So volume, that primary driver --

20            THE COURT:  What line is this?

21            MS. DeMASI:  This is in the end of the second line

22   underneath the figures, your Honor.

23            THE COURT:  The increase in transaction fee is driven

24   by a 31 percent increase in transaction volume.

25            MS. DeMASI:  Correct.  Then it says the impact of the

JBP3GREM

1    transaction volume was offset by a decrease in transaction fees

2    earned per dollar originated, that's the average transaction

3    fee rate, from 7.93 in 2016 to 7.40 in 2017.

4              THE COURT:  So you had a 31 percent increase in

5    volume.  What's the outcome of all this?

6              MS. DeMASI:  The outcome is there is an increase in

7    growth and in profitability, but that average transaction fee

8    rate is declining.  It declined from 2015 to '16 to '17 and

9    declined again --

10             THE COURT:  We saw on page 90 that there was

11   approximately a 30 percent change in gross transaction fees.  A

12   positive change.  What was the percentage in 2017 versus 2016?

13             MS. DeMASI:  I think the 30 percent was 2017 to '16.

14   And 47 percent was the increase in volume from --

15             THE COURT:  Between first quarter 2018 to first

16   quarter 2017.

17             MS. DeMASI:  Correct.

18             THE COURT:  Here I think you have to divide 278,000 by

19   228,000.

20             MS. DeMASI:  So here, if you are looking at total

21   revenue, there is also an increase in total revenue.  It does

22   give the percentage.

23             THE COURT:  Oh, revenue, yes.  You get the percentage

24   of revenue and you get the percentage of decline, but you don't

25   put it together.  And the figures that put it together have to

JBP3GREM

1     be divided.  You don't show it.

2          MS. DeMASI:  It shows --

3          THE COURT:  2016 to 2015 showed a 50 percent upwards

4     positive change in gross transaction fees.  2017 to 2016 showed

5     a 22 percent growth in transaction fees.  And we need a

6     calculator to divide 278,000 by 228,000 to find the number.

7     Okay.

8          What else do you want to show me?

9          MS. DeMASI:  So, that discloses the sharp decline in

10    average transaction fee.  The other thing I want to explain to

11    your Honor is what actually happened here was a decline that

12    did not occur until the third quarter of 2018.  So at the time,

13    this again is all disclosed in the investor conference, in

14    materials cited in the plaintiffs' complaint, at the time of

15    the IPO, what GreenSky and the individual defendants understood

16    and anticipated was that solar volume was coming down at a

17    stable rate.  For the past three quarters --

18          THE COURT:  Show me in here, rather than in argument.

19    Show me what you said in the prospectus about solar panels.

20          MS. DeMASI:  Sure.  If you turn to page seven, your

21    Honor.

22          THE COURT:  Seven?

23          MS. DeMASI:  Yes.

24          THE COURT:  Got it.

25          MS. DeMASI:  If you look at the second bullet point on

JBP3GREM

1    page seven, there is something called strong dollar based

2    retention.  That is talking about the dollar retention year

3    over year of certain originated dollars or merchants that come

4    into the GreenSky system.  And what is disclosed here in the

5    middle of that paragraph is that that figure excludes solar

6    merchant as we actively reduced our transaction volume with

7    such merchants in 2017.

8                So in 2017, the solar merchant volume was declined,

9    and --

10               THE COURT:  It carries a huge freight, that phrase.

11               MS. DeMASI:  And the impact -- that tells you solar is

12   declined, and the impact of that decline is disclosed in the

13   average transaction fee rate decline, which declined year over

14   year, quarter over quarter, leading into the IPO.

15               THE COURT:  As shown by those other tables.

16               MS. DeMASI:  Yes, your Honor.

17               THE COURT:  Thanks.  Do you want to respond, Mr. Toll?

18               MR. TOLL:  Just on that point, your Honor?

19               THE COURT:  Yes.

20               MR. TOLL:  Yes.  This is absolutely -- certainly.

21               On that point alone, your Honor, of course it leads me

22   into exactly your question, is what's in the prospectus on

23   solar panels?  235-page prospectus, you look at the risk

24   factors, as Ms. DeMasi said, I think there were like 35 pages

25   of them.  35 risk factors, you do not find the word "solar

JBP3GREM

panel merchant" in any risk factor in the entire prospectus.
The only time in this 230-page document is this reference I
want to say buried in this title called "attractive unit
economics" and all it says is we've reduced volume.  The
investors had no idea what the volume was for solar panel
merchants.  You caught it right at the beginning.  Solar panel
merchant was 20 percent of the business in 2016.

          THE COURT:  We learned that from a later statement,
right?

          MR. TOLL:  We learn that from a later statement, but
the company knew it.  It is not like they didn't know this.
The investors didn't know it.  And what happened is they made
an active decision, and that's from -- the CEOs explain it in
November of 2018.

          THE COURT:  Ms. DeMasi says if you read the prospectus
as a whole, you see that they are excluding solar panel
merchants, see that businesses decided that it's reducing solar
volume.  But overall, because of increases in other business,
the business still expands.  That's what she is telling me.

          MR. TOLL:  Well, there is some truth to the fact that
the business is expanding in other areas.  But again, what
investors are supposed to be told about, and this gets into
item 303, of course, about trends and risks and uncertainties,
is you've nailed it, your Honor.  This was their most
profitable business, and we know it was 20 percent of the

JBP3GREM

volume in 2016.  Since they were earning 14 percent, and all

the other business was earning six and a half percent, the --

            THE COURT:  She said the 6.7 percent was a composite

that included solar panels.

            MR. TOLL:  Right.  But I am saying in general, when

you just look at non-solar panels, it was about six and a half

percent.  This was disclosed later on.  That was the non-solar

business.  The solar business was about 14.  When you melded

them together, I think in '16 or '17, it was like 7.8, then it

went down, as solar decreased, the average went down from 7.9,

7.4, 6.8.  But the non-solar was always steady around six and a

half.

            THE COURT:  I'll ask you what Ms. DeMasi was saying to

me when I cut her off.  What's the obligation?  You know that

businesses constantly change the mix of their business.

Nothing is stable in business.  And here is a disclosure under

"unit economics and strong dollar based retention," speaking

about cohorts.  Cohorts meaning like merchants.  And telling us

that the business is actively reducing transaction volume with

merchants, solar panel merchants.

            I guess what you want to tell me is that we don't know

from this that the solar panel merchants by far drive the

highest transaction fee.  And if you were to eliminate this

cream of the business, without mixing it into the homogenized

mass, you are going to have an impact.

JBP3GREM

1           MR. TOLL:  That is one thing, absolutely, your Honor.

2    In addition, you don't know that solar panel business was

3    20 percent of the volume in 2016.  It's not like it's

4    1 percent.  It's 20 percent in '16.  The investors aren't told

5    that.  They don't have a clue.

6           So when they make this disclosure they are going to

7    actively reduce transaction volume with solar merchants, no

8    investor knows what that means.  And you know what makes it

9    worse, your Honor?  Ms. DeMasi's point is she says the

10   statistics -- she read to you on pages 90 and 94 -- tell people

11   that the solar panel business caused the fee rate to go down.

12   That is incorrect, your Honor.  They don't tell you that.  In

13   fact, they tell you the opposite.

14          If you look at the very same description that she

15   referred to, they say, they give you a different reason why the

16   transaction fee rate went down.  If I could turn to page 90 and

17   94 I believe she cited of the prospectus.  So if you look in --

18          THE COURT:  Yes.

19          MR. TOLL:  If you look towards bottom of the page or

20   in the middle of that paragraph, the bottom paragraph where she

21   read to you about the drop in the transaction volume.  I'm

22   sorry.  The increase in higher volume.

23          THE COURT:  Increase the transaction fees was driven

24   by a 47 percent increase in transaction volume, offset by a

25   decrease in transaction fees earned per dollar.

JBP3GREM

1      MR. TOLL:  Right.  And then read the very next

2 sentence, where they absolutely tell you something that is

3 completely incorrect to what the truth is.  Instead of saying

4 transaction fee rates vary, because the difference between

5 solar and non-solar, and we got rid of solar, they say

6 transaction fee rates vary based on the financing terms

7 selected by consumers at the point of sale, and in general

8 loans with higher annual percentage yields carry lower

9 transaction fee rates.

10      Your Honor, the disclosure is just highly misleading.

11 It omits critical information about the business, and this

12 dramatic change they made about a year before the offering.

13      THE COURT:  Let's talk about regulation S-K 303.

14      MR. TOLL:  Okay.  So, the duty, again, I think that

15 the probably seminal case, multiple cases, but the Second

16 Circuit's case in <u>Panther Partners</u>.  So here's what the

17 regulation requires.  It says a registrant must describe any

18 known trends or uncertainties that the registrant reasonably

19 expects will have a material unfavorable impact on revenues or

20 income from continuing operations.

21      In addition to that, you have the SEC's interpretative

22 release on item 303, which says there is a disclosure duty when

23 there is a trend, a demand, a commitment, an event or an

24 uncertainty which is presently known to management.  And there

25 is no question management knew they were cutting out the solar

JBP3GREM

business in 2016.

THE COURT:  Which paragraph of 303 are you working with?

MR. TOLL:  I'm sorry.  I am reading from the interpretative release, your Honor, on this right now.

THE COURT:  Right.

MR. TOLL:  The first part I was reading from regulation itself.

THE COURT:  Which part?

MR. TOLL:  What I just described.  Describe any known trends or uncertainties that the registrant reasonably expects will have a material unfavorable impact on revenues or income.

THE COURT:  Where is that, 303(a)?

MR. TOLL:  Oh, I don't have it in front of me, your Honor.  I have to apologize.  I am not sure which section of 303.  But that is the seminal language that is quoted in the Panther Partners case.

THE COURT:  303(a)(3).  Results of operations. Requires a registrant to describe any unusual or infrequent events or transactions.  Is that --

MR. TOLL:  I think it's (a)(1), your Honor.

THE COURT:  Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.

JBP3GREM

1          But we have not been talking about liquidity.

2          MR. TOLL:  No, I am not talking about liquidity.  It

3   talks about have a material unfavorable impact on revenue or

4   income from continuing operations.

5          THE COURT:  That's not in (1).

6          MR. TOLL:  I'm sorry, your Honor.  I thought it was.

7   That's looking at our brief where we cite that section, and it

8   says (a)(1).

9          THE COURT:  Your brief describes it from the case and

10  not from the regulation itself.  Primary sources.

11         So, under results of operations, which I think this

12  is, subparagraph (3), what you are talking about is (a)(2).

13  (3)(2).  Describe any known trends or uncertainties that have

14  had or that registrant reasonably expects will have a material

15  favorable or unfavorable impact on net sales or revenues or

16  income from continuing operations.

17         MR. TOLL:  Correct, your Honor.

18         THE COURT:  If the registrant knows of events that

19  will cause a material change in the relationship between costs

20  and revenues, such as known future increases in costs, labor or

21  materials or price increases or inventory adjustments, the

22  change in the relationship shall be disclosed.

23         And what you are maintaining is that there were trends

24  and uncertainties that were originating in the decision to tamp

25  down solar panel sales.

JBP3GREM

1                MR. TOLL:  Correct, your Honor.

2                THE COURT:  Which were not identified.

3                MR. TOLL:  Correct, your Honor.

4                THE COURT:  Do you want to respond to that,

5      Ms. DeMasi?

6                MS. DeMASI:  Sure, your Honor.  Thank you.  So in item

7      303 there is two requirements for an obligation to disclose,

8      neither of which is met here.  The first is that the trend

9      or --

10               THE COURT:  Neither of which is met here?

11               MS. DeMASI:  Neither of which is met here.  The first

12     is that there be a presently known trend or uncertainty.  That

13     management presently knows of about it.  At the time of the

14     IPO, solar was 8 percent of the business.  It was a small

15     percent.  And there was no undisclosed trend.  The only

16     trend --

17               THE COURT:  Wouldn't you say that it declined from

18     20 percent to 8 percent is a beginning of a trend?

19               MS. DeMASI:  Well, your Honor, the -- the fact that --

20               THE COURT:  How many years do you need for a trend?

21               MS. DeMASI:  The fact that there was a decline, you

22     need a number of quarters for a trend, and for the past year

23     solar had been at 12 percent.  Stable.  There was no trend.

24               THE COURT:  But nothing says this.  Nothing here says

25     this.

JBP3GREM

1          MS. DeMASI:  And your Honor, that's --

2          THE COURT:  Maybe that's so.  But I'm dealing with a

3    12(b)(6) motion.  It may be that there is enough alleged even

4    though it may not be proved.  But it seems to me for a 12(b)(6)

5    motion, Ms. DeMasi, that --

6          MS. DeMASI:  Your Honor, I think --

7          THE COURT:  There is an allegation here that I can't

8    really dispose of on the face of the complaint.

9          MS. DeMASI:  So your Honor, in paragraph 105 of the

10   complaint, I think this will be clearer to look at this.

11         THE COURT:  Yes.

12         MS. DeMASI:  There is a chart.

13         THE COURT:  One moment.  Paragraph 105.

14         MS. DeMASI:  Yes.  This is the third quarter

15   earnings -- an investor conference after third quarter

16   earnings.

17         THE COURT:  On page 38.

18         MS. DeMASI:  Correct.  Page 37, your Honor.  Paragraph

19   105.

20         THE COURT:  Yes.

21         MS. DeMASI:  So this chart shows what actually

22   happened here and what was known, and what this black line is

23   showing year over year, you can see it goes quarter by quarter

24   starting in 2017, is it shows the decline in solar.  And solar

25   was stable for three quarters in a row at 12 percent.

JBP3GREM

1          This is exactly what management knew and understood,

2     that the solar was stable.  Not that there was a declining

3     trend.

4          It is true that, as alleged, that there was an effort

5     to decline solar.  That was disclosed.  But there was no trend

6     of a decline.  To the contrary, it was stable quarter over

7     quarter.  By the time of the IPO, you can see the 8 percent,

8     they were declining from 12 percent to 8 percent.  That was

9     disclosed that there was a decline.  That's where management

10    expected the solar volume to stay.

11         And so when you talk about item 303 that there has to

12    be a trend known to management, that is reasonably likely to

13    have a material effect on the company's financial condition.

14    Neither of those was true at the time of the IPO.

15         THE COURT:  The trouble with this argument,

16    Ms. DeMasi, is it may be highly persuasive in the context of a

17    summary judgment motion.  But not in a 12(b)(6) motion.

18         What the plaintiffs allege seems to be plausible.

19    That's as far as I can go.  If the prospectus had said it

20    declined from 20 percent in 2016 to 15 percent in the first

21    quarter of 2017, but have stabilized it at 12 percent, it might

22    be different.  But, there is a steep decline from 2017, which

23    probably should have been noted in the first quarter of 2018,

24    because that's an 8 percent.  And the prospectus is dated from

25    May.  So the first quarter figures should have been available.

JBP3GREM

1      MS. DeMASI:  That's correct, your Honor.  One

2  quarter -- I think the case law is clear that one quarter does

3  not establish a trend.

4      THE COURT:  Of course one quarter does not establish a

5  trend.  But you've got quarters coming back from 2016.  There

6  is enough alleged, Ms. DeMasi.  I can't dismiss the complaint

7  on that basis.  Let's go on to some other issues.

8      MS. DeMASI:  I could get to the second issue of item

9  303 because both have to be met.

10      So the second, if your Honor were to find based on the

11  complaint as alleged that there is a trend, it also has to be

12  reasonably likely to have a material effect on the company's

13  financial condition.  And as of that time, when the company

14  intended to keep solar at 8 percent, having seen that it was

15  stable at 12 percent, the company had no anticipation that this

16  would have any financial impact.  No financial impact was

17  noted, even in the second quarter of 2018.  It didn't happen

18  until the third quarter of 2018, after the IPO.

19      THE COURT:  The prospectus cries out for an

20  explanation.  Line of business would move away from high

21  profitable items to lower profitable items depending on an

22  increase in transaction volume, which is a rather risky

23  proposition to overcome the decline in unit profitability.  It

24  doesn't make sense without more of an explanation.

25      At this point, I have too many questions to grant the

JBP3GREM

1    motion in this aspect.

2         MS. DeMASI:  Understood, your Honor.  Would you like

3    to hear on any other issue?

4         THE COURT:  What's the next issue?

5         MS. DeMASI:  Well, your Honor, there also has to be a

6    materiality.

7         THE COURT:  They are all the same.  Should we go on to

8    12(2)?

9         MS. DeMASI:  I see with respect to 12(2) we have a

10   single argument.

11        THE COURT:  The same issue?

12        MS. DeMASI:  There is the same issues, of course, that

13   we've already discussed.  But there is an issue as to one of

14   the plaintiffs in particular.

15        THE COURT:  Let's do that.  Let's do that.  I think

16   you are right on that.

17        MS. DeMASI:  CPERS purchased and sold on the same day,

18   and as a result we don't believe could have suffered any loss.

19        THE COURT:  If the price was inflated because of

20   misrepresentation for the purpose of buying, it was similarly

21   inflated for the purpose of selling, and there is no damage.

22        MS. DeMASI:  That's correct.

23        THE COURT:  That's simply the argument.

24        MS. DeMASI:  That is correct.

25        THE COURT:  Mr. Toll?

JBP3GREM

1              MR. TOLL:  You don't want me to speak on Section 11 at
2     all, your Honor?
3              THE COURT:  Not unless you want to lose the case.
4              MR. TOLL:  You always know when to be quiet.  Thank
5     you.
6              Mr. Bunch will deal with 12.
7              MR. BUNCH:  Thank you, your Honor.  Of course, on a
8     12(a)(2) claim, loss causation is not an element of the claim.
9     So, the test is whether on the face of the complaint the
10     plaintiff can prove no set of facts that would entitle it to
11     relief.  And here there was a loss on those shares.  Very small
12     one, but there was a loss.
13              THE COURT:  It can't be due to misrepresentation,
14     Mr. Bunch.
15              MR. BUNCH:  I agree with you, your Honor.
16              THE COURT:  There is no plausible relationship between
17     a trading loss when the price was similarly inflated on the buy
18     side and the sell side.
19              MR. BUNCH:  I hear you, your Honor.  To a certain
20     extent, this is somewhat of an academic exercise because CPERS,
21     the Boca Raton funds, has a 12(a)(2) claim that has not been
22     attacked, so the claim survives even if it doesn't survive --
23     I'm sorry.  Northeast Carpenters has the claim.  So the claim
24     survives even if it does not survive for CPERS, the Boca Raton
25     funds.

JBP3GREM

1          THE COURT:  How many plaintiffs are there?

2          MR. BUNCH:  Three.

3          THE COURT:  One is knocked out and two remain.

4          MR. BUNCH:  El Paso also does not have a (a)(2) claim.

5          THE COURT:  Because the same thing?

6          MR. BUNCH:  Because they did not buy in the offering.

7          THE COURT:  Let's take one at a time.  Which one am I

8    dismissing?

9          MR. BUNCH:  Northeast Carpenters the GreenSky

10   defendants haven't attacked.

11         THE COURT:  Which one am I dismissing, the one that

12   bought and sold the same day.  What's that?

13         MR. BUNCH:  That's CPERS.

14         THE COURT:  All right.  Let Ms. DeMasi make argument

15   on El Paso.

16         MR. BUNCH:  Your Honor, we dropped the 12(a)(2) claim

17   on behalf of El Paso because El Paso did not purchase in the

18   IPO.

19         THE COURT:  Doesn't that affect the Section 11 claim

20   as well?

21         MR. BUNCH:  No, your Honor, because they bought shares

22   that were issued in the offering.  But they didn't purchase on

23   the offering.  They bought in the aftermarket, your Honor.

24         THE COURT:  How can you tell that they bought the

25   shares in the offering if they bought it in the market?

JBP3GREM

```
 1              MR. BUNCH:  Your Honor, there are a number of indicia
 2    of buying from the underwriter at the offering price.  On the
 3    offering date is strong indication that they purchased in the
 4    offering.
 5              THE COURT:  Let Ms. DeMasi make the argument first.
 6              MS. DeMASI:  Sure, your Honor.  With respect to El
 7    Paso, it is plead that the shares are traceable.  So we think
 8    that will be a factual issue.
 9              THE COURT:  So I can't deal with it now.
10              MS. DeMASI:  Correct, your Honor.
11              THE COURT:  Okay.
12              MS. DeMASI:  We do believe that CPERS should be
13    dismissed.
14              THE COURT:  The motion will be granted as far as CPERS
15    is concerned.  Denied as to the balance.
16              MS. DeMASI:  Thank you, your Honor.
17              THE COURT:  So what do we have with control persons?
18    Let's assume we have control since we are suing directors and
19    officers.  And there is Section 11, Section 12 liability at
20    least for the time being.  Where do we go?
21              MS. DeMASI:  Given your Honor's ruling, we do not -- I
22    have separate argument with respect to Section 15.  Our
23    argument with respect to Section 15 was derivative of the
24    arguments on the main claims.
25              THE COURT:  Then I can rule that the motion to dismiss
```

JBP3GREM

1    is denied with respect to the claim that there was not an

2    adequate disclosure, making not misleading that which was

3    disclosed.

4            The motion is granted with regard to CPERS, because

5    there is no causation between the buying and selling and the

6    alleged misrepresentation.

7            I think that's as far as we have to go.  I find there

8    is materiality.  I don't know if that wants to be argued there.

9            Where do we go from here?  You have to answer?

10           MS. DeMASI:  Yes, your Honor, we do have to answer.

11           THE COURT:  How much time.

12           MS. DeMASI:  I believe the rules give us 14 days.

13           THE COURT:  I would give you more if you want.

14           MS. DeMASI:  We would like 30 days, your Honor.

15           THE COURT:  Sure, but just don't ask for an

16   adjournment.  Take enough time so you don't ask me for

17   adjournment.

18           MS. DeMASI:  Let me just confer with my client for

19   one second, your Honor.

20           THE COURT:  I think 30 days is adequate, though.

21           MS. DeMASI:  Your Honor, we are simply looking at when

22   that falls, given the holidays.

23           THE COURT:  Today is the 25th.  We have Thanksgiving

24   and we have Christmas.  Why don't you take -- what's the second

25   Friday in January?

JBP3GREM

1           MR. COSENZA:  January 13, your Honor.

2           THE COURT:  January 13.

3           MS. DeMASI:  Thank you, your Honor.

4           MR. COSENZA:  30 days would be Christmas.

5           THE COURT:  No adjournments.

6           MS. DeMASI:  Understood.

7           THE COURT:  I want to set up a first Rule 26 meeting.

8  When would be a good time, Mr. Toll?  Why don't you confer with

9  Ms. DeMasi and Mr.Cosenza.  Confer with the defendants and give

10 me a date.

11          MS. DeMASI:  Right now, your Honor?

12          THE COURT:  Yes.

13          (Pause)

14          MR. TOLL:  Late January, your Honor, work for you?

15          THE COURT:  Yes.  How about 2:30, January 23.  Would

16 you be having your conference and getting your initial

17 disclosures ready by then.

18          MR. TOLL:  That's fine on our end, your Honor.

19          MS. DeMASI:  That's fine.

20          THE COURT:  January 23, 2:30, initial case management

21 conference.  Anything else I have to do?

22          MS. DeMASI:  Your Honor, let me just say there is some

23 possibility I will be on trial.  I have a jury trial in

24 January, but my colleague Lauren Kennedy will be happy to do

25 the conference.

JBP3GREM

1            THE COURT:  You can do whatever you'd like.

2            MS. DeMASI:  I don't want your Honor to think I didn't

3    show up.

4            THE COURT:  No.  I understand that Cravath has a

5    number of cases, not just this one.

6            MS. DeMASI:  Thank you, your Honor.

7            THE COURT:  Fortunately.  Okay.  Thanks very much.

8            MS. DeMASI:  Have a good day.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25