**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re GreenSky Securities Litigation | Case No. 18-cv-11071 (AKH) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND
APPROVAL OF THE PLAN OF ALLOCATION**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

Introduction ............................................................................................................... 1

Argument .................................................................................................................... 5

I.    The Proposed Settlement Is Fair, Reasonable, and Adequate, and Warrants Final Approval ............................................................................................................ 5

   B.   Lead Plaintiffs and Co-Lead Counsel Have Adequately Represented the Class ............. 7

   C.   The Settlement Was Reached After Arm's-Length Negotiations ..................... 8

   D.   The Relief Provided by the Settlement Is Adequate ......................................... 10

      1.   The Complexity, Expense and Likely Duration of the Litigation ............................ 11

      2.   The Risks of Establishing Liability and Damages ..................................... 12

      3.   The Effective Process for Distributing Relief to the Class ........................... 14

      4.   The Anticipated Attorneys' Fees and Expenses Are Reasonable ............................ 15

      5.   Agreements Required to be Identified Under Rule 23(e)(3) .................................... 16

   E.   Application of the Remaining *Grinnell* Factors Supports Approval of the Settlement ... 16

      1.   The Ability of Defendants to Withstand a Greater Judgment .................................. 17

      2.   The Reaction of the Class Supports Approval of the Settlement .............................. 17

      3.   The Stage of the Proceedings and the Amount of Discovery Completed ................. 18

      4.   The Range of Reasonableness of the Settlement Fund, in Light of the Best Possible Recovery and All of the Attendant Risks of Litigation .............................. 20

II.   The Plan of Allocation Is Fair and Reasonable and Should be Approved ........................... 21

III.  Notice to the Class Satisfied the Requirements of Rule 23 and Due Process ...................... 23

Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................................................................................21

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ............................................................................................12

*In re AOL Time Warner, Inc.*, *Sec. and ERISA Litig.*,
  No. 02-cv-5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................................12

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)...................................................................................................7

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)..............................................................................6, 11

*In re Canadian Superior Sec. Litig.*,
  No. 09-cv-10087, 2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011).........................................21

*Chavarria v. N.Y. Airport Serv., LLC*,
  875 F. Supp. 2d 164 (E.D.N.Y. 2012) .............................................................................5, 17

*Christine Asia Co., Ltd. v. Yun Ma*,
  No. 1:15-MD-02631, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019).....................................15

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)...................................................................................... *passim*

*City of Providence v. Aeropostale Inc.*,
  No. 11-cv-7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ..............................................9

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007)....................................................................................................7

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001).................................................................................................5, 8

*Danieli v. IBM Corp.*,
  No. 08-cv-3688, 2009 WL 6583144 (S.D.N.Y. Nov. 16, 2009)...........................................15

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)..................................................................................................7

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  No. 12-mdl-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ......................................8, 11

*Fresno Cty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*,
    925 F.3d 63 (2d Cir. 2019)...................................................................15

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ...................................................20, 23

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ...........11

*In re Glob. Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................17

*In re GSE Bonds Antitrust Litig.*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019).................................................8, 10

*Hefler v. Wells Fargo & Co.*,
    No. 16-cv-05479, 2018 WL 4207245 (N.D. Cal. Sept. 4, 2018)...........16

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ...................................................14, 21

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009).............................................11, 21

*Maley v. Del Glob. Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................21

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04-cv-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...........25

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .....................................................6, 21

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) ........................................................20

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    No. 02-mdl-1484, 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ..............20

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)............................................................5, 20

*Padro v. Astrue*,
    No. 11-cv-1788, 2013 WL 5719076 (E.D.N.Y. Oct. 18, 2013) .......17, 19

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ...................................................20, 21

*In re Patriot Nat'l, Inc. Sec. Litig.*,
  828 F. App'x 760 (2d Cir. 2020) .......................................................................21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................7, 8, 11

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .......................................................................12

*Silberblatt v. Morgan Stanley*,
  524 F. Supp. 2d 425 (S.D.N.Y. 2007)..............................................................21

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003)...............................................................12

*In re Take Two Interactive Sec. Litig.*,
  No. 06-cv-1131, 2010 WL 11613684 (S.D.N.Y. June 29, 2010) ....................16

*Tchrs.' Ret. Sys. of La. v. A.C.L.N. Ltd.*,
  No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ....................17

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008)..........................................................11, 14

*In re Veeco Instruments Inc. Sec. Litig.*,
  No. 05-mdl-01695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ....................9

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)...................................................................5, 6, 8, 23

*In re Warner Chilcott Ltd. Sec. Litig.*,
  No. 06 Civ. 11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009) ..................18

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) ...................................................................20

*Yang v. Focus Media Holding Ltd.*,
  No. 11-cv-9051, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ......................10

## STATUTES

15 U.S.C. § 77k(e) .......................................................................................14, 23

15 U.S.C. § 77z-1(a)(7)........................................................................................24

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(c) .......................................................................23, 24, 25

Fed. R. Civ. P. 23(e) ............................................................................................ *passim*

Lead Plaintiffs Northeast Carpenters Annuity Fund ("Northeast Carpenters"), El Paso Firemen & Policemen's Pension Fund ("El Paso"), and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS") (collectively, "Lead Plaintiffs") submit this memorandum of law in support of Lead Plaintiffs' unopposed motion for final approval of the Stipulation of Settlement dated May 24, 2021 ("Stipulation" or "Settlement"), proposing to settle all claims in this action (the "Action"), and approval of the proposed Plan of Allocation.[1]

## INTRODUCTION

After more than two years of litigation, the Settling Parties agreed to the proposed Settlement that provides for, among other things, an all-cash payment of $27.5 million for the benefit of the Class. The Settlement was reached after extensive litigation, including a substantial investigation preceding the filing of two detailed complaints, full briefing and oral argument on Defendants' motions to dismiss, and extensive fact discovery, which included the production of over 5.3 million pages of documents by Defendants and various non-parties and six depositions, including of Lead Plaintiffs and certain of the Underwriter Defendants' employees. The Settlement was thus reached only after the Settling Parties and Co-Lead Counsel were well informed as to the strengths and weaknesses of the claims and defenses and after the Settling Parties participated in mediation with a private mediator, Robert A. Meyer, Esq. of Judicial Arbitration and Mediation Services, Inc. ("JAMS"), a highly-respected mediator with substantial experience overseeing negotiations of complex securities class action settlements. Moreover, the Settlement represents a substantial

---

[1] The Court is respectfully referred to the accompanying Joint Declaration of Steven J. Toll and Max Schwartz in Support of Motions for Final Approval of the Proposed Settlement and Approval of the Plan of Allocation, and for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl."), for a detailed description of the case and the proposed Settlement. Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated May 24, 2021 (ECF No. 180) ("Stipulation").

portion of the potential provable damages suffered by the Class. Joint Decl. ¶¶ 41–45. Lead Plaintiffs and Co-Lead Counsel believe that the Settlement is a very positive result for Class Members considering the risks of continued litigation, including in particular the risks to Lead Plaintiffs' ability to prove elements of their claims including falsity, materiality, and damages, and to defend against Defendants' affirmative defense of negative loss causation. *Id.* ¶¶ 43, 57–58. Thus, it is Lead Plaintiffs' and Co-Lead Counsel's informed opinion that, in light of the foregoing risks, the Settlement is a very good result for the Class.

On June 11, 2021, the Court preliminarily approved the Settlement and directed that notice of the Settlement be provided to potential Class Members. ECF No. 187 ("Preliminary Approval Order"). The $27.5 million Settlement Amount was deposited into the designated Escrow Account on or by July 16, 2021, and has been invested for the benefit of the Class pursuant to the terms of the Settlement. *Id.* ¶ 40. If and when the Settlement becomes final, the Settlement Amount will be disbursed in accordance with the proposed Plan of Allocation.

The Settling Parties reached the Settlement only after vigorous litigation, by which time Lead Plaintiffs and Co-Lead Counsel had developed a thorough understanding of the strengths and weaknesses of the claims and defenses in the Action. The $27.5 million Settlement was achieved after Co-Lead Counsel: (1) conducted an extensive investigation of all potential claims that could be asserted against GreenSky, its officers and directors, and its underwriters; (2) filed two amended complaints based on the results of that investigation; (3) opposed Defendants' motions to dismiss through both the submission of extensive briefing and oral argument, resulting in the Court's November 26, 2019 order denying the motions to dismiss except as to Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge's ("CPERS") claims under Section 12(a)(2) of the Securities Act of 1933; (4) negotiated a proposed case

management order, protective order, protocol for the production of electronically-stored information ("ESI"), and remote deposition protocol; (5) filed a motion for class certification and negotiated the terms of a proposed order granting class certification; (6) coordinated mailing and publication of notice of pendency of the Action to Class Members; (7) negotiated the scope of Lead Plaintiffs' document production, and reviewed and produced documents to Defendants; (8) prepared for and defended the depositions of representatives of each of the three Lead Plaintiffs; (9) engaged in negotiations with counsel for Defendants to obtain an agreement on the documents to be produced by Defendants, including the custodians to be searched and the search terms to be used to locate documents; (10) negotiated and reached agreement on certain of Defendants' claims of privilege; (11) conducted extensive non-party discovery, including serving subpoenas on GreenSky's outside auditor, PricewaterhouseCoopers ("PwC"), and FT Partners, an investment banking firm that provided GreenSky with consulting services in connection with the GreenSky IPO; (12) obtained, reviewed, and analyzed over 5.3 million pages of documents produced by Defendants and non-parties; (13) negotiated the number and identities of witnesses to be deposed; (14) prepared for depositions of nine of Defendants' current and former officers and employees and conducted depositions of three prior to the Action settling; (15) consulted with non-testifying experts who assisted Co-Lead Counsel in evaluating damages and loss causation issues; (16) participated in a fulsome mediation process conducted by Robert A. Meyer, Esq., of JAMS, an experienced and highly-respected mediator,[2] which process was preceded by the exchange of detailed written mediation statements by the Settling Parties; (17) negotiated and drafted appropriate documentation of the Settlement, including a memorandum of understanding ("MOU"), the

---

[2] *See* Declaration of Robert A. Meyer ("Meyer Decl.") ¶¶ 3-5, attached as Ex. A to the Joint Declaration.

Stipulation, a motion for preliminary approval of the Settlement, and the Notices to be issued to potential Class Members; and (18) supervised the dissemination of the Notices to Class Members, and prepared final documentation of the Settlement, including the motion papers filed contemporaneously herewith. *Id.* ¶ 4. Thus, the Settlement is the culmination of substantial investigation, discovery practice, document review, vigorous litigation, and a thorough mediation process with a well-regarded private mediator.

In reaching the Settlement, Lead Plaintiffs and Co-Lead Counsel considered the numerous risks associated with continuing the litigation, including the risks of recovering less than the Settlement Amount after substantial delay or of no recovery at all. Although Lead Plaintiffs had already overcome motions to dismiss in substantial part, Defendants continued to maintain their argument that evidence in this Action would fail to support a finding of falsity and materiality, and that loss causation could not be demonstrated. *Id.* ¶¶ 43, 57–58. Moreover, even were Lead Plaintiffs to successfully prevail on the elements of their claims and Defendants' affirmative defenses, and ultimately liability at trial, Defendants' damages expert calculated damages at merely a fraction of Lead Plaintiffs' damages expert's calculations. *Id.* ¶¶ 44–45. Lead Plaintiffs risked further delay caused by post-trial motions or appeals which inevitably would be filed if Lead Plaintiffs prevailed at trial. These and many other risks support the reasonableness of the Settlement.

The $27.5 million Settlement achieved by Lead Plaintiffs and Co-Lead Counsel avoids all of these risks and uncertainties and provides an immediate and substantial financial benefit for the Class now. In light of the significant obstacles to recovery, and the substantial time and expense that continued litigation would require, Lead Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement is a very good result for the Class, and provides a fair and reasonable resolution of the claims against Defendants in this Action.

## ARGUMENT

### I. The Proposed Settlement Is Fair, Reasonable, and Adequate, and Warrants Final Approval

Under Rule 23(e) of the Federal Rules of Civil Procedure, the Settlement should be approved if the Court finds it "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court must carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not a product of collusion.") (internal citations omitted). "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

Public policy favors the settlement of disputed claims among private litigants, particularly in complex class actions such as this one. *See Wal-Mart*, 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 171 (E.D.N.Y. 2012) ("Settlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'") (citation omitted). Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Because "'[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation,' the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial.'" *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) (citation omitted); *see also Chavarria*, 875 F.

Supp. 2d at 172 (a court may neither "substitute its judgment for that of the parties who negotiated the settlement" nor "conduct a mini-trial of the merits of the action"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) ("In deciding whether to approve a settlement, a court 'should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another.'") (citation omitted).

Under the recent amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors:

(A)   whether the class representatives and class counsel have adequately represented the class;

(B)   whether the proposal was negotiated at arm's length;

(C)   whether the relief provided for the class is adequate, taking into account:

    i.   the costs, risks, and delay of trial and appeal;

    ii.   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

    iii.   the terms of any proposed award of attorneys' fees, including timing of payment; and

    iv.   any agreement required to be identified under Rule 23(e)(3); and

(D)   whether the proposal treats class members equitably relative to each other.

In *City of Detroit v. Grinnell Corp.,* the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463; *see also Wal-Mart Stores*, 396 F.3d at 117; *In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265-66 (S.D.N.Y. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23 (e)(2) Advisory Committee Notes to 2018 Amendments. Indeed, courts in the Second Circuit "understand[] the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019). Thus, the discussion below includes both sets of factors, noting where they overlap.

## B.  Lead Plaintiffs and Co-Lead Counsel Have Adequately Represented the Class

Rule 23(e)(2)(A) requires a Court to find that "the class representatives and class counsel have adequately represented the class" before preliminarily approving a settlement. "Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).

Lead Plaintiffs' interests are aligned with other class members' interests because they suffered the same alleged injuries: losses resulting from allegedly false statements and omissions made in connection with the GreenSky IPO. Because of these alleged injuries, Lead Plaintiffs have an "interest in vigorously pursuing the claims of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

Further, Lead Plaintiffs were active and informed participants in the litigation. Lead Plaintiffs (i) regularly communicated with Co-Lead Counsel regarding the posture and progress of the

Action; (ii) reviewed and/or discussed all significant pleadings and motions filed in the Action; (iii) gave extensive deposition testimony; (iv) searched for, reviewed, and produced documents requested by Defendants; (v) reviewed and/or discussed significant decisions in the Action, including the decisions to mediate and settle the case; and (vi) actively participated in the mediation that led to the Settlement. Joint Decl. ¶ 77.

Additionally, throughout the Action, Lead Plaintiffs had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases. During the course of the litigation, Co-Lead Counsel developed a deep understanding of the facts of the case and the merits of the claims. *Id.* ¶¶ 44–45, 62–63. Co-Lead Counsel are also highly qualified and experienced in securities litigation, as set forth in their firm resumes (*see* Exs. E-F), and were able to successfully conduct the litigation against skilled opposing counsel.[3] And Co-Lead Counsel have shown that "they are qualified, experienced, and able to conduct the litigation, as evidenced in their interactions with the Court as well as with a mediator." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019). Thus, Rule 23(e)(2)(A) supports approval.

**C.  The Settlement Was Reached After Arm's-Length Negotiations**

A strong initial presumption of fairness attaches to a proposed settlement reached as a result of arm's-length negotiations between experienced counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. 12-mdl-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd, In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016). Further, a mediator's involvement in settlement negotiations can help show their fairness. *In re Payment Card*, 330 F.R.D. at 35; *see also D'Amato*, 236 F.3d at 85 (explaining that a

---

[3] Defendants were represented by three well-regarded law firms: Cravath, Swaine & Moore LLP, Susman Godfrey LLP, and Willkie Farr & Gallagher LLP.

"mediator's involvement in … settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

The Settlement here merits such a presumption of fairness because it was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced mediator, and after an extensive investigation into the claims. As noted above and in the Joint Declaration, the Settling Parties and their counsel were well informed about the strengths and weaknesses of the case before agreeing to settle. The judgment of Co-Lead Counsel—law firms that are highly experienced in securities class action litigation—that the Settlement is in the best interests of the Class is entitled to "great weight." *City of Providence v. Aeropostale Inc.*, No. 11-cv-7132, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd, Arbuthnot v. Pierson*, 607 Fed. App'x 73 (2d Cir. 2015). Moreover, Lead Plaintiffs took an active role in supervising the litigation, as envisioned by the PSLRA, and endorse the Settlement. *See* Declaration of Ian Ruegg, New Jersey Fund Director of the Northeast Carpenters Annuity Fund ("Northeast Carpenters Decl.") ¶¶ 6–8, attached as Exhibit B to the Joint Declaration; Declaration of Tyler C. Grossman, Executive Director of the El Paso Firemen & Policemen's Pension Fund ("El Paso Decl.") ¶¶ 6–8, attached as Exhibit C to the Joint Declaration; Declaration of Jeffrey R. Yates, Retirement Administrator of the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS Decl.") ¶¶ 6–8, attached as Exhibit D to the Joint Declaration. A settlement reached "with the endorsement of [] sophisticated institutional investor[s] … is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-mdl-01695, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Further, as described above and in more detail in the Joint Declaration, during two years of litigation, Co-Lead Counsel conducted an intense, months-long investigation, marshaled its

findings in two amended complaints, largely defeated motions to dismiss, conducted fact discovery that included serving requests for documents and deposition testimony on non-parties, reviewed the production of over 5.3 million pages of documents, and synthesized their contents in a brief accompanied by over 30 exhibits prepared in support of mediation. Joint Decl. ¶ 33. Finally, experts were consulted on multiple aspects of the Action, including loss causation and damages, giving Co-Lead Counsel and Lead Plaintiffs additional insight into the strengths and weaknesses of the claims and defenses in the Action.

The extensive and arm's-length nature of the settlement negotiations and the involvement of an experienced and respected mediator like Mr. Meyer support the conclusion that the Settlement is presumptively fair, reasonable, and adequate. *Yang v. Focus Media Holding Ltd.*, No. 11-cv-9051, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) (noting that "[t]he participation of this highly qualified mediator strongly supports a finding that negotiations were conducted at arm's length and without collusion"). The Declaration of Mr. Meyer, attached as Exhibit A to the Joint Declaration, details the process by which the Settlement was reached and Mr. Meyer's perspective on the Settlement and states that he believes that the proposed Settlement represents "a very favorable resolution to highly uncertain litigation" and is "eminently fair, reasonable, and adequate." *Id.* ¶¶ 6, 15.

### D. The Relief Provided by the Settlement Is Adequate

In determining whether a class-action settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account … the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). "This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i)." *In re GSE Bonds*, 414 F. Supp. 3d at 693. Indeed, "[t]his assessment implicates several *Grinnell* factors, including: (i) the complexity,

expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial." *In re Payment Card*, 330 F.R.D. at 36.

### 1. The Complexity, Expense and Likely Duration of the Litigation

Securities class actions like this one are by their nature complicated, and district courts in this Circuit have long recognized that "[a]s a general rule, securities class actions are 'notably difficult and notoriously uncertain' to litigate." *In re Facebook*, 2015 WL 6971424, at *3; *Bear Stearns*, 909 F. Supp. 2d at 266; *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

This case was no exception. As discussed in the Joint Declaration, the case involved complicated and intricate issues related to falsity, materiality, loss causation, and damages. Additionally, prevailing on summary judgment and then achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensue) would have been a very complex and risky undertaking that would have required substantial additional time and expense. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things, "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Indeed, the trial of the Action here would have required extensive expert testimony on numerous contested issues, including falsity, materiality, loss causation, and damages. Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See, e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570,

579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited…").

Of course, even if Lead Plaintiffs had prevailed at trial, it is virtually certain that appeals would be taken, which would have, at best, substantially delayed any recovery for the Class. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there is always a risk that the verdict could be reversed by the trial court or on appeal. *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

### 2.  The Risks of Establishing Liability and Damages

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463. In most cases, this will be the most important factor for the Court to consider in its analysis of the proposed settlement. *See id.* at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."). Although Lead Plaintiffs and Co-Lead Counsel believe the claims asserted against Defendants are meritorious, they recognize that the Action presented several substantial risks to establishing both liability and damages. Securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet. *See In re AOL Time Warner, Inc.*, *Sec. and ERISA Litig.*, No. 02-cv-5575, 2006 WL 903236, at *11 (S.D.N.Y. Apr. 6, 2006) (noting that "[t]he difficulty of establishing liability is a

common risk of securities litigation"). Here, in particular, Defendants would have vigorously challenged Lead Plaintiffs on falsity, materiality, loss causation, and damages.

**Risks of Establishing Liability.** At summary judgment and trial, Defendants would strenuously maintain that Lead Plaintiffs failed to establish that Defendants' statements were materially false and misleading. For example, Lead Plaintiffs would have to establish that GreenSky did not adequately disclose the impact that the Company's decision to exit the solar market was having on GreenSky's average transaction fee rate. Joint Decl. ¶ 19–20, 43. Defendants would argue that GreenSky not only disclosed the Company's reduction in solar and the declining transaction fee rate, but also why that decline was happening. Defendants would also argue that it was not misleading to present GreenSky's shift to elective healthcare as a growth opportunity, because GreenSky fully disclosed the risks inherent in any new vertical. *Id.* ¶¶ 43–45, 57–58. In short, it was far from certain that Lead Plaintiffs would be able to prove the falsity of Defendants' statements through summary judgment and at trial.

**Risks of Establishing Damages.** Another principal challenge in continuing the litigation is the difficulty of proving damages and demonstrating loss causation, which would have been hotly contested by Defendants (indeed, the absence of loss causation is an affirmative defense available to Defendants under Section 11), particularly at summary judgment, and would continue to be challenged in *Daubert* motions, at trial, and in post-trial proceedings and appeals.

Defendants and their experts would have made several credible arguments that would have reduced damages, potentially significantly. *See id.* ¶¶ 44–45, 57. Co-Lead Counsel expects that Defendants would have vigorously persisted in arguing, at summary judgment, trial, and on appeal, that much of the decline in GreenSky's stock price was not attributable to Defendants' alleged misstatements and omissions. Although Co-Lead Counsel would work extensively with

13

Lead Plaintiffs' damages expert with a view towards presenting compelling arguments to the jury and prevailing on these matters at trial, Defendants would have put forth well-qualified experts of their own who were likely to opine at trial that the Class suffered little or no damages. As Courts have long recognized, the substantial uncertainty as to which side's experts' view might be credited by the jury presents a serious litigation risk. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 193 (S.D.N.Y. 2012) ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *Telik*, 576 F. Supp. 2d at 579-80 (in this "'battle of experts', it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found…").

Given all of these risks with respect to liability, loss causation, and damages, Lead Plaintiffs and Co-Lead Counsel believe that it is in the best interests of the Class to accept the certain and substantial benefit conferred by the Settlement.

### 3. The Effective Process for Distributing Relief to the Class

Rule 23(e)(2)(C) instructs courts to consider whether the relief provided to the class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Here, the proposed Plan of Allocation was prepared with the assistance of Lead Plaintiffs' damages consultant, Global Economics Group, which has significant experience in drafting plans of allocation. Joint Decl. ¶¶ 46–48. The Plan of Allocation provides a reasonable, rational basis for Class Members to recover their *pro rata* damages based on the dates of their GreenSky Class A common stock transactions.

The proposed Plan of Allocation is also fair and reasonable because, for Class Members who purchased shares of GreenSky Class A common stock pursuant or traceable to GreenSky's IPO, the Plan of Allocation calculates damages based on the methodology set forth in the Securities Act. *See* 15 U.S.C. § 77k(e) (limiting damages to the difference between the purchase

price paid per share and either the value of the shares at the time the suit was brought, the price at which the shares were sold in the market before suit, or the price at which the shares were sold after suit but before judgment if less than the difference between the purchase price and value of the shares at the time of suit). *See Danieli v. IBM Corp.*, No. 08-cv-3688, 2009 WL 6583144, at *5 (S.D.N.Y. Nov. 16, 2009) (approving plan of allocation where it "is rationally related to the relative strengths and weaknesses of the respective claims asserted" and falls within the range of possible approval).

### 4.  The Anticipated Attorneys' Fees and Expenses are Reasonable

Rule 23(e)(2)(C)(iii) requires courts to examine "the terms of any proposed award of attorneys' fees, including timing of payment." The total Settlement Fund will be $27.5 million, plus accrued interest. Co-Lead Counsel has applied for an award of attorneys' fees of 25% of the Settlement Fund plus reimbursement of Litigation Expenses. After entry by the Court of an order awarding Co-Lead Counsel's attorneys' fees and Litigation Expenses, "any awarded attorneys' fees and Litigation Expenses shall be paid to Co-Lead Counsel from the Escrow Account by the Escrow Agent." Stipulation ¶ 7.3. If the Settlement is terminated or the fee and expense order is reversed or modified, then Co-Lead Counsel will refund to the Escrow Account any fees paid within 10 business days. *Id.*

Courts in this District have approved similar fees for comparable class settlement funds, finding that they are well within the applicable range of reasonable percentage fund awards. *See, e.g.*, *Fresno Cty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 66 (2d Cir. 2019), *cert. denied*, *Isaacson/Weaver Fam. Tr. v. Fresno Cty. Emps.' Ret. Ass'n*, 140 S. Ct. 385 (2019) (affirming percentage method and Lead Counsel's award of attorneys' fees of 25% of the settlement fund plus interest); *Christine Asia Co., Ltd. v. Yun Ma*, No. 1:15-MD-02631, 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019) (awarding 25% fee as "reasonable in light of the work

of Plaintiffs' Counsel, their investment of resources in the case, their prosecution of the action for the benefit of the Class, the risks that they faced in the litigation, and the overall benefit of the Settlement achieved").

### 5.  Agreements Required to be Identified Under Rule 23(e)(3)

Rule 23(e)(2)(C)(iv) requires courts to consider "any agreement required to be identified by Rule 23(e)(3)," that is, "any agreement made in connection with the proposal." The Settling Parties have entered into one such agreement, which establishes certain conditions under which Defendants may terminate the Settlement if Class Members who collectively purchased more than a specified number of shares of GreenSky Class A common stock request exclusion (or "opt out") from the Settlement. Such supplemental agreements are customary in securities class action settlements and their confidentiality "avoid[s] the risk that one or more shareholders might use this knowledge to insist on a higher payout for themselves by threatening to break up the Settlement." *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479, 2018 WL 4207245, at *7 (N.D. Cal. Sept. 4, 2018) (approving confidentiality of opt-out termination agreement); *In re Take Two Interactive Sec. Litig.*, No. 06-cv-1131, 2010 WL 11613684, at *11-12 (S.D.N.Y. June 29, 2010) (noting side letter agreement and preliminarily approving settlement).

### E.  Application of the Remaining *Grinnell* Factors Supports Approval of the Settlement

Together with the enumerated factors set forth in Rule 23(e)(2)(C), several other *Grinnell* factors are relevant to the adequacy inquiry, including (1) "the ability of the defendants to withstand a greater judgment" (the seventh *Grinnell* factor), (2) "the reaction of the class to the settlement" (the second *Grinnell* factor), (3) "the stage of the proceedings and the amount of discovery completed" (the third *Grinnell* factor), and (4) "the range of reasonableness of the settlement fund in light of the best possible recovery" and "all the attendant risks of litigation" (the eighth and ninth *Grinnell* factors). These factors either favor final approval or, at worst, are neutral.

### 1. The Ability of Defendants to Withstand a Greater Judgment

The ability of a defendant to pay a judgment greater than the amount offered in settlement is relevant to whether the settlement is fair. *Grinnell*, 495 F.2d at 463. While it is Lead Plaintiffs' understanding that Defendants have the ability to fund a settlement given available insurance, continued litigation would put that insurance at risk of dwindling. *See In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) (ability to withstand a greater judgment supports final approval where the "main settlement funds available to the individuals are the insurance proceeds" which "would be largely consumed by defense costs if this litigation were to continue"); *Tchrs.' Ret. Sys. of La. v. A.C.L.N. Ltd.*, No. 01-cv-11814, 2004 WL 1087261, at *4 (S.D.N.Y. May 14, 2004) (likely depletion of insurance supports settlement approval).

### 2. The Reaction of the Class Supports Approval of the Settlement

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *See, e.g.*, *Chavarria*, 875 F. Supp. 2d at 173 (citation omitted); *see also Padro v. Astrue*, No. 11-cv-1788, 2013 WL 5719076, at *5 (E.D.N.Y. Oct. 18, 2013) ("The fact that a small number of objections were received weighs in favor of settlement," as does "the positive reaction of the class, particularly in light of its size."). Here, the Court-appointed Claims Administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"), mailed copies of the Notice Packet (consisting of the Notice and Proof of Claim Form) to record holders identified in the Company's transfer records and potential Class Members and their nominees. *See* Epiq Decl. ¶¶ 7-10. As of September 13, 2021, Epiq has mailed 14,318 copies of the Notice Packet to potential Class Members. *Id.* ¶ 10. In addition, a Summary Notice was published once in the *Investor's Business Daily* on July 12, 2021, and disseminated on *PR Newswire* the same day. *Id.* ¶ 11. Although the deadline set by the Court for Class Members to object or request exclusion (September 28, 2021) has not yet passed, to date, no objections and only four

unique requests for exclusion have been received. *Id.* ¶¶ 17, 19; *see In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval).

### 3.   The Stage of the Proceedings and the Amount of Discovery Completed

At the time of settlement, Co-Lead Counsel had been litigating this Action for approximately two years. Joint Decl. ¶¶ 10–39. Co-Lead Counsel conducted a significant pre-filing investigation, which consisted of reviewing and analyzing numerous documents filed by GreenSky with the SEC, including the Offering Documents for the Company's IPO; conducting an in-depth investigation of GreenSky's business model; preparing to interview, attempting to contact, and interviewing individuals from a list of former employees of GreenSky that Co-Lead Counsel researched and compiled through its own investigation; and reviewing and analyzing public statements made and distributed by the GreenSky Defendants, including, but not limited to, conference calls, earnings announcements, and wire and press releases. *Id.* ¶¶ 10–16. While continuing its investigation, Co-Lead Counsel synthesized these findings into an Amended Complaint (ECF No. 85) ("FAC") and then a Second Amended Complaint (ECF No. 97) ("SAC"). *Id.* ¶¶ 14–18. Co-Lead Counsel next drafted and filed an extensive opposition to Defendants' motions to dismiss, addressing Defendants' arguments for dismissal that cited, *inter alia*, 626 pages of exhibits. *Id.* ¶¶ 17–21.

After the SAC was sustained, Co-Lead Counsel engage d in a substantial amount of fact discovery, which included the production of over 4.4 million pages of documents by Defendants. *Id.* ¶ 28. The documents sought and obtained from GreenSky focused on, among other things, the Company's decision to exit the solar industry, the effects of that decision on GreenSky's revenue, the Company's decision to conduct an IPO, and the Company's decision to allegedly omit information about those effects in the Offering Documents. The documents sought and obtained from

the Underwriter Defendants focused on, among other things, the due diligence that the Underwriter Defendants conducted in connection with the IPO. *Id*. ¶¶ 28–29, 32. Co-Lead Counsel also conducted third-party discovery, including of GreenSky's auditor, PricewaterhouseCoopers ("PwC"), which produced nearly 1 million additional pages of documents. *Id.* ¶¶ 30–32.

As a result of productions by Defendants and non-parties made in response to Lead Plaintiffs' requests, Co-Lead Counsel was tasked with reviewing over 5.3 million pages of documents during an intense discovery phase in preparation for mediation as well as the anticipated depositions. *Id.* ¶¶ 32–33. Co-Lead Counsel then synthesized its findings from its review of those documents into a mediation statement. *Id.* ¶¶ 35–37. In sum, Co-Lead Counsel spent thousands of hours investigating, litigating, and zealously advocating for the positive resolution of this Action, which effort resulted in a settlement for the Class at the behest of the mediator's recommendation.

Further, at the time of the Settlement, Defendants' Counsel had deposed representatives of each of the three Lead Plaintiffs. *Id.* ¶ 34. At the same time, Co-Lead Counsel began extensive preparations to depose nine witnesses, including key employees of the Underwriter Defendants and GreenSky's senior executives. Co-Lead Counsel deposed three of those witnesses, including employees of Goldman Sachs and JP Morgan who led the underwriting team for the GreenSky IPO, prior to agreeing to settle the Action. Co-Lead Counsel's depositions of those witnesses yielded significant testimony and admissions. *Id.*

For these reasons, at the time the Settlement was reached, Lead Plaintiffs and Co-Lead Counsel had "obtained sufficient information to be able to intelligently assess the strengths and weaknesses of the case and appraise settlement proposals." *Padro*, 2013 WL 5719076, at *6. As a result, Lead Plaintiffs and Co-Lead Counsel have a well-informed basis for their belief that the Settlement is a favorable resolution of the Action for the Class and this factor strongly supports

approval of the Settlement. *See, e.g.*, *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 161 (S.D.N.Y. 2011) (this factor supported settlement where the action had proceeded through substantial document production, five depositions, "a round of mediation submissions and sessions, and expert consultations on damages and causation," and, thus, "the parties were able to make an intelligent appraisal of the value of the case"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd* 798 F.2d 35 (2d Cir. 1986) (settlement approved where the parties "have a clear view of the strengths and weaknesses of their cases"). As such, the stage of proceedings and amount of discovery completed support approval of the Settlement.

### 4.  The Range of Reasonableness of the Settlement Fund, in Light of the Best Possible Recovery and All of the Attendant Risks of Litigation

Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Instead, "in any case there is a range of reasonableness with respect to a settlement." *Newman*, 464 F.2d at 693. According to analyses prepared by Lead Plaintiffs' damages expert, a realistic estimate (from Lead Plaintiffs' perspective) of class-wide damages, after discounting for certain potential defenses (in particular negative loss causation), is $201.3 million, and the Settlement represents nearly 14% of this realistic assessment of damages. Joint Decl. ¶ 45.

This recovery falls well within the range of reasonableness that courts regularly approve under similar circumstances. *See, e.g.*, *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, No. 02-md1-1484, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million settlement representing approximately 6.25% of estimated damages and noting it was at the "higher end of the range of reasonableness of recovery in class action securities litigation"); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement

that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *see also In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming district court's approval of $6.5 million settlement representing 6.1% of the class's maximum potentially recoverable damages); *In re Canadian Superior Sec. Litig.*, No. 09-cv-10087, 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving a $5.2 million settlement representing 8.5% of maximum damages which the court noted "exceed[s] the average recovery in shareholder litigation").

## II.   The Plan of Allocation Is Fair and Reasonable and Should be Approved

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192; *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 430 (S.D.N.Y. 2007) ("Exactitude is not required in allocating consideration to the class, provided that the overall result is fair, reasonable and adequate."). Generally, "[a] plan of allocation that reimburses class members based on the extent of their injuries is [] reasonable." *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002). Plans of allocation, however, need not be tailored to fit each and every class member with "mathematical precision." *PaineWebber*, 171 F.R.D. at 133. Rather, broad classifications may be used in order to promote "[e]fficiency, ease of administration and conservation" of the settlement fund. *Id.* at 133-35. A plan of allocation is fair and reasonable as long as it has a "reasonable, rational basis." *Maley*, 186 F. Supp. 2d at 367; *see also Initial Pub. Offering*, 671 F. Supp. 2d at 497.

In determining the fairness, reasonableness, and adequacy of a proposed allocation plan, courts give considerable weight to the opinion of experienced counsel. *See In re Marsh*, 265 F.R.D. at 145 ("In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel."); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) ("An allocation formula need only have a reasonable, rational basis,

particularly if recommended by 'experienced and competent' class counsel …. As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight.").

Here, Co-Lead Counsel developed the Plan of Allocation in consultation with a well-credentialed damages expert, Jeremy Marmer, PhD, CFA, of Global Economics Group, and believes that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among eligible Class Members. Joint Decl. ¶ 46. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Class Members who submit timely and valid Proof of Claim Forms to the Claims Administrator, in accordance with the requirements established by the Court, and who are approved for payment ("Authorized Claimants"). The Plan of Allocation provides a fair and rational basis for Class Members to recover their *pro rata* share of the Net Settlement Fund for all shares of GreenSky Class A common stock purchased pursuant and/or traceable to the IPO according to the formula set forth in the Notice. *See* ECF No. 180-2 ¶¶ 24-38. The Plan of Allocation provides a reasonable, rational basis for Class Members to recover their *pro rata* share of the Net Settlement Fund based upon the dates of their GreenSky Class A common stock transactions. In particular, the Plan of Allocation allocates losses to all purchases through the date of suit pursuant or traceable to the IPO as follows:

(a) if sold before the opening of trading on November 12, 2018, the Recognized Loss for each such share shall be the purchase price (not to exceed the issue price at the offering of $23.00) minus the sale price;

(b) if sold after the opening of trading on November 12, 2018, through the close of trading on August 5, 2019, the Recognized Loss for each such share shall be the purchase price (not to exceed the issue price at the offering of $23.00) minus the sale price (not to be less than $9.92, the closing share price on November 12, 2018); or

(c) if retained through the close of trading on August 5, 2019, the Recognized Loss for each such share shall be the purchase price (not to exceed the issue price at the offering of $23.00) minus $9.92, the closing share price on November 12, 2018.

The proposed Plan of Allocation is also fair and reasonable because, as described above, for Class Members who purchased or acquired shares of GreenSky Class A common stock pursuant or traceable to the IPO, the Plan of Allocation calculates damages based on the methodology set forth in the Securities Act. *See* 15 U.S.C. § 77k(e) (limiting damages to the difference between the purchase price paid per share and either the value of the shares at the time the suit was brought, the price at which the shares were sold in the market before suit, or the price at which the shares were sold after suit but before judgment if less than the difference between the purchase price and value of the shares at the time of suit).

For these reasons, Co-Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See Giant Interactive Grp.*, 279 F.R.D. at 163 ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"). Moreover, as noted above, as of September 13, 2021, 14,318 copies of the Notice, which contains the Plan of Allocation and advises Class Members of their right to object to the proposed plan, have been sent to potential Class Members and, to date, no objections to the proposed plan have been received.

### III. Notice to the Class Satisfied the Requirements of Rule 23 and Due Process

The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable." Fed. R. Civ. P. 23(e)(1). Notice of a settlement is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114 (citation omitted).

Both the substance of the Notice and the method of its dissemination to potential Class Members satisfied these standards. Here, the proposed Notice includes all the information required by Rule 23(c)(2)(B), including (i) "the nature of the action" (¶¶ 1, 14-17); (ii) "the definition of the class certified" (¶ 2); (iii) "the class claims, issues, or defenses" (¶¶ 2, 14-17); (iv) "that a class member may enter an appearance through an attorney if the member so desires" (¶¶ 51, 63); (v) "that the court will exclude from the class any member who requests exclusion" and "the time and manner for requesting exclusion" (¶¶ 54-66); and (vi) "the binding effect of a class judgment on members under Rule 23(c)(3)" (¶¶ 42-48). Fed. R. Civ. P. 23(c)(2)(V)(i)-(vii). Likewise, the proposed Notice includes all the information required by the PSLRA, including a statement of class members' recovery (¶ 3), a statement of the issues on which the parties disagree (¶ 5), a statement of the attorneys' fees and costs sought (¶ 6), identification of counsel (¶ 7), and a statement of the reasons for the settlement (¶¶ 18-20). *See* 15 U.S.C. § 77z-1(a)(7) (listing required disclosures).

In accordance with the Court's Preliminary Approval Order, the Claims Administrator has disseminated 14,318 copies of the Notice to potential Class Members. Epiq Decl. ¶ 10 In addition, the Claims Administrator caused the Summary Notice to be published on July 12, 2021 in the *Investor's Business Daily* and disseminated on *PR Newswire* the same day. Copies of the Notice and Proof of Claim Form were made available on a dedicated website maintained by the Claims Administrator and Co-Lead Counsel featured a link on Cohen Milstein's website that guided investors to the Claims Administrator's settlement website. Joint Decl. ¶¶ 51, 65 Epiq Decl. ¶¶ 14-15.

This combination of individual first-class mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice …

practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-cv-8144, 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: September 14, 2021

Respectfully submitted,

/s/ Steven J. Toll

COHEN MILSTEIN SELLERS & TOLL PLLC
Steven J. Toll (admitted *pro hac vice*)
S. Douglas Bunch (SB-3028)
Jan Messerschmidt (admitted *pro hac vice*)
1100 New York Avenue, N.W. │ Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dbunch@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Jessica (Ji Eun) Kim (5326129)
88 Pine Street │ 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax: (212) 838-7745
jekim@cohenmilstein.com

Manuel J. Dominguez (admitted *pro hac vice*)
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: (561) 515-1400
Fax: (561) 515-1401
jdominguez@cohenmilstein.com

SCOTT + SCOTT ATTORNEYS AT LAW LLP
Max Schwartz (MS-2517)
Tom Laughlin (TL-8888)
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
mschwartz@scott-scott.com
tlaughlin@scott-scott.com

*Attorneys for Lead Plaintiffs Northeast Carpenters Annuity Fund, El Paso Firemen & Policemen's Pension Fund, and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge*