# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GREENSKY SECURITIES LITIGATION | Case No. 18-cv-11071 (AKH) |

**JOINT DECLARATION OF STEVEN J. TOLL AND MAX SCHWARTZ IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND APPROVAL OF THE PLAN OF ALLOCATION, AND FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

We, Steven J. Toll and Max Schwartz, declare as follows:

1.      We are partners at Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Scott + Scott Attorneys at Law LLP ("Scott + Scott"), respectively, Co-Lead Counsel for Lead Plaintiffs Northeast Carpenters Annuity Fund ("Northeast Carpenters"), El Paso Firemen & Policemen's Pension Fund ("El Paso"), and Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS") in *In re GreenSky Securities Litigation*, No 18-cv-11071 (S.D.N.Y.). We have personal knowledge of the facts set forth in this declaration and information provided to us by others at our firms who worked under our supervision.

2.      We submit this declaration in support of Lead Plaintiffs' motion for final approval of the proposed Settlement and approval of the Plan of Allocation, as well as Co-Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses, including the expenses of Lead Plaintiffs pursuant to 15 U.S.C. § 77z-1(a)(4).[1] We have supervised and actively participated in the prosecution of this Action throughout its duration.

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated May 24, 2021 (ECF No. 180) ("Stipulation").

3.      This declaration does not seek to detail each and every event that has occurred since the Action was commenced. Rather, the declaration provides the Court with highlights of the litigation and the events leading to the Settlement.

4.      In entering the Settlement, Lead Plaintiffs and Co-Lead Counsel were well-informed about the strengths and weaknesses of the Action. As detailed below, prior to entering the proposed Settlement, Co-Lead Counsel: (1) conducted an extensive investigation of all potential claims that could be asserted against GreenSky, its officers and directors, and its underwriters; (2) filed two amended complaints based on the results of that investigation; (3) opposed Defendants' motions to dismiss through both the submission of extensive briefing and oral argument, resulting in the Court's November 26, 2019 order denying the motions to dismiss except as to Lead Plaintiff CPERS' claims under Section 12(a)(2) of the Securities Act of 1933; (4) negotiated a proposed case management order, protective order, protocol for the production of electronically-stored information ("ESI"), and remote deposition protocol; (5) filed a motion for class certification and negotiated the terms of a proposed order granting class certification; (6) coordinated mailing and publication of notice of pendency of the Action to Class Members; (7) negotiated the scope of Lead Plaintiffs' document production, and reviewed and produced documents to Defendants; (8) prepared for and defended the depositions of representatives of each of the three Lead Plaintiffs; (9) engaged in negotiations with counsel for Defendants to obtain an agreement on the documents to be produced by Defendants, including the custodians to be searched and the search terms to be used to locate documents; (10) negotiated and reached agreement on certain of Defendants' claims of privilege; (11) conducted extensive non-party discovery, including serving subpoenas on GreenSky's outside auditor, PricewaterhouseCoopers ("PwC"), and FT Partners, an investment banking firm that provided GreenSky with consulting services in connection with the GreenSky

IPO; (12) obtained, reviewed, and analyzed over 5.3 million pages of documents produced by Defendants and non-parties; (13) negotiated the number and identities of witnesses to be deposed; (14) prepared for depositions of nine of Defendants' current and former officers and employees and conducted depositions of three prior to the Action settling; (15) consulted with non-testifying experts who assisted Co-Lead Counsel in evaluating damages and loss causation issues; (16) participated in a fulsome mediation process conducted by Robert A. Meyer, Esq., of Judicial Arbitration and Mediation Services ("JAMS"), an experienced and highly-respected mediator,[2] which process was preceded by the exchange of detailed written mediation statements by the Settling Parties; (17) negotiated and drafted appropriate documentation of the Settlement, including a memorandum of understanding ("MOU"), the Stipulation, a motion for preliminary approval of the Settlement, and the Notices to be issued to potential Class Members; and (18) supervised the dissemination of the Notices to Class Members, and prepared final documentation of the Settlement, including the motion papers filed contemporaneously herewith.

5.      Based upon our experience, the extensive discovery conducted, our evaluation of the facts and the applicable law, and our recognition of the risk and expense of continued litigation, Lead Plaintiffs and Co-Lead Counsel submit that the Settlement is fair, reasonable, and adequate. In view of all these considerations, Lead Plaintiffs and Co-Lead Counsel believe the Settlement represents an excellent result, and is in the best interests of the Class, particularly because it provides a meaningful recovery to the Class now, and avoids substantial delay and the possibility of recovering nothing due to the risks, expense, and duration of continued litigation.

6.      From the outset of this Action, Lead Plaintiffs supervised Co-Lead Counsel. Lead Plaintiffs reviewed pleadings and all material filings, and remained informed throughout the

---

[2] *See* Ex. A, Declaration of Robert A. Meyer ("Meyer Decl.") ¶¶ 3-5.

Action. Lead Plaintiffs were also involved in the mediation, and ultimately reviewed and approved the proposed Settlement. *See* Ex. B, Declaration of Ian Ruegg, New Jersey Fund Director of the Northeast Carpenters Annuity Fund ("Northeast Carpenters Decl.") ¶ 6; Ex. C, Declaration of Tyler C. Grossman, Executive Director of the El Paso Firemen & Policemen's Pension Fund ("El Paso Decl.") ¶ 6; Ex. D, Declaration of Jeffrey R. Yates, Retirement Administrator of the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS Decl.") ¶ 6.

7.     In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation. Co-Lead Counsel engaged Jeremy Marmer, PhD, CFA, of Global Economics Group, in preparing the proposed Plan of Allocation. Dr. Marmer has significant experience in drafting plans of allocation. *See* Resume of Jeremy Marmer, PhD, CFA, *available at* https://www.globaleconomicsgroup.com/wp-content/uploads/Jeremy-Marmer-CV.pdf. Under the proposed Plan of Allocation, the Settlement Amount (plus interest accrued and after deduction of Court-approved expenses and attorneys' fees) will be distributed on a *pro rata* basis to members of the Class who timely submit valid Proof of Claim Forms based on their Recognized Loss amounts as calculated pursuant to the Plan of Allocation.

8.     Co-Lead Counsel requests an award of attorneys' fees and reimbursement of Litigation Expenses. Specifically, Co-Lead Counsel is applying for a fee award of 25% of the Settlement Fund (or $6,875,000) plus interest, for reimbursement of Co-Lead Counsel's Litigation Expenses in the amount of $200,786.46, and for reimbursement of Lead Plaintiffs' costs and expenses pursuant to 15 U.S.C. § 77z-1(a)(4) in the amount of $16,092.70.

9.     Co-Lead Counsel submits that the fee and expense application is fair and reasonable. As explained in the accompanying brief in support of Co-Lead Counsel's request for attorneys'

fees and reimbursement of Litigation Expenses, the requested fee of 25% of the Settlement Fund, plus interest, is consistent with fees awarded in comparable securities class actions. In addition, the reasonableness of the fee is further confirmed because an analysis of the lodestar in this Action would result in Co-Lead Counsel receiving a multiplier of 1.46, which is consistent with multipliers awarded in comparable securities class actions.

## HISTORY OF THE ACTION

10.     GreenSky is a financial technology company that operates an online platform which enables third-party businesses to process loan applications at their point of sale. Transaction fees from processing those applications, which vary by business (or merchant) type and are set in advance with specific merchants, constitute a significant majority of GreenSky's revenue. Historically, GreenSky generally obtained a transaction fee rate averaging around 14% for solar panel merchants, more than double the average non-solar transaction fee rate of 6.5%.

11.     In 2018, GreenSky held an IPO, during which Lead Plaintiffs alleged Defendants hid the impact of a key, risky decision that GreenSky had made roughly two years prior—to shift away from the profitable solar merchants with their associated higher transaction fees, and instead move toward the less profitable, significantly lower transaction fee, elective healthcare merchants. In fact, Lead Plaintiffs alleged, GreenSky's Offering Documents failed to mention the effect of GreenSky's decision to transition from solar to elective healthcare, which had already negatively impacted the average transaction fee it was recouping from its merchants. This meant, and the Offering Documents further omitted, that GreenSky was already facing a significant risk that its substantially lower average transaction fee would likely harm the Company's profitability, growth, and EBITDA.

12.     This Action began on November 27, 2018, when plaintiff Rustam Mustafin filed a class action complaint in this Court against GreenSky and eight of its officers and directors ("Individual

Defendants," and together with GreenSky, "GreenSky Defendants"), as well as Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, SunTrust Robinson Humphrey, Inc. (now known as Truist Securities, Inc.), Raymond James & Associates, Inc., Sandler O'Neill & Partners, L.P., Fifth Third Securities, Inc., and Guggenheim Securities, LLC ("Underwriter Defendants" and together with the GreenSky Defendants, "Defendants"). Mr. Mustafin filed his complaint on behalf of a putative class consisting of purchasers of GreenSky's Class A common stock pursuant or traceable to GreenSky's IPO, asserting claims under Section 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

13.    On March 29, 2019, following the filing of competing motions for appointment of lead plaintiff and lead counsel, the Court appointed Northeast Carpenters, El Paso, and CPERS (collectively, the "Fund Group") as Lead Plaintiffs, appointed Cohen Milstein and Scott + Scott as Co-Lead Counsel, and consolidated a related action. ECF No. 76.

## I.    Lead Plaintiffs Undertook a Substantial Investigation Prior to Filing the Amended Complaints

14.    Co-Lead Counsel engaged in significant investigative efforts to develop the claims set forth in this Action and to evaluate Defendants' possible defenses. Co-Lead Counsel's investigation included, *inter alia*, the following:

(a)    reviewing and analyzing numerous documents filed by GreenSky with the SEC, including the Offering Documents for the Company's IPO;

(b)    conducting an in-depth investigation of GreenSky's business model;

(c)    preparing to interview, attempting to contact, and interviewing individuals from a list of former employees of GreenSky that Co-Lead Counsel researched and compiled

through its own investigation, all of whom we believed had personal knowledge of transactions and events that were relevant to claims alleged in this Action; and

(d)     reviewing and analyzing public statements made and distributed by the GreenSky Defendants, including, but not limited to, conference calls, earnings announcements, and wire and press releases.

15.     Indeed, Co-Lead Counsel's investigation, as described above, provided the basis for detailed factual allegations that GreenSky's management decided to transition out of the solar industry and expand into the elective healthcare market by at least early 2016, well before the Company's May 2018 IPO, and that the GreenSky Defendants' statements at the time of the IPO were false in light of these contemporaneous facts. Co-Lead Counsel expended substantial time and effort memorializing and then summarizing and organizing the information obtained from its investigation, as well as aligning first-hand witness accounts with information disclosed in the Company's SEC filings and press releases, so that Lead Plaintiffs could allege, among other things, that: (i) following GreenSky's decision to exit the solar industry, the Company began to aggressively reduce its relationships with solar merchants; (ii) as a result, the percentage of solar transactions drastically dropped from almost 20% of GreenSky's total business by volume in 2016, to 4% by the third quarter of 2018; and (iii) given that this material shift was well underway by the first quarter of 2018—along with the corresponding material trend of declining average transaction fees—Defendants were required to include this information in the May 2018 Offering Documents, which were issued well after the end of that quarter and included discussion of, among other things, the decrease in transaction fees earned per dollar originated, factors contributing to the transaction fee rate, and the Company's expansion into elective healthcare. In addition, Co-Lead Counsel's analysis of the Offering Documents and related investigation provided the basis

for detailed factual allegations that the Offering Documents failed to disclose: (i) the outsized role that solar transaction fee rates had played in elevating GreenSky's overall transaction fee rates and the impact of GreenSky's shifting merchant mix on its transaction fee revenue model; (ii) the significance of merchant mix to the Company's profitability and EBITDA; and (iii) that risks created by GreenSky's change in strategy, which should have been disclosed to investors, had already come to fruition. Indeed, Lead Plaintiffs alleged, the undisclosed risks posed by the expensive and risky decision to shift away from the profitable solar business were already having a significant, negative impact on GreenSky's average transaction fee rate, profitability, and EBITDA in the months leading up to the IPO.

16.     Co-Lead Counsel conducted an intense and thorough investigation over the course of many months and discovered highly relevant information related to each of the above that was essential to sufficiently alleging liability. Notably, Co-Lead Counsel relied upon their creativity and diligence in order to build Lead Plaintiffs' case, given that much of the relevant information was in the hands of Defendants and, therefore, inaccessible to Lead Plaintiffs prior to filing their amended complaints.

## II.   The Amended Complaints and the Motions to Dismiss

17.     Co-Lead Counsel, support staff, and experienced investigators expended considerable time and effort in conducting the investigation described above, which resulted in the First Amended Complaint filed on May 20, 2019. ECF No. 85 ("FAC").

18.     On June 13, 2019, the GreenSky Defendants and the Underwriter Defendants each filed motions to dismiss the FAC. ECF Nos. 89, 92. In response to these motions to dismiss, and consistent with the Court's prior scheduling order, Lead Plaintiffs filed a Second Amended Complaint on June 26, 2019. ECF No. 96 ("SAC").

19.     On July 3, 3029, the GreenSky Defendants and the Underwriter Defendants each filed motions to dismiss the SAC. ECF Nos. 99, 101. Defendants argued in their respective motions to dismiss that Lead Plaintiffs failed to allege that GreenSky had a duty to disclose the allegedly omitted information, that GreenSky adequately disclosed that information, and that the alleged affirmative misrepresentations were puffery, opinion, or accurate statements of historical performance. In addition, the Underwriter Defendants argued that Lead Plaintiffs' Section 12(a)(2) claims failed because Lead Plaintiffs had not pled facts demonstrating that they had standing by alleging that they bought shares in the GreenSky IPO. Collectively, Defendants filed 48 pages of briefing in support of their motions (ECF Nos. 100, 102, 109, 111), along with 626 pages of supporting exhibits (ECF No. 103).

20.     In response to both motions to dismiss, Lead Plaintiffs filed an omnibus opposition memorandum, arguing that Defendants omitted material information from the Offering Documents, that Defendants had an additional affirmative duty to disclose the omitted facts under Items 303 and 503 of SEC Regulation S-K, that Defendants made actionable affirmative and material misstatements, and that Lead Plaintiffs had standing to assert their Section 12(a)(2) claims.

21.     This Court heard oral argument on the motions to dismiss on November 25, 2019. During the hearing, the Court asked the parties detailed questions about the SAC and the various legal issues raised by Defendants' motions to dismiss. In an oral ruling, the Court denied the motions to dismiss, with the exception of ruling that CPERS (along with El Paso, whose Section 12(a)(2) claim had been withdrawn) could not bring a claim under Section 12(a)(2) of the Securities Act.

22.     After the Court denied the motions to dismiss, on January 13, 2020, Defendants answered the SAC, denying all allegations of wrongdoing or liability, and also asserting various defenses. ECF Nos. 119-20.

23.     On January 23, 2020, Co-Lead Counsel and Defendants' Counsel appeared for a case management conference to discuss the status of the case. During that status conference, the Court directed the parties to submit a proposed scheduling order for initial non-expert discovery and Lead Plaintiffs' motion for class certification. ECF No. 128. Co-Lead Counsel and Defendants' Counsel met and conferred and agreed on a proposed scheduling order, which the Court entered on January 27, 2020 (the "Scheduling Order"). ECF No. 126. Under the Scheduling Order, the Court required the parties to exchange their initial disclosures under Rule 26(a)(1) by February 6, Lead Plaintiffs to move for class certification by February 21, and Lead Plaintiffs to substantially complete document production with respect to class certification by February 28. ECF No. 126. The Court also set the next status conference for March.

24.     On February 6, 2020, the parties exchanged their Rule 26(a) disclosures.

25.     On February 21, 2020, Lead Plaintiffs moved for class certification, filing a memorandum that detailed how the putative class met all the prerequisites of Rules 23(a) and 23(b)(3). ECF Nos. 130-32.

26.     On May 26, 2020, Co-Lead Counsel and Defendants' Counsel participated in a telephonic status conference at which Defendants informed the Court that they would not oppose class certification. Two days later, the Court entered an Order Regulating Proceedings, directing the parties to file, by June 1, a proposed class certification order, defining the Class; a proposed methodology for notifying potential members of the Class; and a timeline for the distribution of notice of pendency of the Action to Class Members, for the filing of requests for exclusion from

the Class, and for all other aspects of class certification procedures. ECF No. 142. The Court also ordered that all written discovery would be completed by August 31, setting a status conference for September 16 to discuss depositions. *Id.*

27.     On June 1, 2020, the Court then granted Lead Plaintiffs' motion for class certification, defining the Class as follows:

> All persons and entities who purchased GreenSky Class A common stock pursuant and/or traceable to the Registration Statement and Prospectus (the "Offering Documents") issued in connection with Defendant GreenSky, Inc.'s May 25, 2018 initial public offering and were damaged thereby. Excluded from the Class are Defendants; the officers and directors of the Company; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest, provided, however, that any "Investment Vehicle" shall not be excluded from the Class. Investment Vehicle means any investment company or pooled investment fund, including but not limited to, mutual fund families, exchange traded funds, fund of funds, and hedge funds, in which any of the Underwriter Defendants have, has, or may have a direct or indirect interest, or as to which its affiliates may act as an investment advisor, but in which any of the Underwriter Defendants alone or together with its respective affiliates is not a majority owner or does not hold a majority beneficial interest.

ECF No. 144.

## III. Lead Plaintiffs Conducted Substantial Fact Discovery

28.     Following the Court's order certifying the Class, the parties then engaged in extensive fact discovery which included the production of over 4.4 million pages of documents by Defendants. The documents sought and obtained from GreenSky focused on, among other things, the Company's decision to exit the solar industry, the effects of that decision on GreenSky's revenue, the Company's decision to conduct an IPO, and the Company's decision to allegedly omit information about those effects in the Offering Documents. The documents sought and obtained from the Underwriter Defendants focused on, among other things, the due diligence that the Underwriter Defendants conducted in connection with the IPO.

29.     During the review of Defendants' documents and privilege logs, Co-Lead Counsel identified certain potentially important documents that were withheld or redacted by Defendants on the basis of privilege. Co-Lead Counsel and Defendants' counsel then held extensive meet and confer sessions, in which Co-Lead Counsel challenged many of Defendants' privilege claims. In particular, Defendants withheld or redacted certain communications that involved non-parties, including FT Partners, an investment banking firm that provided GreenSky consulting services in connection with its IPO. Co-Lead Counsel researched the law with respect to the propriety of Defendants' privilege claims as to such documents, taking the position that the privilege assertions were improper. During continued negotiations regarding Defendants' privilege claims, Co-Lead Counsel raised legal authority supporting their position that the privilege claims were improper, and Defendants agreed to produce certain of the documents.

30.     Co-Lead Counsel also conducted third-party discovery. On July 29, 2020, Lead Plaintiffs served a subpoena on GreenSky's auditor, PwC, and engaged in numerous meet and confer discussions with PwC's counsel to negotiate the scope of PwC's production in response to the subpoena.

31.     During the period when Co-Lead Counsel was pursuing third-party discovery, the COVID-19 pandemic had led many businesses to close their offices. As a result, Co-Lead Counsel could not use traditional process to serve subpoenas on certain non-parties and had to explore alternate methods of service. For example, on November 20, 2020, Co-Lead Counsel served a subpoena on FT Partners by serving their registered agent, the Secretary of State for the State of New York. But FT Partners failed to respond to the subpoena. Following Co-Lead Counsel's review of previously withheld documents concerning FT Partners, Co-Lead Counsel began preparations to move to compel FT Partners to comply with the subpoena. After Co-Lead Counsel

informed Defendants' Counsel that Lead Plaintiffs intended to seek to compel FT Partners' compliance with the subpoena, counsel for FT Partners contacted Co-Lead Counsel, stating that FT Partners would accept service of the subpoena. Co-Lead Counsel then engaged in meet and confer discussions with counsel for FT Partners to negotiate the scope of FT Partners' production in response to the subpoena. Those negotiations were interrupted when the parties reached an agreement in principle to settle this Action.

32.     Contemporaneously with various productions of documents by Defendants and non-parties, Co-Lead Counsel undertook a review of the more than 5.3 million pages of documents using a process involving direct review and confirmatory review. Co-Lead Counsel conducted an extremely thorough review of the documents. Indeed, a substantial effort was required to review and organize the millions of pages of documents produced throughout discovery.

33.     Co-Lead Counsel's review process was both rigorous and expedited. Not only was Co-Lead Counsel focused on obtaining, reviewing, and synthesizing information in order to prepare for a September 10, 2020 mediation, but the process was also designed to meet the discovery schedule which ordered that the parties "propose a plan for depositions, identifying potential witnesses to depose, prior to" a status conference on September 16, 2020. *See supra* ¶ 26. Co-Lead Counsel faced a daunting task, given the sheer volume and complexity of the materials that needed to be reviewed both for the mediation and for discovery purposes. Thorough review and analysis of the documents was a significant factor with respect to Lead Plaintiffs' preparation for and presentation at the mediation. As evidence of the importance and value of this process, Lead Plaintiffs' mediation statement included over 30 exhibits in support of their claims, most of which were gleaned from the multi-million pages of materials obtained.

34.     In March 2021, the parties began depositions. Defendants' Counsel deposed representatives of each of the three Lead Plaintiffs. At the same time, Co-Lead Counsel began extensive preparations to depose nine witnesses, including key employees of the Underwriter Defendants and GreenSky's senior executives. Co-Lead Counsel deposed three of those witnesses prior to agreeing to settle the Action, including employees of Goldman Sachs and JP Morgan who led the underwriting team for the GreenSky IPO. Co-Lead Counsel's depositions of those witnesses yielded significant testimony and admissions.

**IV.  The Settling Parties Engaged in a Thorough and Lengthy Mediation Process**

35.     During the course of the Action, the parties engaged a neutral third-party mediator, Robert A. Meyer, Esq. of JAMS, and held settlement discussions. Co-Lead Counsel met with the mediator and Defendants' counsel via videoconference and teleconference on multiple occasions over the course of more than six months. In advance of mediation, the Settling Parties exchanged extensive written submissions setting forth their positions with respect to liability, damages, and other issues that impacted the risks and potential outcome of the Action.

36.     During the initial, full-day mediation session on September 10, 2020, Co-Lead Counsel had multiple conversations with Mr. Meyer with respect to a potential settlement. These discussions continued throughout the day. But that initial mediation ended without a successful resolution.

37.     The parties scheduled a second mediation session for October 8, 2020, and exchanged further written submissions, in advance of that date, regarding their positions on the issues in the case. This second mediation, too, ended without a successful resolution.

38.     Throughout fact discovery, the Settling Parties continued to engage in discussions under the auspices of Mr. Meyer. On March 22, 2021, Mr. Meyer advised the Settling Parties that he was prepared to provide a proposal for settlement. Subsequently, on April 6, 2021, Mr. Meyer

advised the Settling Parties that his proposal had been accepted. The Settling Parties informed the Court of the proposed Settlement by letter dated April 7, 2021. ECF No. 176. Following the acceptance of Mr. Meyer's proposal, the Settling Parties exchanged multiple drafts of the necessary settlement papers, including the MOU, the Stipulation, and long- and short-form Notices.

39.     On May 24, 2021, the Settling Parties executed the Settlement, and Lead Plaintiffs filed a motion for preliminary approval of the Settlement and supporting documents. ECF Nos. 178-80. On June 11, 2021, the Court conducted a hearing to consider the merits of preliminary approval of the Settlement. The Court raised several questions with respect to the Settlement and the Notices. That same day, the Court issued an Order granting preliminary approval of the Settlement and setting a hearing date for consideration of final approval on October 19, 2021. ECF No. 187.

## THE SETTLEMENT

40.     On or by July 16, 2021, Defendants caused $27,500,000 in cash to be paid into the Escrow Account for the benefit of the Class in accordance with the terms of the Settlement. The Settlement Amount (plus accruing interest) provides the Class an immediate and substantial benefit and eliminates the significant risks of continued litigation under circumstances where a favorable outcome could not be assured. Co-Lead Counsel and Lead Plaintiffs believe that the Settlement is fair, reasonable, and an excellent result for Class Members considering the risk of an adverse judgment and recovering nothing or less after substantial delay.

## I.   Reasons for the Settlement

41.     Based on knowledge of the facts developed during investigation and litigation of this Action, as well as a recognition of the substantial risks that continued litigation posed, Co-Lead Counsel and Lead Plaintiffs determined that the Settlement was in the best interests of the Class and thus fully endorse the Settlement. Both Lead Plaintiffs and Co-Lead Counsel have significant

experience to make such an assessment. Lead Plaintiffs are sophisticated institutional investors that have actively overseen the prosecution of this Action and other securities fraud class actions, while Co-Lead Counsel comprise two national law firms that specialize in complex securities litigation and are highly experienced in this type of litigation. *See* Ex. E, Cohen Milstein firm resume; Ex. F, Scott + Scott firm resume.

42.     The factual issues raised in this Action were complex, and the Settling Parties engaged in meaningful, extensive discovery before beginning the mediation process, including the production, and Co-Lead Counsel's review, of more than 4.4 million pages of documents produced by Defendants and of nearly 1 million pages of documents produced by non-parties (including GreenSky's independent auditor, PwC). Moreover, Co-Lead Counsel was well positioned to analyze these documents because of its investigation prior to the filing of Lead Plaintiffs' amended complaints. Co-Lead Counsel also consulted non-testifying experts who assisted Co-Lead Counsel in evaluating damages and loss causation issues. That the Settlement followed this informal and formal discovery demonstrates that the Settling Parties—and Lead Plaintiffs and Co-Lead Counsel in particular—had extensive information to properly evaluate the strengths and weaknesses of the claims and defenses asserted in the Action, as well as the potential additional cost and duration of the litigation if the Action did not settle.

43.     Given such discovery and factual analysis, Lead Plaintiffs and Co-Lead Counsel had an informed view of the factual strengths and weaknesses of the Action. Lead Plaintiffs and Co-Lead Counsel believed, for example, that although there was evidence demonstrating materiality and a duty to disclose (a conclusion that GreenSky vehemently disputed), it would be more difficult to assemble evidence establishing materiality and Defendants' duty to disclose at trial. The ability to ultimately prove materiality and a duty to disclose was a significant risk that supported

settlement. In addition, although Co-Lead Counsel had obtained significant documentary and testimonial evidence showing that the Underwriter Defendants had not conducted adequate due diligence—an affirmative defense for underwriters facing Section 11 claims—establishing that the Underwriter Defendants had not performed adequate due diligence at summary judgment and trial was a significant hurdle.

44.     In addition, Co-Lead Counsel and Lead Plaintiffs also assessed the risks that they would face in pursuing further litigation were a reasonable settlement not reached as part of mediation. The procedural risks that remained were numerous. There remained several stages of litigation, including summary judgment, pre-trial motions, and trial. Moreover, the Settling Parties retained consulting experts to calculate the estimated damages in this Action and had arrived at starkly different amounts. Defendants argued that damages calculated by their expert were merely a fraction of the damages Lead Plaintiffs' expert had calculated. Thus, even were Lead Plaintiffs successful in sufficiently alleging and then demonstrating damages and loss causation[3] at summary judgment and trial despite the numerous factual and procedural hurdles, the damages awarded could have been reduced by various factual findings in Defendants' favor throughout litigation and at trial. By any measure, the $27,500,000 proposed Settlement represents a very good recovery for the Class.

45.     Co-Lead Counsel retained a well-regarded and experienced expert to conduct an analysis of damages suffered by the Class. According to that expert's analysis, the Settlement represents nearly 14% of a realistic estimate of Lead Plaintiffs' recoverable damages of $201.3 million, discounted for certain potential defenses (in particular negative loss causation).

---

[3] Although loss causation is not an element of Lead Plaintiffs' Securities Act claims, so-called "negative causation," or lack of loss causation, is an affirmative defense. 15 U.S.C. § 77k(e).

Settlements in this range of recovery (and indeed, well below this range) have routinely received approval by courts as representing recoveries that are fair, reasonable, and adequate. The proposed Settlement is also well within the range of reasonableness given "all the attendant risks of litigation," because it will allow the Class to recover a significant portion of their damages now rather than a possible recovery after years of uncertain litigation and a far-from-guaranteed jury verdict. Indeed, even if Lead Plaintiffs were to obtain a favorable jury verdict that would survive the inevitable round of appeals, there could be insufficient Company assets or insurance policy proceeds to satisfy a substantial judgment – or fund a settlement of greater or even equal size to the proposed Settlement – years down the road.

## II. The Plan of Allocation Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure

46.     The proposed Plan of Allocation was prepared with the assistance of Lead Plaintiffs' consultant, Jeremy Marmer, PhD, CFA, of Global Economics Group, described *supra* ¶ 7, who has significant experience in drafting plans of allocation. The Plan of Allocation provides a fair and rational basis for Class Members to recover their *pro rata* share of the Net Settlement Fund for all shares of GreenSky Class A common stock purchased pursuant and/or traceable to the IPO according to the formula set forth in the Notice. *See* ECF No. 180-2 ¶¶ 24-38.

47.     The Plan of Allocation provides a reasonable, rational basis for Class Members to recover their *pro rata* share of the Net Settlement Fund based upon the dates of their GreenSky Class A common stock transactions. In particular, the Plan of Allocation allocates losses to all purchases through the date of suit pursuant or traceable to the IPO as follows:

(a)     if sold before the opening of trading on November 12, 2018, the Recognized Loss for each such share shall be the purchase price (not to exceed the issue price at the offering of $23.00) minus the sale price;

(b)     if sold after the opening of trading on November 12, 2018, through the close of trading on August 5, 2019, the Recognized Loss for each such share shall be the purchase price (not to exceed the issue price at the offering of $23.00) minus the sale price (not to be less than $9.92, the closing share price on November 12, 2018); or

(c)     if retained through the close of trading on August 5, 2019, the Recognized Loss for each such share shall be the purchase price (not to exceed the issue price at the offering of $23.00) minus $9.92, the closing share price on November 12, 2018.

48.     The proposed Plan of Allocation is also fair and reasonable because, for Class Members who purchased or acquired shares of GreenSky Class A common stock pursuant or traceable to the IPO, the Plan of Allocation calculates damages based on the methodology set forth in the Securities Act. *See* 15 U.S.C. § 77k(e) (limiting damages to the difference between the purchase price paid per share and either the value of the shares at the time the suit was brought, the price at which the shares were sold in the market before suit, or the price at which the shares were sold after suit but before judgment if less than the difference between the purchase price and value of the shares at the time of suit).

## III. Notice to the Class Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure

49.     As required by the Court's Preliminary Approval Order, the Claims Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), a highly-experienced class action claims administrator, notified potential Class Members of the Settlement by mailing a copy of the Notice to potential Class Members by the deadline of July 2, 2021. *See* Ex. G, Declaration of Alexander Villanova ("Epiq Decl.").

50.     As of today, Epiq has disseminated 14,318 copies of the Notice and Proof of Claim Form to potential Class Members and their nominees. *Id.*, ¶ 10.

51.     In addition, a Summary Notice was published once in the *Investor's Business Daily* on July 12, 2021, and disseminated on *PR Newswire* the same day. *See id.*, ¶ 11. Information regarding the Settlement, including downloadable copies of the Notice and Proof of Claim Form, was also posted on the website established by the Claims Administrator specifically for this Settlement and referenced in the Notice, www.GreenSkySecuritiesLitigation.com, *id.*, ¶¶ 14-15, and Co-Lead Counsel posted a link on Cohen Milstein's website, www.cohenmilstein.com, connecting it to the Claims Administrator's website designated for the Settlement. This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

52.     The Notice advises Class Members of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time and place of the Final Approval Hearing. The Notice also contains information regarding Co-Lead Counsel's fee application and the Plan of Allocation.

53.     As explained in the accompanying Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of the Proposed Settlement and Approval of the Plan of Allocation, the Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances and complies with the Court's June 11, 2021 Preliminary Approval Order (ECF No. 187), Federal Rule of Civil Procedure 23, and due process.

**THE APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

54.     In addition to seeking final approval of the Settlement and Plan of Allocation, Co-Lead Counsel is also applying to the Court for an award of attorneys' fees, reimbursement of Litigation Expenses, and reimbursement of Lead Plaintiffs' costs and expenses pursuant to 15 U.S.C. § 77z-

1(a)(4). Specifically, Co-Lead Counsel is applying for a fee of 25% of the Settlement Fund, *i.e.*, $6,875,000, plus interest at the same rate as that earned on the Settlement Fund; reimbursement of $200,786.46 in Co-Lead Counsel's Litigation Expenses; and reimbursement of $16,092.70 for Lead Plaintiffs' costs and expenses (including lost wages) pursuant to 15 U.S.C. § 77z-1(a)(4).

## I.   Application for Attorneys' Fees

### A.   The Time and Labor Expended by Co-Lead Counsel

55.     We and other experienced attorneys and professionals, whose work we supervised, devoted substantial time to litigating this Action. Listed here at ¶¶ 55 and 72 are schedules that summarize Co-Lead Counsel's lodestar, as well as the expenses incurred by category (the "Fee Schedules" and "Expense Schedules," respectively). The Fee Schedules indicate the amount of time spent by each attorney and other professional employed by Co-Lead Counsel, and the lodestar calculations based on their current billing rates. The Fee Schedules were prepared from contemporaneous daily time records regularly prepared and maintained by our firms. For attorneys or other professionals who are no longer employed by Co-Lead Counsel, the lodestar calculations are based upon the billing rates for such persons in their final year of employment.

**Cohen Milstein Sellers & Toll PLLC Lodestar, Inception through August 31, 2021**

| | | Hours | Current Rate | Lodestar |
|---|---|---|---|---|
| **Partners** | | | | |
| Bunch, | S. Douglas | 906.75 | $740 | $670,995.00 |
| Dominguez, | M. John | 62.00 | $890 | $55,180.00 |
| Toll, | Steven J. | 406.50 | $1,125 | $457,312.50 |
| **Total Partner Lodestar** | | **1375.25** | | **$1,183,487.50** |
| | | | | |
| **Of Counsel** | | | | |
| Maser, | David | 16.50 | $675 | $11,137.50 |
| **Total Of Counsel Lodestar** | | **16.50** | | **$11,137.50** |
| | | | | |
| **Associates** | | | | |
| Buttrick, | Alice | 187.00 | $495 | $92,565.00 |
| Dreschel, | Allen | 46.00 | $495 | $22,770.00 |
| Kim, | Jessica | 636.25 | $585 | $372,206.25 |
| Messerschmidt, | Jan | 401.00 | $585 | $234,585.00 |
| **Total Associate Lodestar** | | **1270.25** | | **$722,126.25** |
| | | | | |
| **Staff Attorneys** | | | | |
| Dumas, | Robert | 790.75 | $575 | $454,681.25 |
| Mehta, | Kalpish | 120.25 | $455 | $54,713.75 |
| Sulaiman, | Nada | 247.25 | $470 | $116,207.50 |
| Wallace, | Lyzette | 275.25 | $455 | $125,238.75 |
| Williams, | Kamilah R. | 395.50 | $525 | $207,637.50 |
| **Total Staff Attorney Lodestar** | | **1829.00** | | **$958,478.75** |
| | | | | |
| **Paralegals** | | | | |
| Bleiweis, | Robin | 7.00 | $290 | $2,030.00 |
| Burner, | Richard | 9.25 | $300 | $2,775.00 |
| Hainbach, | Samuel | 6.50 | $300 | $1,950.00 |
| Kluger, | Joshua | 178.50 | $325 | $58,012.50 |
| Mullins, | Marie | 7.50 | $310 | $2,325.00 |
| Sebastian, | Monica | 29.50 | $325 | $9,587.50 |
| Taylor, | Aaron | 44.75 | $300 | $13,425.00 |
| **Total Paralegal Lodestar** | | **283.00** | | **$90,105.00** |
| | | | | |
| **Investigators** | | | | |
| Blasse, | Emilio | 295.00 | $525 | $154,875.00 |
| **Total Investigator Lodestar** | | **295.00** | | **$154,875.00** |
| | | | | |
| **Securities Analyst** | | | | |
| Greenwood, | Susan | 15.50 | $700 | $10,850.00 |
| **Total Securities Analyst Lodestar** | | **15.50** | | **$10,850.00** |
| | | | | |
| **Total Lodestar** | | **5084.50** | | **$3,131,060.00** |

**Scott + Scott Attorneys at Law LLP Lodestar, Inception through August 31, 2021**

| | | Hours | Current Rate | Lodestar |
|---|---|---|---|---|
| **Partners** | | | | |
| Broggi, | Donald | 76.20 | $1,095 | $83,439.00 |
| Burnett, | Michael | 72.30 | $1,095 | $79,168.50 |
| Laughlin, | Thomas | 53.10 | $995 | $52,834.50 |
| Schwartz, | Max | 504.30 | $995 | $501,778.50 |
| Scott, | David | 20.10 | $1,295 | $26,029.50 |
| **Total Partner Lodestar** | | **726.00** | | **$743,250.00** |
| | | | | |
| **Associates** | | | | |
| Cunningham, | Hal | 7.80 | $750 | $5,850.00 |
| Jacobson, | Jeffrey | 77.40 | $550 | $42,570.00 |
| McCabe, | Lauren | 456.70 | $725 | $331,107.50 |
| Swartz, | Rhiana | 24.40 | $750 | $18,300.00 |
| **Total Associate Lodestar** | | **566.30** | | **$397,827.50** |
| | | | | |
| **Staff Attorneys** | | | | |
| Cunningham, | Nga | 245.50 | $650 | $159,575.00 |
| Porter, | Melanie | 429.50 | $625 | $268,437.50 |
| **Total Staff Attorney Lodestar** | | **675.00** | | **$428,012.50** |
| | | | | |
| **Paralegals** | | | | |
| Hogan, | Kelly | 15.00 | $395 | $5,925.00 |
| Steinberger, | Kaitlin | 8.30 | $395 | $3,278.50 |
| **Total Paralegal Lodestar** | | **23.30** | | **$9,203.50** |
| | | | | |
| **Production Support** | | | | |
| Torres, | Charlie | 8.40 | $395 | $3,318.00 |
| **Total Production Support Lodestar** | | **8.40** | | **$3,318.00** |
| | | | | |
| **Research Assistant** | | | | |
| Gatzke, | Dylan | 9.60 | $395 | $3,792.00 |
| **Total Research Assistant Lodestar** | | **9.60** | | **$3,792.00** |
| | | | | |
| **Total Lodestar** | | **2008.60** | | **$1,585,403.50** |

56.     Co-Lead Counsel took this Action on a contingency basis, fully committed our firms'
resources, and then aggressively litigated it over the course of two years without any compensation
or guarantee of success.

**B. The Magnitude and Complexity of the Action**

57.     The claims in this Action presented multiple complex issues. Prosecuting this Action required obtaining and analyzing a large body of evidence. As detailed above, the pre-filing investigation undertaken without subpoena power was a daunting and difficult undertaking. The complexity was no less significant during the formal discovery stage. As detailed throughout, the vast volume of documents produced in this Action added to its complexity especially given the relatively short period of time within which we needed to review, analyze and synthesize millions of pages of materials. Moreover, the issues of materiality, falsity, loss causation, and damages were, and would continue to be, complex and contentious issues in this Action as is evidenced by the vast differences between the positions taken by the Settling Parties and their respective experts. These issues required consultation with loss causation and damages experts.

58.     The magnitude and complexity of the legal issues is evidenced by the extensive filings already in the record. Defendants filed lengthy, multi-issue motions to dismiss the SAC. Lead Plaintiffs were required to address and refute each of the arguments relating to falsity, materiality, and standing. Co-Lead Counsel undertook to create a compelling record in the face of all of these complexities, with a goal of proving Defendants' liability—not a light burden.

**C. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases**

59.     As noted above, the Action was undertaken on a wholly contingent basis. From the outset, we understood that this Action would be a complex and expensive litigation with no guarantee of compensation for the investment of time, money, and effort that the Action would require.

60.     In undertaking the responsibility of prosecuting the Action, Co-Lead Counsel ensured that sufficient attorney resources were dedicated to the investigation of the claims against

Defendants and that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation. As set forth below, Co-Lead Counsel received no compensation and, in total, incurred $200,786.46 in expenses in prosecuting this Action for the benefit of the Class.

61.     Co-Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein, this Action presented a number of risks and uncertainties which could have prevented any recovery whatsoever. Despite the vigorous and competent efforts of Co-Lead Counsel, success in contingent-fee litigation, such as this, is never assured.

### D. Standing and Expertise of Co-Lead Counsel, and Standing and Caliber of Opposing Counsel

62.     The expertise and experience of counsel are other important factors in setting a fair fee. As demonstrated by Co-Lead Counsel's firm resumes, the attorneys at Cohen Milstein and Scott + Scott are experienced and skilled class action securities litigators and have a successful track record in securities cases throughout the country—including within this Circuit. *See* Ex. E (Cohen Milstein firm resume); Ex. F (Scott + Scott firm resume).

63.     The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Co-Lead Counsel was opposed in this Action by very skilled counsel. The GreenSky Defendants and the Underwriter Defendants were represented by highly respected firms, each of which has significant experience in defending complex litigation in general and securities litigation in particular: Cravath, Swaine & Moore LLP, Susman Godfrey LLP, and Willkie Farr & Gallagher LLP.

### E. Lead Plaintiffs' Approval and the Reaction of the Class to Date

64.     As set forth in their declarations, Lead Plaintiffs have been directly involved at each stage of litigation by reviewing pleadings and briefs in the Action, as well as reviewing and

deciding issues that came up during mediation and subsequent settlement negotiations. *See* Northeast Carpenters Decl. ¶ 6; El Paso Decl. ¶ 6; CPERS Decl. ¶ 6.

65.     Also, as set forth in the Epiq Declaration, 14,318 Notices have been disseminated to potential Class Members and their nominees. Epiq Decl. ¶ 10. In addition, the Summary Notice was published in the *Investor's Business Daily* and disseminated on *PR Newswire*. *See id*., ¶ 11. Both the Notice and Summary Notice were published on a dedicated settlement website, www.GreenSkySecuritiesLitigation.com, to which Cohen Milstein's website is also linked. The Notice explains the Settlement and Co-Lead Counsel's anticipated fee request. The deadline to object to Co-Lead Counsel's fee request is September 28, 2021. To date, no Class Member has objected.

66.     Likewise, the Notice informed Class Members that the deadline to request exclusion from the Class is September 28, 2021. To date, only four unique requests for exclusion have been received by the Claims Administrator. Epiq Decl. ¶ 17. The overwhelming approval of the Class to date further supports Co-Lead Counsel's request.

### F.  The Requested Fee of 25% in Relation to the Settlement

67.     Co-Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As set forth in the accompanying Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Reimbursement of Lead Plaintiffs' Costs and Expenses ("Fee Memorandum"), the percentage method is an appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, and has been recognized as appropriate by the U.S. Supreme Court for cases of this nature. Moreover, as further described in the Fee Memorandum, various district courts in the Second

Circuit have granted an award of fees at or above the percentage that Co-Lead Counsel requests herein.

68.     Based on the result achieved for the Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Co-Lead Counsel submits that a 25% fee award is justified and should be approved. Lead Plaintiffs, who are sophisticated institutional investors, approve of Co-Lead Counsel's fee request. *See* Northeast Carpenters Decl. ¶ 10; El Paso Decl. ¶ 10; CPERS Decl. ¶ 10.

69.     As discussed in the Fee Memorandum, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, and is within the range of the percentages awarded in securities class actions in this Circuit.

70.     As described in Co-Lead Counsel's Fee Memorandum, the requested fee is fair and reasonable under both the percentage approach and a lodestar analysis.

### G. Application for Reimbursement of Expenses

71.     Co-Lead Counsel also seeks reimbursement of Litigation Expenses reasonably incurred by Co-Lead Counsel in connection with commencing and prosecuting the claims against Defendants over the course of two years. The Notice apprised potential Class Members that Co-Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $250,000. *See* Epiq Decl. Ex. A ¶ 6. The amount of the reimbursement actually requested is less than what was stated in the Notice and, to date, no objection has been raised to Co-Lead Counsel's request for reimbursement of Litigation Expenses.

72.     As set forth in the Expense Schedules below, Co-Lead Counsel has incurred a total of $200,786.46 in unreimbursed Litigation Expenses through the date of the accompanying motion, in connection with the prosecution of this Action. These expenses were all reasonably and necessarily incurred in connection with the prosecution of this Action on behalf of the Class and

are reflected on the books and records maintained by Co-Lead Counsel. These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

**Cohen Milstein Sellers & Toll PLLC Expenses**

| Expense Type | Cost |
|---|---|
| Photocopying | $2.00 |
| Telephone/fax | $453.14 |
| Courier | $15.95 |
| FedEx delivery | $1,168.24 |
| Court/filing fees | $1,761.72 |
| Process server fees | $2,347.00 |
| Court transcripts | $174.58 |
| Deposition transcripts/videography | $20,160.95 |
| LEXIS/Westlaw/PACER/online research | $5,276.39 |
| Document management/litigation support | $98,985.69 |
| Travel | $3,068.95 |
| Damages experts/consultants | $48,528.75 |
| Mediation | $15,602.74 |
| Overtime meals | $25.00 |
| **Total Litigation Expenses** | **$197,571.10** |

**Scott + Scott Attorneys at Law LLP Expenses**

| Expense Type | Cost |
|---|---|
| Photocopying | $192.25 |
| Telephone/fax | $111.90 |
| Court transcripts | $1,095.90 |
| LEXIS/Westlaw/PACER/online research | $1,565.31 |
| Document management/litigation support | $250.00 |
| **Total Litigation Expenses** | **$3,215.36** |

73.     From the beginning of the Action, Co-Lead Counsel were aware that we might not recover any of our expenses, and would not recover anything until the Action was partially or fully resolved. Co-Lead Counsel also understood that, even assuming that the Action was ultimately successful, reimbursement of expenses would not compensate us for the lost use of the funds

advanced to prosecute the Action. Thus, Co-Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

74.     The Litigation Expenses for which Co-Lead Counsel seek reimbursement were largely incurred for professional fees, including the costs of experts, consultants, and document management. Lead Plaintiffs' experts on damages provided substantial assistance to Co-Lead Counsel in the prosecution and resolution of this Action. This included assisting Co-Lead Counsel in connection with mediation, damages models, the Plan of Allocation, and the Settlement.

75.     The other expenses for which Co-Lead Counsel seek reimbursement are also the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, long distance telephone and facsimile charges, courier and delivery expenses, computerized research, overtime expenses, filing fees, and photocopying.

76.     All of the Litigation Expenses incurred, which total $200,786.46, were necessary to the successful prosecution and resolution of the claims against Defendants. In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, we respectfully submit that the Litigation Expenses incurred by Co-Lead Counsel should be reimbursed in full.

## II.   Application for Reimbursement of Lead Plaintiffs' Expenses

77.     Included in Co-Lead Counsel's request for reimbursement of Litigation Expenses is a request for reimbursement of Lead Plaintiffs' reasonable costs and expenses (including lost wages) pursuant to 15 U.S.C. § 77z-1(a)(4), in recognition of Lead Plaintiffs' contribution to the prosecution and successful resolution of this securities class action. In particular, Northeast Carpenters requests $4,103.20 (Northeast Carpenters Decl. ¶ 13); El Paso requests $1,891.76 (El

Paso Decl. ¶ 13); and CPERS requests $10,097.74 (CPERS Decl. ¶ 13), for a total of $16,092.70. These costs were reasonably incurred by the staff of Lead Plaintiffs and were directly related to the representation of the Class, including, but not limited to: (i) regularly communicating with Co-Lead Counsel regarding the posture and progress of the Action; (ii) reviewing and/or discussing all significant pleadings and motions filed in the Action; (iii) giving extensive deposition testimony; (iv) searching for, reviewing, and producing documents requested by Defendants; (v) reviewing and/or discussing significant decisions in the Action, including the decisions to mediate and settle the case; and (vi) actively participating in the mediation that led to the Settlement. *See* Northeast Carpenters Decl. ¶ 6; El Paso Decl. ¶ 6; CPERS Decl. ¶ 6. Accordingly, we respectfully submit that the costs and expenses reasonably incurred by Lead Plaintiffs should be reimbursed in full. To date, moreover, no Class Member has objected to Lead Plaintiffs' request for reimbursement.

We declare, under penalty of perjury, that the foregoing facts are true and correct.

Dated: September 14, 2021             \_\_\_\_/s/ Steven J. Toll_____
                                      Steven J. Toll


                                      \_\_\_\_/s/ Max Schwartz_____
                                      Max Schwartz